UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **DOCKET NO. 24-105** |
| | * | |
| **VS** | * | **SECTION: "D"** |
| | * | |
| **VANESSA MOTTA** | * | |
| | * | |

## MEMORANDUM IN SUPPORT OF MOTION TO COMPEL

Ms. Motta submits the following Memorandum in Support of her Motion to Compel seeking an Order compelling the Government: (1) to produce all *Brady* and *Giglio* materials as it discovers such materials, without any specific request from the defense; (2) to obtain and produce all *Brady*, *Giglio*, and Rule 16 material held by all members of the prosecution team; and (3) to produce all FBI 302 memoranda generated from interviews of individuals *similarly situated* to Ms. Motta.

### I.     INTRODUCTION

Despite conferral with the Government, the Government refused to comply with its discovery and *Brady*/*Giglio* obligations. *See* Exhibit 1.[1] The Government takes the position that it is not obligated to produce and that it intends to withhold *Brady* and *Giglio* material contained in witness statements until the Jencks Act deadline. *See id.*; Rec. Doc. 225 (Proposed Scheduling Order). This is contrary to the Government's constitutional obligation under *Brady* that imposes on the Government an affirmative duty to immediately disclose favorable evidence to the defense.

---

[1] This Exhibit includes the Defendant's initial January 7, 2025, discovery letter, March 14, 2025, supplemental discovery letter, and Government's March 17, 2025, response.

Importantly, *Brady* material is defined in reference to Ms. Motta's theory of defense, without regard to what the Government believes would be successful. Ms. Motta has specifically requested the FBI 302 memoranda generated from interviews of *similarly situated* individuals that, like Ms. Motta, were oblivious to the staged accidents. Such FBI 302 memoranda directly support Ms. Motta's affirmative defense that she lacked the requisite criminal intent because she, like similarly situated professionals and the plaintiff personal injury industry at large, was reasonably blind to these plaintiffs' fraudulent scheme. This industry blindness was a result of custom and general practice that is unique to the industry. Courts have routinely found similar evidence of custom and general practice to be supportive of an affirmative defense that the defendant lacked the requisite criminal intent, and thereby relevant to the jury's ultimate evaluation of the case.

Accordingly, those FBI 302 memoranda are *Brady* material that Ms. Motta is entitled to immediate production. There exists no justification for the Government's refusal to produce the materials. If the Government is allowed to continue to withhold and delay production, Ms. Motta will not only be prejudiced in her preparation of her defense but will suffer further financial hardship due to her inability to work as an attorney until she has been cleared of these charges. This case has already been continued to September 2025 over the objection of Ms. Motta who desires to enforce her right to a speedy trial.

Therefore, pursuant to *Brady* and in order to prevent further delay of these proceedings, this Court should order immediate production of the relevant FBI 302 memoranda generated from the interviews of *similarly situated* individuals.

II.  **LAW AND ARGUMENT**

    A.  **The Government is constitutionally obligated to independently search for and turn over all *Brady* material as it discovers it, including in the absence of a specific request**

The Due Process Clause of the Fifth Amendment of the United States Constitution requires that the prosecution disclose all evidence that is favorable to the accused or that could impeach the testimony of any witness. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* and its progeny impose on the Government an affirmative duty to disclose favorable evidence to the defense, even if the defense never specifically requests it. *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995). Simply put, the "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437. The U.S. Attorney's Office's own Discovery Policy does an able job of setting forth is *Brady/Giglio* policy. *See Justice Manual*, DEP'T OF JUSTICE, https://www.justice.gov/jm/title-9-criminal (last visited April 8, 2025).

In considering a pretrial motion seeking the production of *Brady* material, the standard is whether the evidence is favorable to the defense, regardless of whether the Government believes it may impact the outcome of the case:

> [T]he question before the trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable, and therefore must be disclosed . . . . The only question before (and even during) trial is whether the evidence at issue may be "favorable to the accused", if so, it must be disclosed without regard to whether the failure to disclose it would likely affect the outcome of the upcoming trial.

