**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | **CRIMINAL NO.  24-105** |
| **v.** | \* | **SECTION:  "D"(1)** |
| **SEAN D. ALFORTISH,** *et al.* | \* | |
| | \*     \*     \* | |

**GOVERNMENT'S OPPOSITION TO**
**VANESSA MOTTA'S MOTION TO COMPEL DISCOVERY**

The United States of America, through the undersigned attorneys, hereby opposes defendant Vanessa Motta's Motion to Compel Discovery. *See* Rec. Doc. 243. Motta requests that this Court issue an order stating that:

- "The government is constitutionally obligated to independently search for and turn over all *Brady* material as it discovers it, including in the absence of a specific request," *see* Rec. Doc. 243-1, pp. 3-5;

- The government must "promptly produce and identify all *Giglio* material," including early production of materials that fall under the Jencks Act, *see* Rec. Doc. 243-1, pp. 5-10; and

- "The government must turn over all *Brady* material, including FBI 302 memoranda, supporting Ms. Motta's defense," that is, that she was "oblivious" to the fact that certain collisions were staged because of "industry blindness" to the staged collision scheme. *See* Rec. Doc. 243-1, pp. 10-16.

Motta's claims fail in light of well-established Fifth Circuit precedent. For the reasons below, Motta's motion should be denied.

## FACTS AND PROCEDURAL BACKGROUND

Motta and her codefendants are charged with participating in a years-long scheme to intentionally stage automobile collisions and file fraudulent insurance claims and lawsuits based on the staged collisions. *See* Rec. Doc. 78 (Superseding Indictment). Among the individuals involved in the staged collisions were multiple "slammers" who crashed automobiles into 18-wheeler tractor-trailers and directed passengers in staged collisions to certain attorneys and law firms to file fraudulent lawsuits. Rec. Doc. 78, p. 4. Cornelius Garrison was a slammer who directed passengers to Motta, Motta Law, LLC, Jason F. Giles, and The King Firm, LLC. Rec. Doc. 78, p. 6. Garrison was paid to direct passengers to Motta and Motta Law by Sean D. Alfortish, a disbarred attorney who was Motta's fiancée. Rec. Doc. 78, pp. 5-6. A second slammer, Ryan Harris, worked with Garrison and also directed passengers in staged collisions to Alfortish, Motta, and Motta Law. *See* Rec. Doc. 184 (Harris's Factual Basis).

In September 2020, a federal grand jury in the Eastern District of Louisiana charged Garrison and eight codefendants in a seven-count indictment related to staged collisions. *See United States v. Garrison*, E.D. La. No. 20-92, Doc. 1. The indictment made references to "Co-Conspirator A" (Alfortish) and "Attorney B" (Motta), stating that "Co-Conspirator A solicited and/or referred personal injury clients to Attorney B." *Id.* at p. 2. Certain information in the indictment clearly came from Garrison, including that "Co-Conspirator A instructed Garrison on the number of passengers to include in staged collisions" and "Co-Conspirator A instructed Garrison to lie about payments he received from Co-Conspirator A if ever asked." *See id.* at p. 7.

Four days after the indictment, Garrison was murdered at his mother's New Orleans home. Garrison's fellow slammer Harris has pleaded guilty to his conduct the night Garrison was murdered, as has Harris's romantic partner Jovanna Gardner. In the factual basis supporting his

guilty plea, Harris admitted that, in 2020, he learned that Garrison was cooperating, as did Alfortish, Motta, and codefendant Leon M. Parker. Rec. Doc. 184, p. 4. Harris further admitted that he facilitated a meeting between Alfortish and Parker so Alfortish could pay Parker to murder Garrison. Rec. Doc. 184, pp. 4-5.

Gardner made similar admissions in the factual basis supporting her guilty plea. *See* Rec. Doc. 49. Gardner was not aware that Harris, Alfortish, and Parker intended to commit violence against Garrison; instead, she believed that Harris planned to visit Garrison on the night of the murder for the purpose of paying Garrison not to cooperate with the federal investigation. Rec. Doc. 49, pp. 2-3. Harris told Gardner that "the lawyers" (whom Gardner understood to mean Motta and Alfortish) had instructed Harris to meet with Garrison and convince Garrison not to cooperate. Rec. Doc. 49, p. 2.

