**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 24-105** |
| **SEAN D. ALFORTISH, ET AL.** | **SECTION: D (1)** |

**VANESSA MOTTA AND MOTTA LAW, LLC'S OPPOSITION TO
GOVERNMENT'S MOTION TO ADMIT STATEMENTS
<u>UNDER THE FORFEITURE BY WRONGDOING EXCEPTION</u>**

Not one of Mr. Garrison's alleged statements is admissible against Ms. Motta or Motta Law, LLC (together, "Ms. Motta") under the forfeiture-by-wrongdoing exception. While the government asserts that Ms. Motta forfeited her rights because either her co-conspirator's alleged wrongdoing should be imputed to her or because she acquiesced in her co-conspirator's wrongdoing, neither argument finds support in law or fact. The government fails to carry its evidentiary burden of proving by a preponderance of the evidence that Ms. Motta wrongfully and intentionally made Mr. Garrison unavailable to testify. Therefore, its motion must be denied.

**I.    FACTUAL BACKGROUND**

In June of 2016, Ms. Motta passed the Louisiana bar exam and was admitted to the practice of law. She began her career by joining the Brandner Law Firm in New Orleans. In January 2017, after only seven months at the Brander Law Firm, Ms. Motta decided to start her own personal injury law practice, an incredibly difficult feat to pull off as a newly admitted lawyer with so little experience. During that same period of time, she was struggling to care for her then only child who was suffering from life threatening illnesses (ultimately resulting kidney and liver transplants).

Around that same time she was introduced to Sean Alfortish, who was fourteen years her senior and worked in the medical factoring industry (which is a fancy phrase for a company that

purchases medical bills and provides options for providers that allow attorneys to use their financial resources in litigation). They started romantically dating in March 2017 and quickly became a committed couple. As it so happened, Mr. Alfortish owned a small office building in Kenner, Louisiana, that he used for work. He also rented out spare office space in the building to other lawyers like Lionel Sutton and others. Mr. Alfortish offered to let Ms. Motta rent one of those offices, which she gladly accepted in April 2017. As their relationship quickly became serious, they ultimately purchased a home together, renovated it, and moved into it in 2018.

The government's briefing not only ignores these facts, but also is riddled with five major factual mischaracterizations. First, the government cites to three automobile collisions in which it claims "passengers were directed to Alfortish, Motta, and Motta Law for representation in [] fraudulent lawsuit[s]."[1] Not only is that false, but it is also facially absurd as to at least two of those collisions. The October 15, 2015, collision, which the government alleges was staged by Mr. Garrison, occurred while Ms. Motta was in law school. She had never heard of Mr. Garrison or Mr. Alfortish at that time. She was merely a law student. The four passengers in that collision secured representation from the Arnona Rose Law Firm and Tim Fields (not Ms. Motta), who filed suit on their behalf and have not been accused of any wrongdoing. One of those passengers, Mr. Garrison, ultimately decided almost two years after the collision to discharge Arnona Rose and hire Motta Law LLC to represent him. Moreover, the passengers in the April 12, 2017, collision first sought representation from the King Firm, not Motta Law LLC, and only later switched counsel. In short, to assert as the government now does that these "passengers were directed to Alfortish, Motta, and Motta Law for representation in a fraudulent lawsuit[s]" is demonstratively false.

---

[1] R. Doc. 227.

Second, the government mischaracterizes Mr. Garrison's purported statements to the FBI regarding Ms. Motta's involvement in the alleged fraud.  In the body of the government's brief, it states that Mr. Garrison stated that Ms. Motta "did know the accidents were staged from the start" and later that Garrison "believed Motta knew accidents were staged because there were so many" but notably attempted to bury in a short footnote Mr. Garrison's initial statement to the FBI when he said Ms. Motta "did not know the accidents were staged."[2]  Contrary to the government's *staged* presentation of his statements, the government's own documents paint a different picture of what Mr. Garrison believed about Ms. Motta's knowledge of the alleged fraud.  When Mr. Garrison first discussed Ms. Motta with the FBI in October 2019, he was crystal clear: "VANESSA MOTTA did not know the accidents were staged."  The following month, after news of the investigation became widespread,[3] Mr. Garrison was again asked whether Ms. Motta was involved.  In response, and only after the media explosion, Mr. Garrison stated "MOTTA's accident cases were given to her by ALFORTISH.  She may not have entirely known these cases were fraudulent initially, but probably did as of this interview."  Exhibit 1 (FBI 302 report of November 11, 2019 interview). In other words, Mr. Garrison stated that now that the alleged scheme was publicly outed he thought Ms. Motta probably *now* knew the accidents were staged.  Presumably not happy with those responses, the FBI revisited the issue again in December 2019, and Mr. Garrison allegedly changed his story completely, now stating that Ms. Motta "did know the accidents were staged from the start."  No doubt that was the answer the FBI was looking for, but unfortunately for the government, his final statement to the FBI completely destroyed the truthfulness of that answer. When the FBI raised this issue with Mr. Garrison a final time in January 2020, Mr. Garrison caved

---

[2] *Id.*

[3] *See* R. Doc. 98, Exhibit T (November 7, 2019 news article).

and said what he actually believed was true – Mr. Garrison only "*believed* Motta knew accidents were staged because there were so many," but could not say for sure one way or the other.  While Mr. Garrison was wrong, Ms. Motta never knew any collision was staged, the critical fact here is that Mr. Garrison did not know for sure one way or the other whether Ms. Motta knew or not.  This fact completely destroys the government's entire theory that there was a conspiracy involving Ms. Motta and Mr. Garrison because no conspiracy can exist without a knowing agreement to commit a crime.  Put differently, Mr. Garrison's final uncertainty as to Ms. Motta's knowledge exonerates Ms. Motta.