*United States v. Mix*, 2:12-cr-00171-SRD-ESS (E.D. La. Dec. 11, 2012), ECF 155 at 6 (internal quotations omitted) (quoting *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) and ordering pretrial disclosure of *Brady* materials); *see also United States v. George*, No. 17-cr-201, 2019 WL 4982324, at *2 n.17 (E.D. La. Oct. 8, 2019) ("Courts have noted the distinction between

the materiality standard applied to post-conviction appellate review of alleged *Brady* violations and the favorability standard applied to pretrial disclosure obligations."); *United States v. Price*, 566 F.3d 900, 913 n.14 (9th Cir. 2009) (explaining that "[t]he 'materiality' standard usually associated with *Brady* . . . should not be applied to pretrial discovery of exculpatory materials," and that "the proper test for pretrial disclosure of exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense . . . .")).[2]

*Brady* is often said to be a self-executing disclosure obligation. But when the Government is less than forthcoming, courts may exercise their broad discretion to compel pretrial production of *Brady* materials. *See United States v. Runyan*, 290 F.3d 223, 245 (5th Cir. 2002); *accord United States v. Campagnuolo*, 592 F.2d 852, 857 n.2 (5th Cir. 1979) (noting that the trial court acts within

---

[2] The Government is subject to additional rules and guidance that supplement and broadened disclosure obligations. ABA Model Rule of Professional Conduct 3.8 "The prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense . . . ." Rule 3.8(d). The Supreme Court of the United States has recognized that Rule 3.8(d) imposes an even higher standard on prosecutors than the standard mandating disclosure of exculpatory evidence under *Brady*. *See Kyles*, 514 U.S. at 437 (emphasis added) ("[*Brady*] requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of *any* evidence tending to exculpate or mitigate.").

The Department of Justice states that "Prosecutors are also encouraged to provide discovery broader and more comprehensive than the discovery obligations," set forth by Fed. R. Crim. P. 16 and 26.2, the Jencks Act, *Brady*, and *Giglio*. *Justice Manual*, *9-5.002-Criminal Discovery*, DEP'T OF JUSTICE (Dec. 2017), https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.001.
Moreover, for the purposes of *Brady*, "the format of the information does not determine whether it is discoverable." *Id.* "For example, material exculpatory information that the prosecutor receives during a conversation with an agent or a witness is no less discoverable than if that same information were contained in an email." *Id.*; *see also United States v. Rigas*, 779 F. Supp. 2d 408, 415 n.5 (M.D. Pa. 2011) (granting defendants' motion to compel production of *Brady* material noting that the Memorandum for Department Prosecutors promulgated by the Attorney General of the United States, "provides substantial guidance to prosecutors and instructs them to move beyond strict adherence to the basic tenets of *Brady* by engaging in liberal discovery," and refusing to "allow this case to devolve into one that sacrifices the Defendants' due process rights based on an overly restrictive interpretation of the Government's discovery obligations."); *Justice Manual*, *9-5.001-Policy Regarding Disclosure of Exculpatory and Impeachment Information*, DEP'T OF JUSTICE (Jan. 2020) ("Recognizing that it is sometimes difficult to assess the materiality of evidence before trial, prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence."), https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.001.

its "sound discretion" to order pretrial disclosure of *Brady* material and rejecting as "without merit" the prosecution's argument that it did not have to comply with that order).

As the Government identifies *Brady* material—defined by reference to Ms. Motta's theory of the defense, regardless of whether the Government believes that evidence is more inculpatory than exculpatory, or whether it thinks the evidence will carry the day—it is obligated to turn it over. *See, e.g.*, *United States v. Rodriguez*, No. 08 CR 1311 (RPP), 2009 WL 2569116, at *12 (S.D.N.Y. Aug. 19, 2009) ("*Brady* material is to be turned to Defendants as it is discovered by the Government."); *United States v. Richards*, No. 3:08-CR-39-M, 2008 WL 2634367, at *2 (W.D. Ky. July 2, 2008) (ordering the government to "continue to comply with its responsibilities to turn over [*Brady*] evidence as it is discovered."); *United States v. Fontenot*, No. 10-65-JJB, 2010 WL 4056194, at *2 (M.D. La. Oct. 14, 2010) (stating that the government has "a continuing duty to provide any Brady material that it discovers or that comes not its possession."). None of this should be news to the Government, which acknowledged this obligation at Ms. Motta's arraignment.