Motta and her codefendants were charged in this case in December 2024. Rec. Doc. 78. The government has filed a proposed scheduling order in which it proposed a deadline of April 14, 2025, to file motions to compel discovery. Rec. Doc. 225, pp. 1-2. No other defendants have filed motions to compel. Trial is currently scheduled to begin on Monday, September 8, 2025. Rec. Doc. 208.

## LAW AND ARGUMENT

I. **Motta's claim that the government must independently search for *Brady* material is meritless, and it should be denied.**

A. **The government has complied with *Brady*.**

"Under *Brady v. Maryland*, a defendant's due process rights are violated when the prosecution suppresses evidence that is exculpatory." *United States v. Cessa*, 861 F.3d 121, 128 (5th Cir. 2017) (citing *Brady*, 373 U.S. 83, 87 (1963)). "The principle also applies to evidence that could be used to impeach prosecution witnesses." *Id.* (citing *Giglio v. United States*, 405

U.S. 150, 152-54 (1972)). "To establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *Id.*

This is not the first case involving *Brady* and a large quantity of data. The primary case in the Fifth Circuit is *United States v. Skilling*, 554 F.3d 529 (5th Cir. 2009), *vacated in part on other grounds*, 561 U.S. 358 (2010). In *Skilling*, the defendant was the former CEO of the Enron Corporation who was indicted following civil, criminal, and Congressional investigations into the failure of Enron. *See id.* at 534. A jury convicted Skilling on 19 counts of conspiracy, securities fraud, making false statements, and insider trading. *Id.* at 542.[1]

On appeal, Skilling pointed to the government's production of "several hundred million pages of documents" and argued that it "resulted in the effective concealment of a huge quantity of exculpatory evidence." *Id.* at 576. According to Skilling, "no amount of diligence, much less reasonable diligence, could have accomplished" the task of "effectively reviewing the government's disclosure." *Id.* "In Skilling's words, 'it would have taken scores of attorneys, working *around-the-clock* for several *years* to complete this job.'" *Id.* (emphasis in original).

The Fifth Circuit rejected Skilling's argument that "the government should have scoured the open file in search of exculpatory information to provide to him." *Id.* at 577. The Fifth Circuit held that "the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence." *Id.* at 576. It also stated that, "where potentially exculpatory information is available to the defendant through an exercise of due diligence, there is no suppression for the purposes of *Brady*." *Id.* The Fifth Circuit observed that "the government

---

[1] The Supreme Court later remanded Skilling's case to the Fifth Circuit after it rejected the government's theory of honest services fraud. *Skilling*, 561 U.S. at 413-14. The Fifth Circuit ultimately affirmed all of Skilling's convictions. *United States v. Skilling*, 638 F.3d 480, 488-89 (5th Cir. 2011).

did much more than drop several hundred million pages on Skilling's doorstep." *Id.* at 577. The discovery was "electronic and searchable." *Id.* Further, the government "produced a set of 'hot documents' that it thought were important to its case or were potentially relevant to Skilling's defense," "created indices to these and other documents," and "provided Skilling with access to various databases concerning prior Enron litigation." *Id.* Moreover, because the government gave Skilling equal access to the same materials it had, "the government was in no better position to locate any potentially exculpatory evidence than was Skilling." *Id.*

The Fifth Circuit left open the possibility that the government could violate *Brady* even in cases with open file discovery. *See id.* For example, the government could "pad" an open file "with pointless or superfluous information to frustrate a defendant's review of the file." *Id.* The government could also create "a voluminous file that is unduly onerous to access" or "hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it." *Id.* However, the Fifth Circuit refused to assume bad faith by the government absent "compelling evidence to the contrary." *See id.* The Fifth Circuit concluded, "[C]onsidering the additional steps the government took beyond merely providing Skilling with the open file, the equal access that Skilling and the government had to the open file, the complexity of Skilling's case, and the absence of evidence that the government used the open file to hide potentially exculpatory evidence or otherwise acted in bad faith, we hold that the government's use of the open file did not violate *Brady*." *Id.*

The Fifth Circuit has continued to rely on its holding in *Skilling*. *See United States v. Stanford*, 805 F.3d 557, 572 (5th Cir. 2015) ("We have previously rejected such 'open file' *Brady* claims where the government provided the defense with an electronic and searchable database of records, absent some showing that the government acted in bad faith or used the file

to obscure exculpatory material.") (citing *Skilling*, 554 F.3d at 577). So have other circuit courts of appeals. *See United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (quoting *Skilling*, 554 F.3d at 576); *United States v. Warshak*, 631 F.3d 266, 297-98 & n.30 (6th Cir. 2010) (quoting *Skilling*, 554 F.3d at 576-77, and rejecting defendant's argument that the government was "obliged to sift fastidiously through the evidence").