Third, the government mischaracterizes Ms. Motta's efforts to secure independent counsel for Mr. Garrison in connection with a civil deposition in a completely unrelated case.  In that case, which is not implicated in this indictment, Ms. Motta represented several individuals in a car accident in which Mr. Garrison was not a passenger.  Despite the fact that Mr. Garrison was not involved with that accident, defense counsel served Mr. Garrison with a notice of deposition.  In reaction, Mr. Garrison reached out to Ms. Vanessa – not the other way around – to seek guidance.  To ensure Mr. Garrison had legal counsel to assist him in the deposition, she helped secure another attorney, Brad Egenberg, to represent him.  Importantly, if Ms. Motta was in a conspiracy with Mr. Garrison and did not want him to testify or, even more likely if that were the case (which it is not), wanted him to testify untruthfully to protect their conspiracy, she would have simply told him to do that herself.  Instead, she secured another attorney to represent him.  Mr. Egenberg had his own ethical duty to represent Mr. Garrison's interests, not Ms. Motta's interests.  If called at trial, Mr. Egenberg is expected to testify under oath that he did *not* agree to corruptly represent Mr. Garrison, violate his ethical duties, and commit the federal crime of obstruction of justice.

Fourth, in a footnote, the government mischaracterizes Ms. Motta's efforts to resist discovery requests regarding Mr. Garrison from defense counsel in cases that had nothing to do with Mr. Garrison. To understand this, it is necessary to see the larger picture of what was happening in late 2018 and into 2019 when news of this investigation broke. The reality is that Ms. Motta had no idea any accidents were staged. When the government's investigation into these collisions made the local news in 2019, Ms. Motta was shocked and alarmed. She requested information from the government, defense counsel, and the Courts as to any evidence of fraud, but they refused to provide any evidence or information. She asked her clients, who all swore the accidents were legitimate. And because she had no personal reason to believe any of her cases were fraudulent, but still had an ethical duty to represent her clients, she continued representing her clients and fought against any and all efforts by defense counsel to conduct discovery on non-parties, including Mr. Garrison. The government now wants to twist her ethical requirement to zealously represent her clients as some sort of criminal conduct. It is not.

Finally, the government attempts to rope in Ms. Motta into Mr. Garrison's murder by drafting Mr. Harris's factual basis in a muddled, but completely false, way. Mr. Harris's factual basis refers to a purported meeting between Ryan Harris, Sean Alfortish, Leon Parker, and Ms. Motta where they all commented to Mr. Harris that "Garrison was a 'rat' and a 'snitch' and that it would be better if Garrison was dead." That meeting never took place and Ms. Motta never said that to Mr. Harris, or anyone, at any time.

## II.    LEGAL ANALYSIS

The government seeks to admit Cornelius Garrison's alleged statements against Ms. Motta at trial under the forfeiture by wrongdoing exception. Under Supreme Court precedent, an unavailable witness's unconfronted testimonial statement is admissible when the witness "was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Giles v. California*,

554 U.S. 353, 358-59 (2008). This is known as "forfeiture by wrongdoing," and the doctrine narrowly applies "when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Giles*, 554 U.S. at 359 (emphasis in original). Rule 804(b)(6) of the Federal Rules of Evidence codifies the forfeiture-by-wrongdoing doctrine, *Giles*, 554 U.S. at 367, and provides that if a declarant is unavailable as a witness, his statement is not excluded by the rule against hearsay when "offered against a party that wrongfully caused – or acquiesced in wrongfully causing – the declarant's unavailability as a witness, and did so intending that result." Fed. R. Evid. 804(b)(6). "[T]he requirement of intent means that the exception applies *only if* the defendant has in mind the particular purpose of making the witness unavailable." *Giles*, 554 U.S. at 367 (internal quotation marks and citation omitted) (emphasis added). "The party invoking the rule carries the burden of showing by a preponderance of the evidence that the opposing party wrongfully and intentionally made the witness unavailable." *United States v. Hankton*, 51 F.4th 578, 598-99 (5th Cir. 2022).[4]

The forfeiture-by-wrongdoing doctrine does not apply as a matter of law, and Mr. Garrison's statements cannot be admitted against Ms. Motta. First, there is no evidence that Ms. Motta had the requisite intent to make Mr. Garrison unavailable as a witness or procured his unavailability. Second, Ms. Motta's co-conspirator's acts cannot be imputed to her because Mr. Garrison's murder was not within the scope of or a reasonably foreseeable consequence of the staged collision scheme. Third, Ms. Motta did not acquiesce to Mr. Alfortish's purported wrongdoing. Therefore, the government's motion must be denied.

---

[4] Presumably forgetting its clear expression of this evidentiary standard in *Hankton*, the Fifth Circuit recently affirmed a district court's pre-*Hankton* observation that there was "ambiguity as to which [evidentiary] standard should apply" – *i.e.*, either the preponderance-of-the-evidence or clear-and-convincing-evidence standards. *United States v. Age, et al.*, No. 22-30656, 2025 WL 1201973, at *15 (5th Cir. Apr. 25, 2025). Because the district court analyzed the evidence under both standards, the Fifth Circuit held that the district court did not err. *Id.* It did express the correct evidentiary standard, likely because there was no need to do so following *Hankton*. *Id.* In any event, here, because the government cannot meet its burden of proof under the preponderance-of-the-evidence standard, it necessarily cannot meet its burden under the clear-and-convincing standard. Therefore, this "ambiguity" is of no moment. Under either standard, the government cannot carry its evidentiary burden.

**A.**    **Because Ms. Motta did not have the requisite intent to make Mr. Garrison unavailable as a witness or caused Mr. Garrison's unavailability, Mr. Garrison's statements cannot be admitted against her.**

The government argues that "Motta's persistent efforts to prevent Garrison from talking to anyone about the staged collision scheme – including federal criminal investigators and insurance defense attorneys in depositions[5] – demonstrated her bad intent and desire to make Garrison an unavailable witness."[6]   But these "persistent efforts" to which the government refers prove that Ms. Motta had the opposite intent in mind – *i.e.*, the specific intent to make Mr. Garrison *available*. Because the forfeiture-by-wrongdoing doctrine applies "*only if*" Ms. Motta has the specific intent to make the witness unavailable, *Giles*, 554 U.S. at 367 (emphasis added), and the government cannot carry its evidentiary burden, Mr. Garrison's statements cannot be admitted against her.