### B. *Giglio* material is *Brady* material

The Government should be required to promptly produce and identify all *Giglio* material for essentially the same reasons that it must also produce and identify all *Brady* material. *Giglio* material include "evidence important and useful for impeachment purposes." *See Calley v. Callaway*, 519 F.2d 184, 221 (5th Cir. 1975) (citing *Giglio v. United States*, 405 U.S. 150 (1972)). It has long been established that *Brady* materials—evidence known to have exculpatory value to the defense—must be disclosed "upon request" of the accused. *See Brady*, 373 U.S. at 87-88. And *Giglio* itself established that *Giglio* material is *Brady* material. *See Giglio*, 405 U.S. at 154 (internal quotations omitted) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general [*Brady*] rule."); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . .

as well as exculpatory evidence, falls within the *Brady* rule."); *Kyles*, 514 U.S. at 433 ("the [Supreme] Court disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes . . . ."); *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018) (the Government's *Brady* obligation "extends to impeachment evidence as well as exculpatory evidence."). In short, "*Giglio* material, or evidence useful for impeachment purposes, is considered part and parcel of the government's *Brady* disclosure obligation." *United States v. Williams*, No. 20-cr-55 (E.D. La. Nov. 25, 2020), ECF No. 96 at 7.

Because impeachment evidence *is* exculpatory evidence under *Brady*, and can make the difference between conviction and acquittal, see *Bagley*, 473 U.S. at 676, it must be disclosed upon request of the defense. *See, e.g.*, *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) (citing *Brady*, 373 U.S. at 87) ("It is well established that upon a request by a defendant, the Government has a duty to turn over all material exculpatory evidence in its possession, including material impeachment evidence relating to Government witnesses . . . ."). Ms. Motta has made such *Giglio* requests of the Government several times. But the Government has taken the position that if *Brady* material is contained within materials that also constitute *Giglio* or Jencks Act material, it would not produce such material as the Government discovers it. Wrong on *Giglio* for the reasons just discussed, and wrong on Jencks too.

*Giglio* material is distinct from Jencks material. The Jencks Act, 18 U.S.C. § 3500, "requires the government to release to the defendant, after a witness's direct examination, any statement of the witness in the government's possession which relates to the subject matter of the witness's testimony." *United States v. Guerrero*, 768 F.3d 351, 363 (5th Cir. 2014) (internal quotations omitted). Jencks is a statutory backstop. The rule established in *Brady* and *Giglio*, however, is constitutional in origin. And those decisions came after the Jencks Act was enacted.

To be sure, "[t]he decision in *Brady* some six years after the enactment of the Jencks Act inevitably gave rise to the issue of whether the timing of *Brady* or the Jencks Act was controlling." *United States v. Shvarts*, 90 F. Supp. 2d 219, 228 (E.D.N.Y. 2000). But "in seeking to harmonize the Jencks Act and *Brady*, it makes no sense to indulge in a crabbed interpretation of a constitutional right, like *Brady*, and an expansive interpretation of a statutory one like Jencks." *United States v. Snell*, 899 F. Supp. 17, 21 (D. Mass. 1995) (citing *United States v. Poindexter*, 727 F. Supp. 1470 (D.D.C. 1989)). In other words, "[t]he Brady obligations are not modified merely because they happen to arise in the context of witness statements. The government therefore has the obligation to produce to defendant immediately any exculpatory evidence contained in its Jencks materials, including exculpatory impeachment material . . . ." *Poindexter*, 727 F. Supp. at 1485.

Thus, with respect to the timing of disclosure, *Brady* and *Giglio* supersede the more limited protections of the Jencks Act, and require early disclosure for materials that fall within *Brady*—including impeachment materials:

> [T]he congressional rule on the timing of disclosure of prior statements of witnesses codified in the Jencks Act—promulgated some six years before *Brady* was decided—cannot be read to render nugatory the superior constitutional obligation imposed on the Government by *Brady* and its progeny.