Lower courts have also relied on *Skilling* in large cases. For example, in *United States v. Meek*, No. 1:19-cr-00378-JMS-MJD, 2021 WL 1049773 (S.D. Ind. Mar. 19, 2021), the defendants were charged with "several fraud-related crimes stemming from their time as executives for a trucking company." *Id.* at *1. The defendants pointed to the government's production of "millions of pages of documents" and argued that the government had an obligation under *Brady* to "conduct a reasonable search for exculpatory material that has not been disclosed to defendants," "identify exculpatory material of which it is aware," and "identify any exculpatory material that it is withholding for any reason." *Id.* at *3. The court denied the defendants' motions. *Id.* at *4-6. The court found that "the government is not obligated to specifically identify *Brady* material within a mass of discovery to defendants." *Id.* at *4 (citing *Skilling*, 554 F.3d at 576). Additionally, the court found that "*Brady* does not impose an obligation 'on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed.'" *Id.* (quoting *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005)). According to the court, the government complied with its constitutional and discovery obligations by producing the documents "in a user-friendly, searchable, and indexed format," and there was "no indication that the government deliberately concealed or buried any exculpatory evidence in the information it turned over to the defense." *Id.* at *5. Moreover, the defendants were "sophisticated and formerly high-level executives of a publicly

traded company," and they were "represented by experienced and talented counsel from notable law firms across the country." *Id.* Further, the defendants "had access to these documents for more than a year, and they have them (and have had them) in the same user-friendly, searchable, and indexed format as the government." *Id.*

With respect to the defendants' arguments that *Brady* compelled the government to "identify exculpatory material of which it [was] aware," the court found that, "aside from the burden that the requested order would impose on the government, defendants are in a better position to determine what evidence they believe is exculpatory and will help in their defense." *Id.* at *5. As the court found, "To order the government to go beyond simply producing *Brady* material and order it to identify or label *already produced* material as covered by *Brady*—and by omission, identify non-*Brady* material—only invites future disputes as to whether the government did an adequate job of identifying such material or characterized the material consistent with the defendants' view of it." *Id.* (emphasis in original).

Here, the government has complied with *Skilling* and the cases interpreting it. Among other things, the government has:

- Provided discovery in searchable .pdf files, with native files as necessary (for example, for Microsoft Excel spreadsheets). Other than agent summaries of witness interviews (discussed below), the defendants either have access to the same materials as the government, or will have access by the end of the reciprocal discovery period;[2]

---

[2] As the Court is aware, this case followed a years-long investigation that resulted in prosecutions of numerous individuals in multiple sections of the Eastern District of Louisiana. As part of its discovery obligations, the government has sought to provide the defendants with access to any materials in its possession that might be relevant while also withholding materials in its possession that are plainly irrelevant. The government has done this in an attempt to prevent the discovery from being padded with excess and duplicative information. The government does not intend to withhold any materials that may be relevant to this case other than agent summaries of witness interviews. In her motion to compel, Motta

- Provided indices with file names for each record and the custodian (*i.e.*, source) from which it received each record;

- At the request of Motta's counsel, identified seven-digit prefixes for certain grand jury returns related to Motta; and

- Responded to miscellaneous other discovery requests from Motta's counsel, including requests for the location of specific documents within the discovery.

As the above-cited authorities demonstrate, this is the industry standard for discovery in cases with large amounts of data, and it has been for some time. *See Skilling*, 554 F.3d at 576-77; *Stanford*, 805 F.3d at 572; *Gray*, 648 F.3d at 567; *Warshak*, 631 F.3d at 297-98; *Meek*, 2021 WL 1049773, at *4-6; *see also United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 454-56 (S.D.N.Y. 2011) (in case with "extremely voluminous disclosure," no *Brady* issue where the government "provided defendants with searchable electronic productions; indices describing documents related to the featured transactions; indices of audio recordings; and metadata permitting searches of audio recordings"); *United States v. Shafer*, No. 3:09-CR-249-D 05, 2011 WL 977891, at *3-4 (N.D. Tex. Mar. 21, 2011) (in case where discovery consisted of "200 terabytes seized from 600 computers and 10,000 pieces of paper," no *Brady* issue where the government "provided searchable copies of certain documents and has met individually with counsel for the defendants to recommend where counsel focus their review efforts").