Ms. Motta's alleged "persistent efforts" occurred in February of 2020, when, according to the government, she: (1) arranged for Mr. Garrison to be represented by an attorney when deposed as a non-party in a civil action; (2) met with Mr. Garrison's chosen attorney, Claude Kelly, on one occasion before the deposition; and (3) told Mr. Garrison not to worry about the deposition and to think about what to say before saying it when being deposed.[7]   Consistent with Ms. Motta's intent to facilitate Mr. Garrison's testimony, these "persistent efforts" resulted in Mr. Garrison providing testimony at the deposition without obstruction; therefore, he was an *available* witness. *C.f. United States v. Gurrola*, 898 F.3d 524, 534 (5th Cir. 2018) ("Rule 804(b)(6), the forfeiture by wrongdoing exception, allows the introduction of statements offered against a party that has 'engaged or acquiesced in wrongdoing that was intended to, *and did, procure the unavailability of the declarant as a witness*.'") (quoting *Giles*, 554 U.S. at 367) (emphasis added).   Ms. Motta did

---

[5] Tellingly, the government fails to identify a single federal criminal investigator or insurance defense attorney that she allegedly tried to prevent Garrison from talking to in depositions.  There are none.

[6] R. Doc. 227-1 at 21.

[7] R. Docs. 227-1 at 8-9; 227-15 at 1; 227-16 at 1; 227-17 at 1.

not procure Mr. Garrison's unavailability because Ms. Motta's actions were designed to, and did, *furnish* Mr. Garrison's testimony, not silence it, as attorney representation would: (1) help Mr. Garrison prepare for the deposition; (2) ensure that the deposition was taken in accordance with governing procedural and ethical rules; and (3) protect the record from any uncertainty, unprofessional, or abusive practices. Further, her attempt to meet with independent counsel to provide context of the case in which Mr. Garrison would be deposed and her two statements were nothing more than standard operating procedure for any lawyer supporting a person for trial, deposition, or meeting with a new attorney. Notably, the government does not, and cannot, argue that these representation efforts were designed to or procured Mr. Garrison's unavailability more than half of a year later at the time of Mr. Garrison's murder.

To the extent the government asserts that Mr. Harris's factual basis reflects Ms. Motta's intent to make Mr. Garrison unavailable as a witness, it is mistaken. First, Ms. Motta never met with Mr. Harris, Mr. Alfortish, and Mr. Parker. Ever. Cell cite data will establish that no meeting took place. Second, Ms. Motta never said that "Garrison was a 'rat' and a 'snitch' and that it would be better if Garrison was dead" to anyone at any time. But even if she did, which Ms. Motta denies, the government's superseding indictment charging only Mr. Alfortish and Mr. Parker with murder-related crimes[8] underscores the fact that Ms. Motta had no intent to make Mr. Garrison unavailable by murder.[9] Further, that lone statement made at some unidentified and unknown time does not

---

[8] R. Doc. 256 at 20-23.

[9] True, in the sole paragraph devoted to Ms. Motta in its motion's legal-analysis section, the government states, "[a]ccording to Harris, Alfortish was more involved with arranging the murder." R. Doc. 227-1 at 22. This seemingly implies that Ms. Motta had *some* involvement. However, this intentionally misleading, and baseless, statement is wholly contradicted by the fact that the government cannot point to *any* involvement on Ms. Motta's part whatsoever. As the government expressly acknowledges, only Mr. Harris, Mr. Alfortish, Mr. Parker, and Ms. Gardner had any knowledge of or involvement in Mr. Garrison's murder. R. Doc. 227-1 at 10-13. Indeed, the government informed undersigned counsel on multiple occasions that it does not believe Ms. Motta was involved in Mr. Garrison's death. And, as the superseding indictment makes clear, only two individuals are charged with

show by a preponderance of the evidence that Ms. Motta had "in her mind the particular purpose" of murdering Mr. Garrison to make him unavailable as a witness to testify against her or that Ms. Motta did, in fact, murder him, as *Hankton* and *Giles* require.  *See Hankton*, 51 F.4th at 598-99; *Giles*, 554 U.S. at 367.

No evidence establishes the essential element of the forfeiture-by-wrongdoing doctrine: that Ms. Motta had in mind the particular purpose of making Mr. Garrison unavailable as a witness. Yet the forfeiture-by-wrongdoing doctrine attaches "only if" Ms. Motta had this specific intent. *See Giles*, 554 U.S. at 367.  Because the government fails to meet its evidentiary burden as to Ms. Motta's intent, this Court need not address the government's imputation and acquiescence theories.[10]  The forfeiture-by-wrongdoing doctrine does not apply as a matter of law; therefore, the government's motion must be denied.

**B.  Because Mr. Garrison's murder was not in the scope of or a reasonably foreseeable consequence of the staged automobile-collision scheme, Mr. Alfortish's acts cannot be imputed to Ms. Motta and Mr. Garrison's statements cannot be admitted against her.**

Relying on one unreported, non-binding case, *United States v. Age*, No. CR 16-32, 2022 WL 991759, at *3 (E.D. La. Apr. 1, 2022), the government argues that Mr. Alfortish's alleged criminal behavior (*i.e.*, murder) and his resulting forfeiture of his confrontation rights can be imputed to Ms. Motta.[11]  *Age* proposes, based entirely on out-of-circuit caselaw,[12] that "a co-conspirator's waiver of confrontation rights can be imputed to other participants in the conspiracy when the wrongful act at issue was in furtherance and within the scope of an ongoing conspiracy and reasonably foreseeable as a natural or necessary consequence." *Age*, 2022 WL 991759, at *3

---

any involvement with Mr. Garrison's murder whatsoever: Mr. Alfortish and Mr. Parker.  R. Doc. 256 at 20-23.

[10] For completeness, this opposition addresses the government's imputation and acquiescence theories below.
[11] R. Doc. 227-1 at 16, 22.
[12] *See United States v. Cherry*, 217 F.3d 811, 820 (10th Cir. 2000) (creating the legal theory); *United States v. Dinkins*, 691 F.3d 358, 384-85 (4th Cir. 2012) (adopting the *Cherry* analysis).

(internal quotation marks and citations omitted).[13]  No court within the Fifth Circuit has applied *Age*'s co-conspirator-liability theory to the forfeiture-by-wrongdoing exception, let alone relied on *Age*'s reasoning.[14]  This Court should follow suit.  First, *Age* is completely distinguishable and its facts underscore the government's evidentiary shortcomings in the instant case.  Second, assuming *Age*'s imputation theory is sound, which Ms. Motta denies, Mr. Garrison's statements cannot be admitted against Ms. Motta because the government cannot show by a preponderance of the evidence that Mr. Garrison's murder "was [(1)] in furtherance and within the scope of an ongoing conspiracy and [(2)] reasonably foreseeable as a natural or necessary consequence" of the alleged conspiracy to stage collisions and file fraudulent insurance claims and lawsuits, as *Age* requires. *See Age*, 2022 WL 991759, at *3 (quotation omitted).