*United States v. Lino*, No. 00 CR 632, 2001 WL 8356, at *16 (S.D.N.Y. Jan. 2, 2001); *see also United States v. Avellino*, 129 F. Supp. 2d 214, 218 (E.D.N.Y. 2001) ("[D]ue process requires that the government's *Brady* obligation trumps the statutory time table set forth in 18 U.S.C. § 3500 to the extent a temporal conflict is found to exist."); *United States v. Trie*, 21 F. Supp. 2d 7, 23, 26 (D.D.C. 1998) (internal citations omitted) (explaining that "the existence of a duty to disclose witness statements at trial pursuant to the Jencks Act, 18 U.S.C. § 3500, does not eviscerate the government's *Brady* obligation to disclose witness statements well in advance of trial if those statements also fall under *Brady*," and that "[t]o the extent that witness statements of key

government witness are exculpatory or impeaching, however, they constitute *Brady* material, and the government has an obligation to disclose those statements."); *United States v. Tarantino*, 846 F.2d 1384, 1414 n.11 (D.C. Cir. 1988) ("[U]nder *Brady* . . . the government has additional obligations deriving from the Fifth Amendment to disclose exculpatory material, and the limitations on discovery contained in the Jencks Act do not lessen those obligations."); *United States v. Garcia*, No. CR 15-4275 JB, 2017 U.S. Dist. LEXIS 66498, at *140-41 (D.N.M. May 2, 2017) ("The Jencks Act and the non-disclosure rule are legislative and judicially created rules; they are not protections like, and certainly do not supersede, the Constitution."); *United States v. Benjamin One Deer Hart*, No. 14-cr-379 (ADM/LIB), 2015 U.S. Dist. LEXIS 190618, at *2 n.2 (D. Minn. Feb. 18, 2015) ("[W]hen evidence falls within the auspices of both *Brady* and the Jencks Act, the disclosure requirements of *Brady* supersede those of the Jencks Act.").

While the Fifth Circuit has not conclusively weighed in, it has indicated that, where certain evidence implicates both *Brady* and Jencks, *Brady* controls. *See United States v. Martinez*, 87 F.3d 731, 738-39 (5th Cir. 1996) ("Had Espinoza's report contained material information favorable to any of the defendants, then such information would have to be examined within the analytical framework established pursuant to Brady and its progeny *regardless* of whether or not this potentially exculpatory information constituted a ['statement'] under" the Jencks Act). And this Court previously observed that the Fifth Circuit has not endorsed the Government's approach of, "a bright-line rule that [the] Jencks Act governs the timing of disclosure" for all witness statements. *See Williams*, No. 20-cr-55, ECF No. 96 at 9.

Accordingly, any assertion that *Giglio* disclosures must await the time of the Jencks disclosures is misplaced. Instead, under the constitutional rule articulated by *Brady*, *Giglio* materials must be produced as they are discovered in advance of trial. The direct and inevitable

result of the Government's withholding of *Giglio* material is to hamper the preparation of the defense by denying Ms. Motta time and opportunity she would otherwise have to make use of the information for trial. *See United States v. Crozzoli*, 698 F. Supp. 430, 436 (E.D.N.Y. 1988) ("To permit the prosecution to withhold exculpatory evidence despite a request until such time as the prosecutor chooses to disclose it, is to permit the prosecutor to control, to some extent, the preparation of a defense."). To now permit the Government to withhold *Giglio* material without justification—after it has been requested by the defense—subverts fairness to gamesmanship and is fundamentally at odds with the principles of due process and fair play that underlie *Giglio* and *Brady*.

Nor are any of the typical justifications for delaying production of *Giglio* material present in this case—namely, the concerns that premature disclosure of the material may (1) implicitly disclose the identifies of the witnesses the Government will call at trial and (2) expose the witnesses to possible tampering or danger. *See, e.g.*, *Lino*, 2001 WL 8356, at *16, at *48 (discussing "potential dangers of the manufacturing of defense evidence and witness tampering" in racketeering trial where one of the charges was witness tampering); *United States v. Frank*, 11 F. Supp. 2d 322, 325 (S.D.N.Y. 1998) (discussing risk to witness's safety in capital kidnapping/murder trial). Neither concern has any place in this case. Ms. Motta has no criminal history. This is not a murder prosecution or racketeering case. Ms. Motta is a licensed attorney and is further represented by counsel who will ensure that no witness is pressured improperly. *See, e.g.*, *United States v. Nachamie*, 91 F. Supp. 2d 565, 573 (S.D.N.Y. 2000) ("[T]here is no legitimate concern that disclosing the names of unindicted co-conspirators will endanger those individuals or compromise the Government's investigation," because "this case charges Medicare fraud—not narcotics trafficking or murder . . . ."); *Trie*, 21 F. Supp. 2d at 22 n.14 (whereas the defendant has