---

does not request that the Court order the government to produce more discovery, but instead that the government be ordered to search within already produced materials for documents she believes will be helpful to her defense. Except for agent summaries of witness interviews, Motta does not appear to dispute that she and the government have access to the same materials.

**B.      The government should not be required to prepare both sides of the case.**

While the government has endeavored to make the discovery available in accordance with these authorities, Motta will eventually need to review the documents herself rather than ask the government to direct her to the evidence she seeks. Motta incorrectly asserts that "[t]he government is constitutionally obligated to independently search for and turn over known *Brady* material as it discovers it, including in the absence of a specific request." Rec. Doc. 243-1, p. 3. The Fifth Circuit has rejected this argument. *See Skilling*, 554 F.3d at 576 ("[T]he government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence."); *Bigby v. Dretke*, 402 F.3d 551, 574 (5th Cir. 2005) ("The state, however, bears no responsibility to direct the defense toward potentially exculpatory evidence that either is in the possession of the defense or can be discovered through the exercise of reasonable diligence."); *United States v. Mmahat*, 106 F.3d 89, 94 (5th Cir. 1997) ("[T]here is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over."), *overruled in part on other grounds by United States v. Estate of Parsons*, 367 F.3d 409 (5th Cir. 2004) (en banc); *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990) ("While the Supreme Court in *Brady* held that the government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case.").

As the Fifth Circuit has explained, where the government and the defendants have access to the same materials, the government is "in no better position to locate any potentially exculpatory evidence" than the defendants. *See Skilling*, 554 F.3d at 577. Courts have recognized the "untenable position" the government would be in if it had to "prepare both sides of the case

at once." *United States v. Ohle*, No. S3 08 CR 1109(JSR), 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011); *see also Gray*, 648 F.3d at 567; *Meek*, 2021 WL 1049773, at *5. "Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client." *Ohle*, 2011 WL 651849, at *4. "This is especially true considering that, if exculpatory evidence exists, the defense is in the best position to know what such evidence might be and where it might be located." *Id.* "To order the government to go beyond simply producing *Brady* material and order it to identify or label *already produced* material as covered by *Brady*—and by omission, identify non-*Brady* material—only invites future disputes as to whether the government did an adequate job of identifying such material or characterized the material consistent with the defendants' view of it." *Meek*, 2021 WL 1049773, at *5 (emphasis in original).

Here, with the caveats described above, the government has provided Motta access to the same information it has, mostly in searchable .pdf files. The government should not be forced to guess which of these documents Motta will view as favorable to her defense. Presumably, the government and Motta will not agree on which documents suggest intent to commit fraud and witness tampering and which documents do not. This is especially true in this case because Motta has proffered a defense of "industry blindness" that, as explained below, the government believes is legally invalid and factually incoherent. This will inevitably lead to a dispute "as to whether the government did an adequate job of identifying such material or characterized the material consistent with the defendants' view of it." *See Meek*, 2021 WL 1049773, at *5. Pursuant to the Fifth Circuit's holding in *Skilling*, this Court should require the defendants to do their own review of the evidence without forcing the government to characterize documents as

"helpful" or "not helpful" to the defense. *See Skilling*, 554 F.3d at 556-57; *see also Meek*, 2021 WL 1049773, at *5; *Ohle*, 2011 WL 651849, at *4.

Motta cites multiple cases and a provision from the Justice Manual for the proposition that the government has an obligation under *Brady* to disclose material information favorable to the defendant. *See* Rec. Doc. 243-1, pp. 3-5 & n.2. However, Motta conflates disclosure—which the government has done—with searching within already produced materials and identifying documents she believes support her defense. As discussed above, the government has no such obligation, and it would be untenable to require the government to boil the ocean searching for materials that Motta may or may not find useful. *See Skilling*, 554 F.3d at 576-77; *Meek*, 2021 WL 1049773, at *5; *Ohle*, 2011 WL 651849, at *4. Motta's motion to compel should be denied.