> **1.    Based on *Age*'s reasoning and distinguishable facts, its imputation theory does not apply.**

In *Age*, each defendant was charged with, *inter alia*, killing a government witness (Milton Womack) two days after he changed his plea to guilty in a separate Medicare fraud case to prevent

---

[13] The Fifth Circuit recently affirmed *Age* on the limited grounds that the district judge, "[n]oting the ambiguity as to which [evidentiary] standard [*i.e.*, a preponderance of the evidence or clear and convincing] should apply," did not err in finding that the prosecution met its burden under both standards. *United States v. Age, et al.*, No. 22-30656, 2025 WL 1201973, at *15 (5th Cir. Apr. 25, 2025).  It did not address imputing a co-conspirator's acts onto others in the forfeiture-by-wrongdoing context.  And it did not address *Cherry* or *Dinkins*. *See id.*

[14] That no other court within the Fifth Circuit has expressly endorsed the co-conspirator extension of the forfeiture-by-wrongdoing theory is likely because *Age* and the out-of-circuit cases upon which it relies run afoul of the forfeiture-by-wrongdoing exception narrowly tailored later in *Giles*.  *See United States v. Richardson*, No. 19-20076-JAR, 2024 WL 961270, at *22 (D. Kan. Mar. 6, 2024); *cf. United States v. Brown*, 973 F.3d 667, 699-702 (7th Cir. 2020).  *Giles* reaffirmed *Crawford*'s holding that exceptions to the Confrontation right are limited to those only in effect at the time of the founding.  *Giles*, 554 U.S. at 358.  There, because the founding-era understanding of the forfeiture-by-wrongdoing exception only applies when a defendant acted with the design to prevent a witness from testifying, the Supreme Court "decline[d] to approve an exception to the Confrontation Clause unheard of at the time of the founding or for 200 years thereafter" and rejected the State's theory of forfeiture by wrongdoing inconsistent with that founding-era exception.  *Giles*, 554 U.S. at 377.  Noticeably absent from the founding-era forfeiture-by-wrongdoing exception and corresponding caselaw discussed in *Giles* is *any* indication that a defendant's alleged wrongdoing can be imputed to a co-conspirator such that the co-conspirator forfeits her own Constitutional rights, too. Imputing co-conspirator liability was first articulated in 1946, *Pinkerton v. United States*, 328 U.S. 640, 647 (1946), and its extension to the forfeiture-by-wrongdoing doctrine was first articulated in 2000, *Cherry*, 217 F.3d at 818. Obviously, *Pinkerton*'s application in the forfeiture-by-wrongdoing context is not "a founding-era exception to the confrontation right."  *See Giles*, 554 U.S. at 358.

him from testifying in the fraud case (Count 4), killing Mr. Womack in retaliation for his cooperation with law enforcement (Count 7), and conspiring to commit murder for hire (Count 1). *Age*, 2022 WL 991759, at *1 n.4. The court held that there was sufficient evidence to establish at a pre-trial juncture that "Defendants entered into the alleged conspiracy to murder Womack to prevent his availability as a witness" because: (1) "Age Jr. paid for the hit on Womack that was arranged by Age III and Wilson"; (2) the hit was "ultimately carried out by Guillory"; and (3) Age Jr., Age III, Wilson, and Guillory "all knew that Womack was a potential witness." *Age*, 2022 WL 991759, at *6. The court then devoted just one sentence to the government's imputation theory, holding that "the statements [we]re admissible against all Defendants because the object of the conspiracy was to prevent Womack from testifying, so his murder was clearly within its scope and reasonably foreseeable." *Age*, 2022 WL 991759, at *6.

*Age* itself bolsters the conclusion that Mr. Alfortish's purported acts cannot be imputed to Ms. Motta. First, its tailored reasoning proves that Mr. Garrison's murder was not within the scope or a reasonably foreseeable consequence of the conspiracy to stage accidents and file claims and suits. *Age* narrowly held that when the consequence is *also* the object of the conspiracy, then the consequence is within the scope of the conspiracy and reasonably foreseeable and can be imputed in the forfeiture-by-wrongdoing context. *Age*, 2022 WL 991759, at *6.[15] And there, murder was the object of the conspiracy. Murder, therefore, was within the scope and a reasonably foreseeable consequence of the Age family's conspiracy to commit murder. *Age*, 2022 WL 991759, at *6. Here, however, unlike in *Age*, the consequence, murder, was not the object of the charged conspiracy "to intentionally stage automobile collisions and file fraudulent insurance claims and

---

[15] *Cf. United States v. Sanjar*, 876 F.3d 725, 744 (5th Cir. 2017) ("Foreseeability is more often an issue when the substantive offense for which *Pinkerton* liability is being sought is *not* an object of the conspiracy, such as when prosecutors are seeking to hold drug trafficking conspirators liable for firearms and murder offenses committed by fellow dealers.") (citation omitted) (emphasis added).

lawsuits based on the staged collisions."[16]  Here, the object of the charged conspiracy was staging automobile collisions and filing fraudulent insurance claims and lawsuits based on those collisions. Under *Age*'s reasoning, then, Mr. Garrison's murder *was not* within the scope of the conspiracy or a reasonably foreseeable consequence because it was not also the object of the conspiracy to stage car accidents and file fraudulent insurance claims and lawsuits.  *See Age*, 2022 WL 991759, at *6.

Second, *Age*'s distinguishable facts evidence that Age's result – *i.e.*, imputation – does not follow in the instant case.  Unlike in *Age*, where the object of the conspiracy itself was violent (to murder a government witness to prevent his testimony), here, the object of the conspiracy is unquestionably nonviolent: to stage minor accidents and file fraudulent insurance claims and lawsuits.  Unlike in *Age*, where the co-conspirators had a violent criminal history and the paid triggerman was a member of a violent gang and had participated in shootouts before, *Age*, 2022 WL 991759, at *4, here, no co-conspirator had a violent criminal history, was affiliated with a violent gang, participated in shootouts, or had murdered or attempted murder before.  *See United States v. Thompson*, 286 F.3d 950, 966 (7th Cir. 2002) (holding that waiver-by-misconduct of one drug co-conspirator could not be imputed to another drug co-conspirator because murder was not a reasonably foreseeable when there was no evidence that the "defendants knew or had reason to know that an informant would be murdered," or that the drug "conspiracy had previously engaged in murder or attempted murder").  Unlike in *Age*, where each of the co-conspirators was *directly involved* in carrying out the murder either by payment or facilitating the connection between the triggerman and the payor, here, as the government tacitly concedes,[17] only Mr. Alfortish, Mr. Parker, and Mr. Harris were already aware of, and carried out, the plan to murder Mr. Garrison.[18]

---

[16] R. Doc. 227-1 at 2.
[17] *See, e.g.*, R. Doc. 227-1 at 12-16 (noticeably excluding Ms. Motta from the government's explanation of the scheme to commit murder).
[18] R. Doc. 256 at 20-23.