been charged in the indictment with witness tampering, the government showed no evidence of danger of witness tampering sufficient to avoid disclosure of identities of witnesses). Also here, the defense already knows the identities of the witnesses at issue, which are listed in footnotes 3, 4, and 5 below. And while Ms. Motta has been accused of witness tampering by allegedly offering to pay Mr. Garrison not to cooperate with the government (which she did not do), that witness is no longer alive and, to the extent the Government has concerns about additional witness safety, it could have raised those concerns at Ms. Motta's detention hearing. It did not because the Government does not have legitimate fear that Ms. Motta will threaten or tamper with witnesses.

    **C.    The Government must turn over all *Brady* material, including FBI 302 memoranda, supporting Ms. Motta's defense**

Ms. Motta has requested that the Government produce all FBI 302 memoranda of interviews of individuals *similarly situated* to her that she intends to present at trial that support her defense to allegations that she was aware of the fraud or should have known of the fraud. Contrary to its *Brady* obligations, the Government has rejected Ms. Motta's request for such exculpatory materials.

Ms. Motta is being charged with conspiracy to commit wire and mail fraud, which requires specific criminal intent. When charged with an intent crime a defendant can introduce evidence of custom and industry practice to demonstrate that the defendant lacked the requisite intent. Additionally, the Government has indicated that it intends to seek a deliberate ignorance jury instruction against Ms. Motta. The Fifth Circuit pattern jury instructions provide:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his [her] eyes to what would otherwise have been obvious to him [her]. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself [herself] to the existence of a fact.

Fifth Circuit Pattern Jury Instruction § 1.43. Accordingly, a defense to the deliberate ignorance jury charge is evidence that these particular fraudulent collisions were not atypical, otherwise suspicious, or likely to generate questions as to their legitimacy—in other words, that there was industry blindness to these fraudulent collisions as evidenced by *similarly situated* professionals being similarly duped. *C.f. United States v. Riley*, 550 F.2d 233, 236-37 (5th Cir. 1977).

Federal courts have consistently found that evidence tending to negate criminal intent is relevant and admissible, and the exclusion of such evidence is reversable error. *See, e.g.*, *United States v. Garvin*, 565 F.2d 519, 520-23 (8th Cir. 1977) (reversing conviction where defendant was prohibited from introducing evidence that would negate intent in mail fraud prosecution); *United States v. Wicoff*, 187 F.2d 886, 889-90 (7th Cir. 1951) (reversing conviction in misapplication of funds prosecution where trial court improperly excluded evidence that would reflect defendant's lack of criminal intent). In fact, the Fifth Circuit has held that evidence showing custom and general practice can be offered to negate the requisite criminal intent. *See United States v. Riley*, 550 F.2d 233, 236 (5th Cir. 1977) (citing *United States v. Klock*, 210 F.2d 217 (2nd Cir. 1954)) (it was reversible error to prohibit the defendant from introducing evidence of eighty other instances where the bank issued cashier's checks without contemporaneous payment, holding that while custom and general practice is not an absolute defense to criminal intent, it can be considered by the jury to determine the defendant's intent); *see also United States v. Rubin*, 591 F.2d 278, 283 (5th Cir. 1979) (it was reversible error to prohibit evidence related to what the defendant heard from the present and past union presidents as to how the defendant should interpret the union constitution). The Tenth Circuit has even held that it was reversible error to exclude evidence of a similarly situated individual that avoided prosecution, as the evidence was crucial for defendants

to establish their defense that they lacked the requisite criminal intent. *See United States v. Montelongo*, 420 F.3d 1169, 1173-76 (10th Cir. 2005).