## II.    Motta's demand for early production of Jencks Act materials should be denied.

Motta argues that the government must "produce and identify" any impeachment material that arguably falls under *Brady* and *Giglio* as soon as a defendant requests it. *See* Rec. Doc. 243-1, pp. 5-10. Motta asserts that "the Fifth Circuit has not conclusively weighed in" on this issue, *i.e.*, whether alleged *Brady*/*Giglio* evidence that is also contained in Jencks Act material must be disclosed before the Jencks Act deadline. *See* Rec. Doc. 243-1, p. 8.

Contrary to Motta's claim, the Fifth Circuit has conclusively weighed in on this issue, as other courts have recognized. *See United States v. Brown*, 699 F.2d 704, 709 (5th Cir. 1983) ("[W]hen alleged *Brady* material is contained in Jencks Act material, disclosure is generally timely if the government complies with the Jencks Act."); *United States v. Martino*, 648 F.2d 367, 384 (5th Cir. 1981); *United States v. Campagnuolo*, 592 F.2d 852, 863-64 (5th Cir. 1979); *United States v. Anderson*, 574 F.2d 1347, 1352 (5th Cir. 1978); *United States v. Fatty*, No. 17-161, 2018 WL 3708660, at *5 (E.D. La. Aug. 3, 2018) (Knowles, M.J.) ("The government is

aware of its *Brady* and *Giglio* obligations and will produce to Fatty all such material on the Friday (48 hours) before trial. That is the policy in this circuit, and—while Fatty maintains otherwise—this Court sees no reason to deviate from it in this criminal case."); *United States v. Causey*, 356 F. Supp. 2d 681, 698 (S.D. Tex. 2005) ("[T]he law in this circuit is that when evidence is subject to both *Brady* and Jencks, the timing of its production is governed by the Jencks Act.") (collecting cases); *see also Degen v. United States*, 517 U.S. 820, 825 (1996) ("A criminal defendant is entitled to rather limited discovery, with no general right to obtain the statements of the government's witnesses before they have testified.").

Indeed, while the Fifth Circuit has stated that early disclosure of Jencks Act material is "a salutary practice that should be encouraged," it has held that district courts "cannot compel" early disclosure of Jencks Act material. *United States v. McKenzie*, 768 F.2d 602, 609 (5th Cir. 1985); *see also United States v. Yassine*, 574 F. App'x 455, 464 (5th Cir. 2014) ("The trial court cannot compel disclosure at any earlier point; however, early Jencks Act disclosure should be encouraged.") (ellipsis and quotation marks omitted) (emphasis in original); *United States v. Tettleton*, No. 19-00015, 2009 WL 1174358, at *3 (W.D. La. Apr. 29, 2009) ("[N]umerous courts, including the Fifth Circuit, have indicated that a court is not permitted to require the government to produce Jencks material prior to the witness's testimony.") (collecting cases).[3]

The circuit courts of appeals are split on the issue. *See United States v. Lujan*, 530 F. Supp. 2d 1224, 1256 (D.N.M. 2008) (describing circuit split); *Causey*, 356 F. Supp. 2d at 698

---

[3] "The language of the Jencks Act requires that the defendant move the court for production of any covered statements after the witness has testified before the government's duty to disclose attaches." *McKenzie*, 768 F.2d at 609. "The trial court cannot compel disclosure of Jencks material at any earlier point." *Id.* The standard practice in the Eastern District of Louisiana is to disclose Jencks Act material before the legal deadline, specifically the Friday before trial. In the proposed scheduling order, the government proposed a Jencks Act deadline of August 18, 2025, approximately three weeks before the legal deadline and the standard local deadline. *See* Rec. Doc. 225, p. 3.

(same); *United States v. Kouri-Perez*, 47 F. Supp. 2d 166, 172-73 (D.P.R. 1999) (same); *United States v. Beckford*, 962 F. Supp. 780, 791 (E.D. Va. 1997) (same). At least three circuits agree with the Fifth Circuit that evidence that is both *Brady/Giglio* and Jencks is controlled by the timing requirements in the Jencks Act. *See United States v. Hampton*, 750 F. App'x 196, 199 (4th Cir. 2018); *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988); *United States v. Jones*, 612 F.2d 453, 455 (9th Cir. 1979). Conversely, the Second Circuit has held that district courts have "discretion to order pretrial disclosures as a matter of sound case management." *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). The Third and D.C. Circuits have ruled both ways. *Compare United States v. Starusko*, 729 F.2d 256, 263 (3d Cir. 1984), *overruled on other grounds as recognized by Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 289-90 (3d Cir. 2021), *and United States v. Tarantino*, 846 F.2d 1384, 1414 n.11 (D.C. Cir. 1988) (Jencks Act does not affect *Brady/Giglio* obligations), with *United States v. Kaplan*, 554 F.2d 577, 579-80 (3d Cir. 1977), and *United States v. Pollack*, 534 F.2d 964, 974 (D.C. Cir. 1976) (*Brady/Giglio* evidence may be disclosed up to Jencks Act deadline).