Unlike in *Age*, where each defendant was charged with the actual killing of the government witness, not just conspiracy, *Age*, 2022 WL 991759, at *1 n.4, here, only Mr. Harris, Mr. Alfortish, and Mr. Parker are charged with murdering and conspiring to murder Mr. Garrison.

Third, the object of the *Age* conspiracy, to murder to prevent a government witness from testifying, is exactly the type of object that the forfeiture-by-wrongdoing exception seeks to penalize. *See Giles*, 554 U.S. at 367 (holding that the exception applies when a defendant causing the declarant's unavailability as a witness acted with "the particular purpose of making the witness unavailable"). Here, however, the object to "stage automobile collisions and file fraudulent insurance claims and lawsuits based on the staged collisions"[19] does not implicate any forfeiture-by-wrongdoing concerns.

Against this backdrop, *Age* does not control. *Age*'s holding underscores that where, as here, the consequence of the act sought to be imputed is not the object of the conspiracy, then the consequence is not within the scope of or reasonably foreseeable. Finally, the substantial differences between *Age*'s facts and the instant case's facts prove that *Age*'s result, imputation, does not follow here.

### 2. The government's "relationship" theory does not comply with *Age*'s dictates; therefore, *Age*'s imputation theory does not apply.

Even if *Age* did control, the government cannot meet its evidentiary burden. Tellingly, although the government recognizes that *Age*'s imputation theory requires that the wrongful act be both within the scope of the conspiracy *and* reasonably foreseeable,[20] not once does it argue that Mr. Garrison's murder was within the scope or a reasonably foreseeable consequence of the conspiracy "to intentionally stage automobile collisions and file fraudulent insurance claims and

---

[19] R. Doc. 227-1 at 2.
[20] R. Doc. 227-1 at 16 & 16 n.9.

lawsuits based on the staged collisions."[21]  By *Age*'s own dictates, then, the imputation theory does not apply.

Instead of abiding by *Age*'s scope and foreseeability requirements, the government creates a new imputation theory unsupported by any caselaw: that "Motta and Alfortish's romantic relationship and the fact that they worked closely together throughout the staged collision scheme … suggests … that Alfortish's criminal behavior should be imputed to Motta."[22]  And while it cites *United States v. Sanders*, 952 F.3d 263, 275 (5th Cir. 2020) in "support," importantly, *Sanders* does not address Rule 804(b)(6), the forfeiture-by-wrongdoing doctrine, or its extension imputing co-conspirator's acts.  In *Sanders*, the Fifth Circuit considered whether there was sufficient evidence to convict a defendant of conspiracy to commit health care and wire fraud. *Sanders*, 952 F.3d at 275.  The co-conspirator's romantic relationship with "the chief miscreant" was not the deciding factor in upholding her conviction, reasoned the Court.  *Sanders*, 952 F.3d at 276 ("But the evidence of Mrs. Rose's conspiratorial activity goes much further than the fact of her marriage to Mr. Rose.").  In addition to being married to the ringleader, there was sufficient evidence to uphold her conviction because the defendant: (1) participated in the company's culture of questionable billing practices; (2) acted with others in hiding funds from the government; (3) attended post-warrant meetings; (4) admonished employees for failing to maximize billings; and (5) held the number three position in a company permeated with fraud.  *Sanders*, 952 F.3d at 275. Even if the government were correct in implying that *Sanders* stood for the proposition that a relationship, on its own, was a sufficient basis for a conspiracy-related conviction, *Sanders* is

---

[21] R. Doc. 227-1 at 2.

[22] R. Doc. 227-1 at 22.  In other words, the government is manufacturing a brand new, and baseless, quasi-legal theory: "romantic relationship" + "history of obstructive behavior" = "acquiesced to murder."

wholly irrelevant here because it did not address imputation in the forfeiture-by-wrongdoing context.

No law supports that a co-conspirator's acts could be imputed to another co-conspirator in the forfeiture-by-wrongdoing context solely because a relationship between the conspirators existed. Indeed, under the two cases from which the court in *Age* developed its imputation-to-co-conspirators rule, the simple existence of a romantic and working relationship is insufficient to justify imputation. Under *Cherry* and *Dinkins*, "mere participation" in the conspiracy "does not suffice." *Cherry*, 217 F.3d at 820; *see also Dinkins*, 691 F.3d at 385 ("Mere participation in a conspiracy will not trigger the admission of testimonial statements under a forfeiture-by-wrongdoing theory."). Like "mere participation" in the conspiracy, merely having a relationship with a co-conspirator is similarly passive and does not warrant imputation. Therefore, under *Dinkins* and *Cherry*, merely having a relationship with a co-conspirator is insufficient to warrant imputation in the forfeiture-by-wrongdoing context.[23] So, imputation cannot occur here.