The courts' findings in *United States v. Riley*, 550 F.2d 233 (5th Cir. 1977), and *United States v. Rubin*, 591 F.2d 278 (5th Cir. 1979), are both relevant and applicable to this case. In *Riley*, the defendant, the bank's president, was charged with violating 18 U.S.C. § 656 by issuing cashier's checks without contemporaneous payment on ten different occasions. *See United States v. Riley*, 550 F.2d 235. The U.S. Court of Appeals for the Fifth Circuit reversed the defendant's conviction on the basis that the trial court had improperly excluded evidence that was relevant to the defendant's alleged criminal intent or lack thereof, specifically, whether he intended to defraud the bank. *See id*. Among other things, the defendant in *Riley* attempted to show that (a) he never tried to hide the practice of writing these checks from other bank employees; (b) there were eighty other instances of similar cashier's checks written during the same period without contemporaneous payment; and (c) the bank had an informal policy to treat these payments as "informal loans" or "extensions of credit" to trusted bank customers. *See id*. The government in *Riley* argued that these other instances of alleged wrongful conduct were irrelevant to the charges at issue. *See id*. The Fifth Circuit, in reversing the trial court, held that this evidence was directly relevant to the determination of the defendant's intent. *See id*. The court stressed that regardless of how reasonable this defense would be to a jury, the defendant should have the right to present it. *See id*. at 238. In support of its finding, the Fifth Circuit cited several other cases in which appellate courts reversed convictions after a defendant was precluded from introducing evidence tending to negate alleged criminal intent. *See id*. at 236-37.

*United States v. Rubin* is another example of a case in which evidence that would tend to negate a defendant's alleged criminal intent was improperly excluded by a trial court. *United States*

*v. Rubin*, 591 F.2d 278, 282-83 (5th Cir. 1979). In *Rubin*, the defendant, a labor organizer, was convicted of embezzlement based on his unauthorized salary increases. *See id*. at 282. The defendant argued that he did not have the requisite intent to embezzle. *See id*. In support of this argument, he sought to introduce evidence as to his interpretation of union laws, which he claimed permitted the salary increases at issue, as well as evidence of prior conversations he had with past union officials who had apparently advised him that union laws may have permitted such activities. *See id*. at 282-83. The Court of Appeals for the Fifth Circuit, in reversing the trial court, found that such evidence was relevant to the defendant's state of mind. *See id*. Likewise, as discussed above, Ms. Motta seeks to introduce evidence that demonstrates her state of mind based on the prior practices and customs she followed and the fact that similarly situated professionals following the same practices and were similarly duped. For example, in this case, the October 15, 2015, collision was filed by another attorney years before Ms. Motta was involved — how was she to know that collision was staged and not to reasonably rely upon the earlier lawyer's decision to file suit as evidence of the collision's legitimacy?

Because evidence of custom and general practice has been consistently found to be relevant and admissible evidence to defend against crimes of intent, the FBI 302 memoranda of *similarly situated* individuals (e.g., plaintiff personal injury attorneys, treating physicians, secretaries, paralegals, etc.) that, like Ms. Motta, claim they were also oblivious to the staged accidents, are crucial for Ms. Motta to establish her defense that she lacked the requisite criminal intent and are therefore *Brady* evidence. The Fifth Circuit has even held that FBI 302 memoranda constitute *Brady* evidence subject to disclosure when they contain exculpatory evidence. In *United States v. Cessa*, 861 F.3d 121 (5th Cir. 2017), the defendant moved for the government to produce the FBI 302s for nine interviews to the trial court for an in-camera review. *See United States v. Cessa*, 861

F.3d 121, 128 (5th Cir. 2017). Whereas the court granted the motion, the court stated that the FBI 302s were not "helpful" to the defense and denied the defendant's access to the FBI 302s. On appeal, the defendant argued that the FBI 302s constituted *Brady* materials because they contained exculpatory and impeachment evidence. *See id.* The Fifth Circuit found that the district court erred in finding that the FBI 302s were not favorable to the defense as some of the statements in the 302s were exculpatory, holding that "[b]ecause the 302s lent support to [defendant's] trial theory, we find that they were favorable." *See id.* at 129-30. Finding that the 302s were favorable the Fifth Circuit reasoned that:

> A defendant's decision to pursue or disclaim an affirmative defense instruction is not made in a vacuum; defendants must evaluate the evidence available to them and determine whether seeking the instruction is likely to help or harm their cause. Denying defendants access to evidence they are entitled to under *Brady* can significantly change the risk calculus. For this reason, courts routinely find that evidence supporting an affirmative defense is exculpatory and, therefore, favorable under *Brady*.