The out-of-circuit cases cited by Motta are unhelpful because, as discussed above, they are on the wrong side of the circuit split. *See* Rec. Doc. 243-1, pp. 6-8 (citing, among other things, *United States v. Shvarts*, 90 F. Supp. 2d 219 (E.D.N.Y. 2000), *abrogated on other grounds by Coppa*, 267 F.3d at 146, and *United States v. Trie*, 21 F. Supp. 2d 7, 23, 26 (D.D.C. 1998)). Regardless of the circuit split, the law in the Fifth Circuit is clear, and the government has followed it. As explained above, the government has complied with its constitutional obligations under *Brady* and *Giglio*. *See Skilling*, 554 F.3d at 556-57. Additionally, the government intends to produce its witness interview reports well in advance of the September 8,

2025, trial date. *See* Rec. Doc. 225, p. 3 (proposed scheduling order with Jencks Act deadline of Monday, August 18, 2025).

To the extent Motta requests that the Court order the government to identify *Brady*/*Giglio* evidence that falls outside the scope of the Jencks Act, that request likewise is unsupported by law and unnecessary based on the government's efforts. "*Brady* is not a discovery rule," and it is not "a pretrial remedy." *Fatty*, 2018 WL 3708660, at *5 (quoting *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978); *United States v. Garrett*, 238 F.3d 293, 303 (5th Cir. 2000) (Fish, J., concurring)); *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."). Thus, "there is no requirement that *Brady* or *Giglio* material be produced in pre-trial discovery." *Fatty*, 2018 WL 3708660, at *5; *see also Skilling*, 554 F.3d at 576 ("[T]he government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence."). As discussed above, Motta has the same ability to search for evidence within the discovery that the government has. She can make her own determinations as to whether certain documents are helpful or unhelpful to her defense. Motta is not entitled to greater constitutional or discovery rights than other defendants in the Fifth Circuit, and her motion should be denied.

### III.    Motta's demand for early production of agent reports should be denied.

Motta argues that the government should be required to produce certain agent summaries of witness interviews, known as "302s," before the proposed Jencks Act deadline of August 18, 2025. *See* Rec. Doc. 243-1, pp. 10-16. As discussed above, although early disclosure of Jencks Act material is "a salutary practice that should be encouraged," the Fifth Circuit has held that district courts "cannot compel" early disclosure of Jencks Act material. *McKenzie*, 768 F.2d at

609.[4] To sidestep this clear prohibition, Motta claims that she only wants agent reports summarizing interviews of witnesses who are "similarly situated" to her. *See* Rec. Doc. 243-1, pp. 10-16. According to Motta, those individuals include attorneys, doctors, paralegals, and legal assistants who were "oblivious" to the staged collision scheme. *See* Rec. Doc. 243-1, pp. 14-15 & nn.3-5. Motta's claim fails for several reasons.

First, the only individuals in this case who are "similarly situated" to Motta are Jason Giles and Patrick Keating, the only other personal injury attorneys charged with knowingly participating in the staged collision scheme. Only a few of the individuals listed in Motta's motion were implicated in Garrison's statements to law enforcement. Further, unlike Motta, none of the individuals listed in her motion were named in Harris's and Gardner's factual bases, and none have been accused of witness tampering through improper conduct with Garrison, including when he was represented by Federal Public Defender Claude Kelly. Moreover, Motta and Alfortish paid Garrison, Harris, and a third slammer tens of thousands of dollars. Thus, the premise of Motta's motion—that she was somehow singled out from a group of "similarly situated" innocent bystanders—is not true.