---

[23] Further, in *Dinkins*, the Fourth Circuit adopted an even narrower rule than in *Cherry*: that the defendant to which the co-conspirator's action is imputed must intend the that the witness be rendered unavailable and had previously attempted to render the witness unavailable in the same manner. *Dinkins*, 691 F.3d at 386 (imputing liability onto defendant when defendant and a co-conspirator "nearly had succeeded in murdering [the witness] the year before, and had manifested the intent to 'finish the job'"). The defendant in *Dinkins* was incarcerated when his co-conspirators murdered an informant. He and one of his co-conspirators had attempted to kill the same informant in the past, and the defendant announced an intent for him and the co-conspirator to "go to the hospital and finish him [*i.e.*, the witness] off." *Dinkins*, 691 F.3d at 385-86. The Fourth Circuit found that the defendant's prior attempt on the informant's life made the murder by co-conspirators reasonably foreseeable, as required by *Cherry*. The prior attempt showed evidence, on the defendant's part, of a "design" to make the informant unable to testify, as required by *Giles*. So, under *Dinkins*, a defendant who should reasonably have foreseen that her co-conspirator would make a witness unavailable will not have the co-conspirator's action imputed unless that defendant harbored the requisite intent that the witness be made unavailable *and* had previously attempted to make the witness unavailable in the same manner. Here, however, there is no evidence that Ms. Motta had the requisite intent to render Mr. Garrison unavailable as a witness *and* that she previously attempted to make Mr. Garrison unavailable by murdering him. Therefore, the present fact pattern does not warrant imputation in the forfeiture-by-wrongdoing context under *Dinkins*.

The government cannot have it both ways. It cannot ask this Court to apply *Age*'s imputation theory without also applying *Age*'s mandate that for a co-conspirator's acts to be imputed, the consequence of the act must be within the scope and a reasonably foreseeable consequence of the conspiracy. And its imputation-by-relationship theory not only fails because it violates *Age*'s mandate, but also because is wholly unsupported by law. The government's failure to argue (let alone prove by a preponderance of the evidence, as required) that Mr. Garrison's murder was within the scope and a reasonably foreseeable consequence of the conspiracy to stage car accidents is fatal. Accordingly, "Alforish's criminal behavior"[24] cannot be imputed to Ms. Motta, and Mr. Garrison's statements cannot be admitted against her.

### C. Because Ms. Motta did not acquiesce to Mr. Alfortish's purported wrongdoing, Mr. Garrison's statements cannot be admitted against her.

Relying on one unreported, non-binding case, *United States v. Hankton*, No. CR 12-01, 2016 WL 10950447 (E.D. La. June 2, 2016), the government argues that Ms. Motta acquiesced to Mr. Garrison being made unavailable due to her "history of obstructive behavior with Garrison and her close relationship to Alfortish."[25] Under Supreme Court precedent, for a defendant to have acquiesced in wrongfully causing the declarant's unavailability as a witness, the defendant must have "in mind the particular purpose of making the witness unavailable." *Giles*, 554 U.S. at 367 (internal quotation marks and citation omitted). *Hankton*'s distinguishable facts highlight the government's failure to meet its evidentiary burden. Mr. Garrison's statements cannot be admitted against Ms. Motta because the government cannot show by a preponderance of the evidence that she acquiesced to Mr. Garrison's murder.

---

[24] R. Doc. 227-1 at 22.
[25] R. Doc. 227-1 at 16, 22.

In *Hankton*, the court held that Telly Hankton, New Orleans's most notorious gangbanger, acquiesced in wrongfully causing the unavailability of a witness, Hasan Williams, such that the witness's statements were admissible against him. *Hankton*, 2016 WL 10950447, at *3-4. There, Mr. Williams and Jesse Reed were sitting on a stoop when a car rushed into the intersection and two persons toting semi-automatic handguns "opened fire on Jesse Reed." *Hankton*, 2016 WL 10950447, at *1. Mr. Reed and Mr. Williams fled; ultimately, "Reed was gunned down" and "died on the scene from 50 gunshot wounds." *Hankton*, 2016 WL 10950447, at *1. Later that night, Mr. Williams told detectives that he clearly recognized Telly Hankton, who Mr. Williams had known for years, as one of the shooters. He explained that Telly Hankton and his cousin had shot Mr. Reed several times five years prior, starting a "war" between the families, and that Mr. Reed later killed Mr. Hankton's cousin. *Hankton*, 2016 WL 10950447, at *1-2. Mr. Williams testified before a Louisiana grand jury four days after the shooting. *Hankton*, 2016 WL 10950447, at *2. Two weeks after Mr. Reed's murder, while Telly Hankton was in prison, Mr. Williams was murdered by Telly Hankton's gang's hitman. *Hankton*, 2016 WL 10950447, at *2. The weapons used to kill Mr. Williams were ballistically linked to Mr. Reed's murder. *Hankton*, 2016 WL 10950447, at *3.

Mr. Williams's murder, said the government, "coincide[d] with its other charges of bribery, perjury, intimidation, and murder, all intended to accomplish the same ultimate goal: to prevent witnesses from testifying against Telly Hankton." *Hankton*, 2016 WL 10950447, at *3. And although the government did not charge Telly Hankton for the murder of Mr. Williams, it did charge that "Telly Hankton was the leader of a criminal enterprise and that Walter Porter – who [*wa*]s charged with murdering Hasan Williams – was a hitman for the enterprise." *Hankton*, 2016 WL 10950447, at *3 (emphasis in original). Against this backdrop, the court admitted Mr.

Williams's statements because: (1) Mr. Williams and Telly Hankton had known each other for years before the Jesse Reed murder; (2) it was more likely than not that Telly Hankton clearly recognized Mr. Williams; (3) Mr. Williams was killed allegedly by the hitman for the Hankton organization nine days after he identified Telly Hankton before the state grand jury; and (4) the two guns used to kill Mr. Williams were ballistically linked to the same guns used to kill Mr. Reed. *Hankton*, 2016 WL 10950447, at *4.[26]  Telly Hankton's leadership role in the violent criminal enterprise and the conspiracy was crucial.

*Hankton*'s facts are distinguishable.  And they bolster the conclusion that Ms. Motta, unlike Telly Hankton, did not acquiesce in Mr. Garrison's unavailability.

     **1.**     **The differences between Telly Hankton and Ms. Motta, and their respective roles in the charged conspiracies, are critical.**

Telly Hankton's position and standing as "the leader of a criminal enterprise" and the charges brought against him were central to the court finding that even while in jail, the mastermind of the gang had acquiesced to Mr. William's murder.  Unlike in *Hankton*, where Telly Hankton, one of the City's most violent criminals in its history, was charged as the leader of a violent criminal enterprise carrying out hits on various people and charged with various other crimes all related to "prevent[ing] witnesses from testifying against Telly Hankton," *Hankton*, 2016 WL 10950447, at *3, here, Ms. Motta has no criminal history, is not the leader of a violent gang, is not violent person, and no violent history of executing people.  The government does not allege that Ms. Motta had any leadership role whatsoever or control over hitmen.  Therefore, unlike

---

[26] On appeal, the Fifth Circuit, affirming the district court, rejected Telly Hankton's argument that the "district court erroneously applied the conspiratorial liability approach articulated in *Pinkerton*," based on the district court's footnoted remark "that the Fourth Circuit 'has applied conspiratorial principles to the forfeiture [by wrongdoing] doctrine, explicitly rejecting the argument that a defendant could not participate in a murder to silence a witness because the defendant was in prison at the time of the murder.'" *Hankton*, 51 F.4th at 600 (citing *Dinkins*, 691 F.3d 358) (alteration in original).  But, explained the appellate court, "the district court's ruling turned *not* on the Fourth Circuit's conspiratorial liability approach, but on the facts detailed above [in the opinion]." *Hankton*, 51 F.4th at 600 (emphasis added).