*See id.* at 131 (citing *Mahler v. Kaylo*, 537 F.3d 494, 504 (5th Cir. 2008)).

Importantly, here, Ms. Motta is not seeking any FBI 302 memoranda related to potential witnesses that the Government intends to call against her to testify that Ms. Motta was aware of the fraud. Instead, Ms. Motta is <u>only</u> at this time seeking those FBI 302 memoranda generated from interviews of *similarly situated* individuals that, like Ms. Motta, claim they were also oblivious to the plaintiffs' fraudulent scheme. To the extent that the Government interviewed these similarly situated individuals, the FBI 302 memoranda that were generated are directly relevant to Ms. Motta's defense that she did not have the requisite criminal intent that was not the result of deliberate ignorance, and thereby constituting discoverable *Brady* material. *See Cessa*, 861 F.3d at 131.

For example, if a lawyer who initiated one of the cases at issue made statements to the federal government to the effect of not being aware of the alleged fact that the accidents at issue were staged, then that is favorable evidence and Ms. Motta is entitled to this information and further entitled to investigate the basis for which the other lawyer made such a statement.[3] For this same reason, if a doctor involved was similarly "duped" by others into believing these accidents were legitimate, Ms. Motta is entitled to this knowledge and to further investigate the reason why the doctor had that belief.[4] This would also apply to paralegals or secretaries involved with these alleged staged collisions.[5] These FBI 302 memoranda demonstrate not just the custom and general practices of the plaintiff personal injury industry, but also constitute direct evidence that she relied upon to believe these collisions were legitimate.

Not only should these materials be produced immediately pursuant to *Brady*, but they should be produced immediately as the defense needs time to investigate the basis of the claims made in the FBI 302 memoranda in order to adequately present Ms. Motta's defense. With the trial already having been continued to September 2025 on the motion of the Government over the objection of Ms. Motta, any additional delay will be extremely prejudicial. Again, as Ms. Motta awaits trial, she has been suspended from working by the Supreme Court of the State of Louisiana,

---

[3] Ms. Motta believes this would include, but is not limited to, the FBI 302 memoranda or other reports of investigation created in connection with the plaintiff personal injury attorneys Jason Baer, Edwin Shorty, Toni Arnona, Lionel Sutton, Vincent Arnona, Tim Fields, Roderick "Rico" Alvendia, Kurt Offner, Michael Riley, Brian Birdsall, Anthony Irpino, and Adam Avin.

[4] Ms. Motta believes this would include, but is not limited to, the FBI 302 memoranda or other reports of investigation created in connection with Dr. John Hamide, Dr. Samer Shamieh, Dr. Eric Lonseth, Dr. Neil Jolly, and Dr. Peter Liechty.

[5] Ms. Motta believes this would include, but is not limited to, the FBI 302 memoranda or other reports of investigation created in connection with Angel Junio, Monica Samuel, Sylvia Alfortish, Jeff Alfortish, Chris Yount, Paulette Cooper, Orfelina "Linda" Moreno, Patricia Cooper, Amy Devillier, Dawn Palestina, Jennifer Miller, and Brittany Bressler.

as well as this Court. This has resulted in extreme financial hardship for Ms. Motta and her children.

## III.   LOCAL CRIMINAL RULE 12 CERTIFICATE

Plaintiff's counsel has conferred with counsel for the Government for the purpose of amicably resolving the issues discussed herein, however, counsel are unable to come to an agreement. *See* Exhibit 1.

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant Ms. Motta's Motion to Compel, requiring the Government to immediately produce all *Brady* and *Giglio* materials, including the FBI 302 memoranda relating to Ms. Motta's industry blindness defense.

Respectfully submitted,

/s/ *Sean Toomey*
Sean M. Toomey (Bar # 36055)
**LISKOW & LEWIS**
Hancock Whitney Center
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108

***Attorney for Defendant Vanessa Motta***

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing pleading has been served upon counsel of record for all parties by electronic filing on PACER, this 14 day of April, 2025.

/s/     Sean Toomey