Second, even assuming the individuals in Motta's motion were "duped" by the slammers, it would not establish a defense for Motta because it would not make it any more or less likely that Motta knowingly participated in the staged collision scheme. Motta cites the Fifth Circuit Pattern Jury Instruction for deliberate ignorance, Rec. Doc. 243-1, pp. 10-11, and claims that she intends to argue the "affirmative defense that she lacked the requisite criminal intent because she, like similarly situated professionals and the plaintiff personal injury industry at large, was

---

[4] Technically, 302s are Jencks Act material only for the agents who wrote them and not for the witnesses themselves unless the reports are "substantially verbatim." *See United States v. Edwards*, 702 F.2d 529, 531 (5th Cir. 1983). Nevertheless, the government typically produces 302s on the Jencks Act deadline, and it plans to do so here.

reasonably blind to these plaintiffs' fraudulent scheme." Rec. Doc. 243-1, p. 2. "A deliberate ignorance instruction is designed to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *United States v. Nguyen*, 493 F.3d 613, 618 (5th Cir. 2007) (quotation marks omitted). "It is only to be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *Id.* In this case, the government's theory is not that Motta was merely indifferent to the crimes of others, but that she was an important member of the staged collision conspiracy who acted with direct knowledge of her and others' wrongdoing. If Motta feigns obliviousness at trial, then a deliberate ignorance instruction may be appropriate. However, Motta has pointed to no authority holding that the mere possibility of a deliberate ignorance instruction somehow upends decades of binding Fifth Circuit caselaw concerning disclosure of Jencks Act material.

As to Motta's "affirmative defense" claim, "when a defendant asserts an affirmative defense, he admits committing the alleged criminal conduct but argues that he should not be held liable because either such conduct was justified or he was excused under the circumstances." *United States v. Alvarez-Murillo*, 722 F. Supp. 3d 648, 652 (W.D. Tex. 2024). "For example, a defense by justification—such as self-defense or necessity, among others—applies when a defendant engages in conduct that is otherwise criminal but which under the circumstances is socially acceptable and deserves no criminal liability." *Id.* Motta does not concede that she committed the alleged criminal conduct, and, thus, she has not raised an affirmative defense. To the contrary, Motta alleges that the government cannot prove that she acted with intent to defraud. As a result, she is no different from any number of other fraud defendants, and she has not demonstrated that she is entitled to special treatment under the Jencks Act.

Finally, Motta's assertion that she can simply declare that witnesses are "similarly situated" to her and thus rewrite the rules concerning disclosure of witness statements has no basis in the decades of caselaw applying *Brady*. As discussed above, the government satisfies its *Brady* obligations in complex cases when it produces materials to the defendants in a readable and searchable format. *See Skilling*, 554 F.3d at 576-77. It is then incumbent on defendants to search through the discovery and locate documents they believe are helpful to them. *See id.* Requiring the government to produce materials related to arbitrarily selected "similarly situated" witnesses "only invites future disputes as to whether the government did an adequate job of identifying such material or characterized the material consistent with the defendants' view of it." *See Meek*, 2021 WL 1049773, at *5. Such a rule would be particularly untenable here, where Motta is charged with witness tampering, and her codefendants are alleged to have murdered a key witness. It is not difficult to imagine how defendants in witness tampering and witness murder cases could exploit a rule allowing them to claim that a witness is "similarly situated" to them and force early production of the witness's statements. Motta has not demonstrated that the Court should invent such a rule, and her motion to compel should be denied.

III.    **Motta should be required to show that she exercised due diligence in reviewing the discovery.**

This Court should deny Motta's discovery requests because they are not supported by the law and because of the government's efforts to disclose and narrow the discovery. However, in the event the Court is inclined to grant any of Motta's requests, the government asks that the Court first require Motta to make a showing that she exercised due diligence in reviewing the discovery.

"[W]here potentially exculpatory information is available to the defendant through an exercise of due diligence, there is no suppression for purposes of *Brady*." *Skilling*, 554 F.3d at

576; *see also Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) ("When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility of failing to conduct a diligent investigation."); *United States v. Brown,* 628 F.2d 471, 473 (5th Cir. 1980) ("[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim.").