Telly Hankton, Ms. Motta held no position of power from which the government could glean some sort of acquiescence to the acts of those acting on her behalf.

Sidestepping *Hankton*'s dispositive leadership-role fact, the government erroneously contends that Ms. Motta's alleged "history of obstructive behavior with Garrison and her close relationship to Alfortish," constitute acquiescence to his murder.[27]  The government fails to identify any obstructive efforts in its sole paragraph devoted to admitting Mr. Garrison's statements against Ms. Motta.  Based on the government's fact section of its briefing, however, Ms. Motta surmises that her allegedly "obstructive" acts concern: (1) her seeking representation for Mr. Garrison in relation to his non-party deposition in a civil matter; (2) Mr. Harris telling law enforcement that Mr. Alfortish, Ms. Motta, and Mr. Parker allegedly said to Mr. Harris at some unidentified time "that Garrison was a 'rat' and a 'snitch' and that it would be better if Garrison were dead," which Ms. Motta denies making; and (3) Mr. Harris spinning a story to trick Ms. Gardner into believing that "'the lawyers' (whom Gardner understood to mean Motta and Alfortish) had instructed Harris to meet with Garrison and convince Garrison not to cooperate" so that she would assist him in murdering Mr. Garrison.[28]  Seeking representation for Mr. Garrison for a civil deposition in which he testified does not equate to implied consent to a co-conspirator murdering Mr. Garrison.  Nor does one hearsay-ridden, generic statement reflected in Mr. Harris's factual basis, which Ms. Motta vehemently denies making.  Nor does Ms. Gardner's irrelevant impression of Ms. Motta's completely-fabricated "involvement" in an unquestionably false story spun by Mr. Harris to trick Ms. Gardner.  To hold otherwise would defy *Hankton*'s reasoning.

---

[27] R. Doc. 227-1 at 22.

[28] R. Doc. 227-1 at 11-12.  The government states that Mr. Harris's admittedly-false tale is "[s]ignificant to the instant motion."  R. Doc. 227-1 at 11.  When the government must prove by a preponderance of the evidence that the opposing party wrongfully and intentionally made the witness unavailable, *Hankton*, 51 F.4th at 598-99, there is nothing significant regarding verified fiction.

Considering the absence of *Hankton*'s crucial fact – leadership of a large-scale criminal enterprise – neither the above-discussed "acts" nor Ms. Motta's relationship with Mr. Alfortish, constitutes "acquiescence." *See Sanders*, 952 F.3d at 276 (observing that relationship, on its own, was insufficient to maintain conviction). The government, therefore, cannot carry its evidentiary burden to show that Ms. Motta had in mind the particular purpose of making Mr. Garrison unavailable and did procure his unavailability via acquiescence. *See Giles*, 554 U.S. at 367.

> **2.    In addition to the dispositive differences between Telly Hankton's and Ms. Motta's alleged roles, other factual differences prove that *Hankton* does not control.**

Unlike in *Hankton*, where the defendant charged with murdering Mr. Williams "was a hitman for the [Hankton] enterprise," *Hankton*, 2016 WL 10950447, at *3, here, Ms. Motta is not charged with murdering Mr. Garrison. Further, of the three individuals the government asserts were involved in executing Mr. Garrison's murder, namely, Mr. Alfortish, Mr. Harris, and Mr. Parker, none works as a hitman, let alone a hitman for the alleged conspiracy to stage accidents. Further, unlike in *Hankton*, where the government witness was shot fifty times allegedly by the hitman for the Hankton organization using guns ballistically linked to the same guns Telly Hankton used to kill Mr. Reed (whose murder was one of multiple contemplated by the indictment), *Hankton*, 2016 WL 10950447, at *4, here, no murder weapon is (or will be) linked to Ms. Motta and Mr. Garrison's murder is the sole murder contemplated by the indictment.

Considering these dispositive factual differences, *Hankton* does not control. *Hankton*'s distinguishable facts prove that *Hankton*'s result, admitting under an acquiescence theory an unavailable witness's statements against the leader of a gang whose hitman committed the murder, does not follow here. Telly Hankton acquiesced to a witness's murder. Ms. Motta did not. Accordingly, Mr. Garrison's statements cannot be admitted against her.

**D.    An evidentiary hearing is imperative, but *only if* this Court finds that Ms. Motta had in mind the requisite intent to make Mr. Garrison unavailable by murder, which is denied.**

The government contends that no evidentiary hearing is needed because "in *Hankton*, Judge Feldman … concluded that the murdered witness's statements should be admitted without an evidentiary hearing."[29]  Judge Feldman came to no such "conclusion."  As the Fifth Circuit made clear, the district court in *Hankton* did not hold an evidentiary hearing because no party requested one.  *Hankton*, 51 F.4th at 598 ("But Telly did not request a hearing.").  The court in *Age*, however, held an evidentiary hearing at the request of the parties.  Here, Ms. Motta requests an evidentiary hearing to: (1) determine which specific statements the government seeks to admit; (2) safeguard against a wholesale admission of all of Mr. Garrison's unidentified statements; (3) raise double hearsay concerns; (4) determine which of Mr. Garrison's statements to Mr. Kelly that the government seeks to admit are subject to the attorney-client privilege, (5) receive testimony from Brad Egenberg regarding his representation of Garrison, (6) receive testimony from Ryan Harris regarding the purported meeting with Ms. Motta, Harris, Alfortish, and Parker, and (7) receive testimony from an FBI agent regarding the lack of cell cite data corroborating that the meeting did not take place.