In *United States v. Gross*, 424 F. Supp. 3d 800, 805-06 (C.D. Cal. 2019), the defendant filed a motion to continue the trial for additional time to review voluminous discovery. *Gross*, 424 F. Supp. 3d at 802. The court allowed the defendant to file supplemental materials related to a showing of diligence that the court then reviewed in camera. *Id.* at 805. The court found, "To be sure, counsel have spent hundreds of hours preparing a defense, but it is unclear how much of that time has been spent related to review of the government's production." *Id.* The court observed that defense counsel "spent a combined total of over 1,100 hours on the defense, but not more than approximately ten per cent of that time has been spent reviewing discovery." *Id.* at 806 (quotation marks omitted). The defendant's ESI expert spent 436.9 hours "devoted exclusively to dealing with the government's production, but it still appears that comparatively little time has been spent on actual review of the documents." *Id.* at 805-06. In denying the defendant's motion, the court stated that "criticism of the quality of the government's ESI does not in itself demonstrate diligence—it merely underscores the need for diligence." *Id.* at 806. The court concluded that, "while the defense has made a showing that document review in this case is an enormous task, it has not shown diligence in undertaking that task to date." *Id.*

Here, the evidence has been made available to Motta as either searchable .pdfs or native files. Each production is accompanied with a searchable index with file and custodian

information in the same format as the government maintains it, so the defense can organize

evidence by source in the same way the government does. There is no reason Motta cannot load

the data into a database and use key search terms to find the materials she seeks in her motion.[5]

The government has taken the steps recommended by *Skilling* and done its part to make the

discovery available and navigable. It is now Motta's responsibility to review the discovery and

determine what, if anything, is helpful to her defense. *See Gross*, 424 F. Supp. 3d at 806; *see also*

*Kutzner*, 303 F.3d at 336 ("When evidence is equally available to both the defense and the

prosecution, the defendant must bear the responsibility of failing to conduct a diligent

investigation."); *Marrero*, 904 F.2d at 261 ("While the Supreme Court in *Brady* held that the

government may not properly conceal exculpatory evidence from a defendant, it does not place

---

[5] The government understands from Motta's counsel that Motta does not yet have an electronic database to assist with review of the discovery because acquiring such a database would be cost prohibitive. The Federal Judicial Center has published guidance for just such a scenario, that is, when a defendant cannot afford electronic discovery in a complex case. According to *Criminal E-Discovery: A Pocket Guide for Judges* (2019), available at https://www.fjc.gov/content/309106/criminal-e-discovery-pocket-guide-judges:

> The National Litigation Support Team (NLST), part of the Defender Services Office (DSO) of the Administrative Office of the U.S. Courts, is available to help attorneys for indigent defendants struggling with extensive e-discovery. . . . The DSO has three national coordinating discovery attorneys (CDAs) who are experts in e-discovery, have experience with CJA cases, and are knowledgeable about litigation technology. They work with CJA counsel and federal defenders in multidefendant cases to manage large volumes of e-discovery efficiently and cost-effectively to best fit the defendants' needs. The court can ask CJA counsel to request that the case be referred to a CDA through the National Litigation Support Team.

*Pocket Guide*, pp. 8-9. This is true even for non-indigent defendants with retained counsel:

> The Criminal Justice Act can authorize payment of e-discovery review costs when the extent of those costs would render a defendant unable to pay for e-discovery review regardless of whether a defendant can otherwise afford retained counsel. 18 U.S.C. § 3006A(e)(1) allows retained counsel to apply for services to be paid through the CJA system.

*Id.*, p. 6 n.15.

any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case.").

Motta should not be permitted to throw up her hands and cry "*Brady*" merely because the discovery involves a large amount of data. Before the Court rules in Motta's favor and requires the government to go even further beyond the recommendations in *Skilling*, it should at a minimum require Motta to state the number of hours she has spent reviewing the discovery. Additionally, the Court should have Motta list the key search terms and other research methods (*e.g.*, applying filters, tagging documents, creating folders) she has used while reviewing the discovery. Finally, Motta should be required to demonstrate that she could not locate the information she seeks if she simply spent more time reviewing the discovery that has been made available to her.

The Court may deny Motta's requests without such a showing. However, because the exercise of due diligence is a requirement under *Brady*, the Court should not grant relief unless Motta establishes that she has exercised due diligence in her review of the discovery.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendant Vanessa Motta's Motion to Compel Discovery.

Respectfully submitted,

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY


/s/ *Matthew R. Payne*
MATTHEW R. PAYNE
BRIAN M. KLEBBA
MARY KATHERINE KAUFMAN
Assistant United States Attorneys
J. RYAN McLAREN
Trial Attorney


## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Matthew R. Payne*
MATTHEW R. PAYNE
Assistant United States Attorney