First, an evidentiary hearing would establish the contours of the statements the government seeks to admit, which, presently, are wholly unclear.  The government alleges that it "seeks to admit Garrison's statements based on the attached exhibits,"[30] which are a series of FBI 302 reports created by government officials based off of unrecorded conversations Mr. Garrison allegedly had with law enforcement.  Although, at first blush, this might seem like these 302 reports constitute the entire universe of statements the government seeks to admit, they are not.  The government

---

[29] R. Doc. 227-1 at 25.
[30] R. Doc. 227-1 at 1.

also contends that it "seeks to admit Garrison's statements to law enforcement *and others*, *including* [and, therefore, not limited to] FBI special agents and Garrison's criminal defense attorney, FPD Kelly."[31]   The government, however, has not stated with any precision what Mr. Garrison allegedly said, to whom, or in what circumstances apart from the alleged statements in the 302 reports.   Because these statements have not yet been identified, Ms. Motta cannot adequately challenge them.

Second, an evidentiary hearing would guard against the government's sought-after wholesale and limitless admission of all statements attributed to Mr. Garrison.   Contrary to the government's contention, the admission of statements under the forfeiture-by-wrongdoing doctrine is not limitless.   Quoting a portion of a sentence in *Age*, the government erroneously alleges that there is "no limitation on the subject matter of the declarant's statements that can be offered against the defendant at trial."[32]   This proposition neither finds support in the *Age* case nor in the Federal Rules of Evidence.   In *Age*, the court, quoting a non-binding Second Circuit case, stated: "Rule 804(b)(6) places no limitation on the subject matter of the declarant's statements that can be offered against the defendant at trial *to prove that the defendant murdered the declarant*." *Age*, 2022 WL 991759, at *3 (quoting *United States v. Dhinsa*, 243 F.3d 635, 653 (2d Cir. 2001)) (emphasis added).   "There is no limitation," explained the court in Age, "because by its plain terms, Rule 804(b)(6) refers to the intent of a party to procure the unavailability of the *witness*, and does not limit the subject matter of the witness' testimony to past events or offenses the witness would have testified about had he been available." *Age*, 2022 WL 991759, at *3 (internal quotation marks and alterations omitted; emphasis in original).   The court later walked back its "limitless" approach, noting that each of the statements can be introduced subject to objections to

---

[31] R. Doc. 227-1 at 20.
[32] R. Doc. 227-1 at 16-17 (quoting *Age*, 2022 WL 991759, at *3).

admissibility, like those under Rules 403 and 608.  *Age*, 2022 WL 991759, at *6.  This "limitless" approach to proving that a defendant murdered the declarant does not apply, when, as here, the defendant, Ms. Motta, is not charged with murder.  *See Age*, 2022 WL 991759, at *3 (all defendants charged with murder).

Further, consistent with Judge Ashe's limiting construction, *Age*, 2022 WL 991759, at *6, the government's sought-after "limitless" approval of Mr. Garrison's alleged statements sidesteps this Court's duty to determine the relevance of any evidence and whether the probative value of the testimony is substantially outweighed by risks of prejudice, confusion, or waste of time.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 148 (1997) (Breyer, J., concurring) (describing that the judge must exercise "the 'gatekeeper' duties that the Federal Rules of Evidence [including Rule 403] impose").  For example, even if a statement is received as an exception to the hearsay rule under Rule 804(b)(6), it must still pass muster under Rules 401 and 403.[33]

Third, an evidentiary hearing would prompt this Court's analysis of the admissibility of Mr. Garrison's alleged statements that are embedded within double hearsay, including statements attributed to Mr. Garrison in FBI 302 reports, under Rule 805 of the Federal Rules of Evidence.  Because Mr. Garrison's conversations with law enforcement were not recorded, the reliability and accuracy of the law enforcement's renditions of Mr. Garrison's alleged statements are called into question.  Further, the Fifth Circuit has held that statements contained in an FBI agent's 302 report are "those of the FBI agent who made the report" and not of the interviewee, such that the 302

---

[33] This duty necessarily dovetails into an analysis of the statements under Rule 602 of the Federal Rules of Evidence.  According to the Advisory Committee Notes to Rule 803, "In a hearsay situation, the declarant is, of course, a witness, and neither this rule nor Rule 804 dispenses with the requirement of firsthand knowledge.  It may appear from his statement or be inferable from circumstances.  See Rule 602."  Advisory Committee Notes, Fed. R. Evid. 803.  The requested hearing would also address Ms. Motta's Rule 602 concerns.

report is inadmissible hearsay if offered as the truth of what the interviewee stated. *United States v. Whitfield*, 590 F.3d 325, 363 & 363 n.28 (5th Cir. 2009).

Finally, an evidentiary hearing is necessary to determine whether the unidentified statements Mr. Garrison made to his attorney, Mr. Kelly, are protected by attorney-client privilege, which unquestionably survives death. *See, e.g.*, *Swidler & Berlin v. United States*, 524 U.S. 399 (1998) (holding that the government cannot compel and the court cannot order an attorney to disclose privileged communications of the deceased, despite their importance to a criminal investigation).

Given Ms. Motta's request and the court's holding of an evidentiary hearing upon request in *Age*, this Court should hold an evidentiary hearing to address, *inter alia*, Ms. Motta's above-listed concerns. However, if Ms. Motta does not have the requisite intent necessary for the forfeiture-by-wrongdoing doctrine to attach, none of Mr. Garrison's statements can be admitted against her, and no evidentiary hearing is needed.

## III.    CONCLUSION

The government's motion is woefully misguided as to Ms. Motta and is an example of prosecutorial overreach. And it has not met its burden of showing by a preponderance of the evidence that Ms. Motta wrongfully and intentionally made Mr. Garrison unavailable. As an evidentiary hearing will make clear, there is no evidence that Mr. Alfortish's criminal behavior should be imputed to Ms. Motta or that Ms. Motta acquiesced to Mr. Garrison's unavailability. Accordingly, Mr. Garrison's statements cannot be admitted against Ms. Motta or Motta Law, and the government's motion must be denied.

Respectfully submitted,

*/s/ Sean M. Toomey*
Sean M. Toomey (La. Bar #36055)
Hancock Whitney Center
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
Email: stoomey@liskow.com

***Attorney for Defendants Vanessa Motta and Motta Law, LLC***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 28th day of April, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system.

*/s/ Sean M. Toomey*