### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.  24-105** |
| **v.** | * | **SECTION:  "D"(1)** |
| **RYAN HARRIS,** *et al.* | * | |
| | * * * | |

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SEVERANCE

The United States of America, through the undersigned attorneys, hereby opposes

motions to sever by defendants Jason F. Giles, The King Firm, LLC, Vanessa Motta, Motta Law,

LLC, Carl G. Morgan, Diaminike F. Stalbert, and Timara N. Lawrence. *See* Rec. Docs. 216, 271,

287, 288 & 291. As explained below, the Second Superseding Indictment properly charges a

single conspiracy that includes Giles, The King Firm, Motta, Motta Law, Morgan, Stalbert, and

Lawrence as conspirators. The defendants have not demonstrated misjoinder under Federal Rule

of Criminal Procedure 8, and they have not shown that this is the rare case requiring severance

under Federal Rule of Criminal Procedure 14. Accordingly, their motions should be denied.

## INTRODUCTION

In 1973, the Fifth Circuit affirmed the convictions of defendants who were part of a

sprawling scheme to stage automobile collisions and file fraudulent insurance claims based on

the staged collisions. *United States v. Perez*, 489 F.2d 51, 54-55 (5th Cir. 1973). The scheme

involved passengers in the collisions, "hitters" who intentionally caused the collisions, and

various attorneys who knowingly filed fraudulent claims. *Id.* The Fifth Circuit described the

scheme as "an American tragedy . . . because it is just another instance in which large numbers

of Americans get willingly involved in enterprises which reflect a lack of compunction, possibly

even a proclivity, to enter into the proverbial 'get-rich-quick scheme' evidencing not only a disregard for the law but, sadly, also a deafness to conscience." *Id.*

On appeal, the defendants raised similar arguments to those in the instant motions, namely, that the indictment charged multiple conspiracies and that the district court erred when it denied their motions for severance. *See id.* at 57. Among other things, the defendants argued that, after the first staged collision, the two conspirators central to the scheme "proceeded to set up separate and distinct operations with no control exerted by either over the other's sphere of operation." *Id.* at 59. In denying the defendants' claims that there were multiple conspiracies, the Fifth Circuit stated that "this was not a series of little concoctions to set up a particular collision. It was rather a grand scheme for all to obtain some reward for his/her participation each according to the part played and the risk undertaken." *Id.* at 64. In denying the defendants' severance claims, the Fifth Circuit held that the district court mitigated any prejudice resulting from the joint trial with instructions to the jury, including an admonishment that the jury "must consider the guilt or innocence of each defendant separately and independently." *Id.* at 67.

In the fifty years since the Fifth Circuit decided *Perez*, the law related to multiple conspiracies has become even less rigid, and the law related to severance, particularly in conspiracy cases, has become even more difficult for defendants to satisfy. The defendants' claims here would have been meritless in 1973, and they are even more so now. Accordingly, their motions for severance should be denied.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Slammers and attorneys.

The defendants are charged with participating in a years-long scheme to intentionally stage automobile collisions and file fraudulent insurance claims and lawsuits based on the staged

collisions. *See* Rec. Doc. 256 (Second Superseding Indictment). Among the individuals involved in the staged collisions were multiple "slammers" who crashed automobiles into 18-wheeler tractor-trailers and directed passengers in staged collisions to certain attorneys and law firms to file fraudulent lawsuits. Rec. Doc. 256, p. 4. Cornelius Garrison was a slammer and a central figure in the conspiracy. *See* Rec. Doc. 256, p. 6. Garrison worked with fellow slammer Ryan Harris to stage collisions for Motta, Motta's fiancée Sean D. Alfortish, and Motta Law. *See* Rec. Doc. 184 (Harris's Factual Basis). Garrison and Harris also staged collisions for Giles and The King Firm. *See* Rec. Doc. 184, pp. 1-2 (Harris's Factual Basis: "Passengers in Harris and Garrison's staged collisions were directed to Jason Giles ('Giles') and The King Firm, LLC ('The King Firm'), among other attorneys and law firms. Giles and The King Firm paid Garrison, and they were aware the passengers Harris and Garrison directed to them had been involved in staged collisions.").[1]

Garrison and Harris were not the only slammers who operated in the New Orleans area. Other slammers included Slammer G, who accepted illegal payments from Giles, The King Firm, Alfortish, and others to bring them automobile collision cases. *See* Rec. Doc. 227-8, p. 1 (FBI agent's report summarizing interview with Garrison stating that Slammer G "set up the accident" for a 2015 collision involving a Hotard bus); Rec. Doc. 227-8, p. 2 (same, stating that Slammer

---

[1] As described in other filings, Garrison cooperated extensively against Giles and The King Firm. *See* Rec. Doc. 227-1, pp. 5-6 (summarizing Garrison's statements to law enforcement). Among other things, Garrison stated that Giles "wanted [Garrison] to bring [The King Firm] 25 cases per month" and that Garrison and another slammer staged so many collisions for The King Firm that they "had to take breaks . . . because The King Firm had to replenish the funds for staging accidents." Rec. Doc. 227-1, p. 6. The government has decided not to seek admission of these statements to law enforcement under the forfeiture by wrongdoing exception to the hearsay rule. *See* Rec. Doc. 227-1, pp. 22-24. Instead, the government will seek to admit statements Garrison made to Harris during and in furtherance of the conspiracy, including that certain of his and Garrison's staged collisions were directed to Giles and The King Firm. These coconspirator statements from Garrison to Harris are not hearsay; thus, they will be admissible against Giles and The King Firm. *See* Fed. R. Evid. 801(d)(2)(E) (stating that a statement is not hearsay if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy").

G worked with another slammer and knew Alfortish).[2] From August 2015 to December 2017,

The King Firm paid Slammer G over $25,000 in the form of advances against a settlement in a

personal injury case.[3] At around the same time, from January 2017 to December 2017, Alfortish

paid Slammer G over $46,000 in "professional fees" from an entity Alfortish controlled. Also in

2017, using the same entity, Alfortish paid over $119,000 in "professional fees" to Garrison and

over $72,000 in "professional fees" to Harris.

      Another slammer was Slammer H, from whom Garrison learned how to stage collisions.

Rec. Doc. 227-5, p. 1. When they first began working together, Garrison and Slammer H mostly

staged collisions with just automobiles before graduating to collisions with 18-wheeler tractor-

trailers. *See* Rec. Doc. 227-5, p. 1.[4] Slammer H "told [Garrison] not to put four people in a car

when staging an accident because it raised red flags." Rec. Doc. 227-5, p. 1. Later, when

Garrison became frustrated with the pace of his fraudulent lawsuit that resulted from a staged

---

[2] The government attached redacted copies of FBI agents' reports summarizing interviews with Garrison to its motion concerning Sean Alfortish's and Leon Parker's pretrial detention, Rec. Doc. 98, and its motion concerning the forfeiture by wrongdoing exception to the hearsay rule. Rec. Doc. 227. To avoid unnecessarily expanding the record by repeatedly attaching the same exhibits, the government references the reports here by citing to the motion on forfeiture by wrongdoing. *See* Rec. Doc. 227. The government will provide copies of the reports upon request from the Court.

[3] Giles and The King Firm also funneled money through advances and loans against settlements to slammers Damian Labeaud and Roderick Hickman. *See United States v. Hickman*, E.D. La. No. 20-cr-80, Doc. 107, pp. 2-3 ("[Giles] would sometimes loan Hickman and Labeaud money and then subtract the loan amount when calculating how much was owed to Hickman and Labeaud for a staged accident. Additionally, [Giles] represented Hickman and Labeaud in accidents that they were each involved [in], and concealed subsequent payments to them for staging accidents as advances on their settlement and/or loans.").

[4] Garrison told law enforcement that he and Slammer H staged numerous collisions for Giles and The King Firm. Rec. Doc. 227-5, p. 1. According to Garrison, Giles and The King Firm paid Slammer H $1,300 per passenger for staged collisions before reducing the amount to $1,000 in 2017. Rec. Doc. 227-5, p. 1. Garrison "believed every tractor-trailer accident at The King Firm was a staged accident from [Slammer H] and Garrison." Rec. Doc. 227-5, p. 1.

collision with a Hotard bus, Slammer G and Slammer H introduced Garrison to Alfortish, and Garrison brought his case to Alfortish, Motta, and Motta Law. Rec. Doc. 227-11, pp. 1-2.

Two additional slammers, Damian Labeaud and Roderick Hickman, first worked as illegal runners for Giles, who paid them $1,000 per passenger for collisions with tractor-trailers and $500 per passenger for collisions that did not involve tractor-trailers. *Hickman*, E.D. La. No. 20-cr-80, Doc. 107, pp. 1-2.[5] In or around 2015, Labeaud and Hickman began staging collisions for The King Firm, which Giles and others had recently founded. *Hickman*, E.D. La. No. 20-cr-80, Doc. 107, p. 2. Labeaud and Giles communicated through coded language, including fishing terms, to refer to staged collisions Labeaud and Hickman brought to The King Firm. *Hickman*, E.D. La. No. 20-cr-80, Doc. 107, p. 2; *see also Hickman*, E.D. La. No. 20-cr-80, Doc. 1, pp. 17-18 (Hickman's indictment describing text messages between Labeaud and Giles, including a text message from Labeaud saying, "I got 2 real nice big one for u rite now bro I will see u n about 1 hour ok ?"). Giles and The King Firm paid Labeaud and Hickman for the collisions using different methods. Sometimes, Giles and The King Firm loaned Labeaud and Hickman money and then subtracted the loan amount when calculating how much was owed to Labeaud and Hickman for a staged collision—in other words, fronting Labeaud and Hickman money in the form of a loan. *See Hickman*, E.D. La. No. 20-cr-80, Doc. 107, p. 2. Additionally, Giles and The King Firm represented Labeaud and Hickman in their own cases, and they concealed payments to Labeaud and Hickman as advances on their settlements or loans. *Hickman*, E.D. La. No. 20-cr-80, Doc. 107, pp. 2-3.

---

[5] Runners are different from slammers in that runners direct passengers from legitimate collisions to attorneys and law firms in exchange for payment, whereas slammers intentionally stage collisions and then direct passengers to the attorneys and firms. Under Louisiana law, paying runners is a felony that carries a term of imprisonment of 90 days to five years. *See* La. R.S. § 37:219.

Similarly, Giles, The King Firm, Motta, and Motta Law were not the only attorneys and law firms who participated in the staged collision scheme. For example, attorney Patrick Keating has pleaded guilty to conspiring with Giles, Labeaud, Hickman, and others to file fraudulent lawsuits based on Labeaud and Hickman's staged collisions. *See United States v. Keating*, E.D. La. No. 20-cr-117, Doc. 26 (Keating's factual basis). Keating worked at a separate personal injury firm. According to Keating, during his and Labeaud's first meeting in 2017, Labeaud told him that he had been bringing passengers to Giles and The King Firm in exchange for illegal payments for years. *Keating*, E.D. La. No. 20-cr-117, Doc. 26, pp. 1-2. Keating accepted staged collision cases from The King Firm via Labeaud, and he similarly communicated with Labeaud through coded language, including fishing terms, to refer to staged collisions. *See Keating*, E.D. La. No. 20-cr-117, Doc. 26, pp. 3-4 (describing text messages between Labeaud and Keating, including a text message from Labeaud saying, "Do u want somemore fish 2dy 4 lunch bro !!").

In addition to Keating, Attorney C, Attorney D, Attorney E, and Attorney F all worked at separate personal injury firms and were all members of the staged collision conspiracy. Attorney C was a close friend of Giles's who worked on staged collision cases with both Giles/The King Firm and Motta/Motta Law. Attorney D also worked on at least one staged collision case with Giles/The King Firm; during his cooperation, Garrison told law enforcement that Attorney D paid him for staged collisions. Rec. Doc. 227-11, p. 1. Attorney E likewise paid Garrison and Slammer G in cash for staged collisions, and Attorney E similarly referred cases to The King Firm. *See* Rec. Doc. 227-11, p. 2. Attorney F shared office space with Motta. Garrison told law enforcement that he brought staged collisions to Alfortish, who then divided them between Attorney F and Motta. Rec. Doc. 227-11, p. 2.

The slammers, attorneys, and law firms were sometimes assisted by Alfortish, a convicted fraudster and disbarred attorney who is Motta's romantic partner. Alfortish worked for a medical factoring company that assisted law firms with financing medical procedures related to collisions and then collected payment once the cases based on the collisions settled. Garrison met Alfortish through Slammer G and Slammer H and gradually began staging collisions for Alfortish, Motta, Motta Law, and Attorney F instead of Giles, The King Firm, Attorney D, Attorney E, and others. *See* Rec. Doc. 227-11, pp. 1-2. Alfortish used a trust account and an account for a shell company to make payments to Garrison, Harris, and Slammer G. Much of the money that went into Alfortish's accounts came from Motta and Attorney F. Alfortish told Garrison and Harris that, if anyone ever asked why they were receiving so much money from Alfortish, they should lie and say that the payments were for construction work. *See* Rec. Doc. 184, p. 4; Rec. Doc. 227-11, p. 2.

## II.    Staged collisions.

Various iterations of the slammers, attorneys, and law firms participated throughout the staged collision scheme, sometimes overlapping with certain coconspirators and other times overlapping with others. Examples of the staged collisions include the following:

### A.    October 2015 Hotard bus collision.

In October 2015, Garrison staged a collision with a Hotard bus. Attorney D paid $600 to Slammer G for the collision, and, in turn, Slammer G paid Garrison to stage it. Rec. Doc. 227-8, p. 1.[6] Unlike other staged collisions where the slammers fled the scene and were not part of subsequent lawsuits, Garrison was a plaintiff in the fraudulent lawsuit that resulted from the

---

[6] The other passengers in the Hotard bus collision pleaded guilty to staging the collision with Garrison as the slammer. *See United States v. Garrison*, E.D. La. No. 20-cr-92, Docs. 121, 169 & 226 (factual bases for Doniesha Gibson, Chandrika Brown, and Ishais Price).

collision with the Hotard bus. Attorney D represented Garrison in the lawsuit. In subsequent months, Garrison continued staging collisions for Attorney D, negotiating an increase in his payments from $600 per passenger to $1,000 per passenger. Rec. Doc. 227-11, p. 1. During this same time period, Garrison began staging collisions for Alfortish and Motta, and Alfortish paid Garrison thousands of dollars through the entities he controlled. Rec. Doc. 227-11, pp. 1-2. In August 2017, Garrison fired Attorney D and took the Hotard bus case to Motta and Motta Law. Garrison told Alfortish that the collision with the Hotard bus had been staged. Rec. Doc. 227-11, p. 2. In August 2018, the fraudulent lawsuit settled for $650,000, with Garrison receiving over $85,000, Motta Law receiving over $106,000, and Attorney D's firm receiving over $93,000. Additionally, Alfortish's medical factoring company received $68,000.

### B.    October 2015 Chevrolet Tahoe collision.

Two days before the Hotard bus collision, Labeaud and Hickman staged a collision between a tractor-trailer and a Chevrolet Tahoe. The collision was one of multiple that Labeaud and Hickman staged that involved the Big Easy Truck Stop. Labeaud spoke with Giles over the phone before and after the collision, including during a call shortly after the collision when Labeaud told Giles that he had some "fish" to bring him. *See United States v. Robinson*, E.D. La. No. 20-cr-108, Doc. 49, p. 3 (factual basis for passenger Anthony Robinson). Labeaud then directed the passengers to The King Firm, which filed a fraudulent lawsuit based on the collision. *Robinson*, E.D. La. No. 20-cr-108, Doc. 49, pp. 3-4. Approximately six months after the collision, Giles referred one of the passengers to Attorney D (the same attorney from Garrison's Hotard bus collision) for representation in a cross-claim. *Robinson*, E.D. La. No. 20-cr-108, Doc. 49, p. 4.

In 2017, while the Tahoe lawsuit was pending, insurance defense attorneys began alleging fraud and that Labeaud and Hickman's collisions were staged. Among other things, the defense attorneys proffered expert findings that collisions involving the Big Easy Truck Stop had certain red flags that suggested a staged collision ring. In November 2017, The King Firm settled a case where Labeaud was a plaintiff for $258,000, with one King Firm associate telling a financing company, "There were recent allegations of fraud that pushed us to resolve sooner rather than later":

---

**To:** ▮▮▮▮▮▮▮▮
**Subject:** Damian Labeaud P-AE-LA-879034

▮▮▮▮▮,

I left you a few messages about this client. Please let me know if you guys would be able to reduce the outstanding balance by $5,000 to $26,725.

All of the providers, including us, are taking a hit to get this one done. There were recent allegations of fraud that pushed us to resolve sooner rather than later.

Thanks,

▮▮▮▮▮▮▮▮

Attorney

The King Firm

---

*See* November 2017 Email, attached hereto as Government's Exhibit A. The week after the email, Giles and the other King Firm partners manipulated Labeaud into stating that his and Hickman's collisions were legitimate and secretly recorded him saying it.[7]

---

[7] Giles and The King Firm's secret recording of Labeaud is described in more detail below.

Allegations of fraud continued throughout 2018 and 2019, but The King Firm pressed on with the Tahoe case and other cases that were brought to them by Labeaud and Hickman. In October 2018, Motta forwarded a King Firm associate an email exchange she had with a claims management company during which she argued against allegations of fraud in her cases, including the Hotard bus case. The associate forwarded Motta's email to Giles and the other King Firm partners and stated, "Interesting read":

From: ███████  ██████ @kinginjuryfirm.com>
To: █████  |    @kinginjuryfirm.com>, Jason Giles <jgiles@kinginjuryfirm.com>, ████
           @kinginjuryfirm.com>
Subject: Fwd: Litigation case
Date: Wed, 17 Oct 2018 14:49:55 +0000

---

Interesting read. Start at the bottom.

███████
Attorney
The King Firm
2912 Canal Street
New Orleans, LA 70119
Main: ██████
Fax: 800-901-6470
███ @kinginjuryfirm.com

---------- Forwarded message ---------
From: **Vanessa Motta** <vanessa@mottalaw.com>
Date: Tue, Oct 16, 2018 at 4:23 PM
Subject: Re: Litigation case
To: ████████████ @kinginjuryfirm.com>

███,

Per our discussion, please see the correspondence with ████ and me.

Thank you,

Vanessa Motta
Attorney at Law
Motta Law, LLC

*See* October 2018 Email, attached hereto as Government's Exhibit B.

10

In June 2019, the Tahoe case went to mediation. *Robinson*, E.D. La. No. 20-cr-108, Doc. 49, p. 6. Around the time of the mediation, Giles and The King Firm told their clients to settle their cases because the FBI was investigating staged collisions and the trucking company they were suing suspected that the lawsuit was fraudulent. *Robinson*, E.D. La. No. 20-cr-108, Doc. 49, p. 6. Shortly after the mediation, the parties agreed to a settlement that totaled over $4.7 million. *Robinson*, E.D. La. No. 20-cr-108, Doc. 49, p. 6.

**C.    January 2016 Dodge Charger collision.**

In January 2016, Garrison staged a collision between a tractor-trailer and a Dodge Charger that included defendant Leon Parker. Rec. Doc. 256, pp. 13-14; *see also* Rec. Doc. 227-1, pp. 3-4 (summarizing phone calls between Garrison and Parker around the time of the staged collision). Garrison and Parker knew each other, and Parker had a romantic relationship with slammer Ryan Harris's mother. Harris's mother and brother were also involved in the Charger collision. In the fraudulent lawsuit that followed, Parker was represented by Giles and The King Firm, and Harris's family members were represented by Attorney C. Rec. Doc. 256, pp. 13-14; *see also* Rec. Doc. 227-4 (letter from Giles confirming his representation of Parker).

In November 2018, as Parker's case progressed, the insurance defense attorneys opposing Parker's lawsuit sent the King Firm associate handling Parker's case an expert report detailing red flags in Parker's collision and other collisions. *See* Expert Report, attached hereto as Government's Sealed Exhibit C. The report was authored by the same expert who previously opined about Labeaud and Hickman's collisions involving the Big Easy Truck Stop. The expert's report correctly identified multiple fraud indicators suggesting that the collision was part of a broader staged collision ring in the New Orleans area:

> I have become aware of 60 accidents that have been identified within this 14 mile stretch of Interstate 10 in [ ] New Orleans . . .

with similar fact patterns, many of which include situations **where tractor trailer drivers were flagged down and told that they caused an accident (red flag)**. In addition, a significant number of the claimants involved in these accidents are **related in some way (red flag), retained counsel prior to seeking treatment (red flag), and were directed to doctors for treatment by these attorneys (red flag)**. In addition, in each accident, there are always a multitude of passengers in the cars, and while most **report no injury at the scene (red flag)**, the ones that do, complain of minor injuries but **refuse treatment (red flag)**. While these alleged **impacts are very minor with little, or in some cases, no observable damage (red flag)**, most or all occupants of these private passengers vehicles pursue bodily injury claims. In many cases, these claims involve serious **back and neck surgery resulting in substantial demands for payment (red flag)**. The likelihood of this many people being seriously injured [in] these accidents, especially when no serious injuries are noted at the scene, is nil, **a very significant red flag.**

Additionally, all involved private passenger vehicles were occupied by as many as 12 passengers, and **not one of these accidents involved just a lone driver.** Since the National Highway Traffic and Safety Administration (NHTS) reports that the average overall private passenger vehicle occupancy rate is 1.54 persons . . . it is a statistical improbability that all 60 accidents would involve private passenger vehicles with multiple occupants. **Multiple occupants in a large number of accidents that are in some way connected is a very significant red flag and is a fraud ring indicator.**

So far, I am aware of significant links between at least nineteen (19) of the over sixty (60) accidents, however I have not been able to obtain copies of the other 40 or so police reports, so my investigation and review continues. However, all of the following 19 accidents have essentially the same fact pattern (a private passenger vehicle with multiple passengers side-swipes a tractor trailer rig, driver flagged down, minor or no damage, minor or no injuries noted at the scene, treatment refused at the scene, with claims or lawsuit being pursued by all occupants).

Gov. Ex. C, p. 9 (emphasis in original).

The expert's report identified the Charger collision as potentially being part of the staged

collision ring, along with Garrison's Hotard bus collision, an April 2017 collision involving

defendant Carl Morgan (discussed below), and multiple collisions involving Harris's and Parker's family members. Gov. Ex. C, pp. 10-12. As to the Hotard bus collision, the report pointed out that Garrison "was in phone contact with people involved in these similar accidents" and that there was video of the plaintiffs' car crashing into the bus. Gov. Ex. C, p. 10. As to the Charger collision, the report noted that Parker "was called by Cornelius Garrison two times immediately before the accident and one time immediately following the accident (7:48 PM, 8:23 PM, and 9:07), as well as earlier that day and the following morning. [Harris's mother] was contacted by Garrison at 3:50 PM on the day of the accident." Gov. Ex. C, p. 10. The report also included a screenshot of a Facebook post from an individual later referenced in the Second Superseding Indictment as Individual 1. Gov. Ex. C, pp. 12-13. The Facebook post stated that a passenger in one of the collisions was "sitting [sic] accidents up with 18 wheelers on The Blind Side now that's f***** up the insurance company in the FBI looking for [the passenger] and her crew that hang in Gentilly by Burger King." Gov. Ex. C, p. 13. Shortly after he received the expert's report, the King Firm associate handling Parker's case forwarded it to Attorney C, saying, "Some of your cases are listed in this report so I figured I would share." *See* November 2018 Email, attached hereto as Government's Exhibit D.

In December 2018, the insurance defense attorneys sent the King Firm associate a witness list that included Garrison. The associate forwarded the witness list to Giles and another partner, noting its inclusion of Garrison as "the only random witness":

From: ████████████████ @kinginjuryfirm.com>
To: Jason Giles <jgiles@kinginjuryfirm.com>, ████████████ @kinginjuryfirm.com>
Subject: Fwd: Darnell Harris et al v. US Xpress/Leon Parker
Date: Fri, 07 Dec 2018 17:25:23 +0000
Attachments: Clerk.Fax-file_Witness_and_Exhibit_List_(10202357xA8A8F).pdf
Inline-Images: Galloway2_02f3b712-1b21-4b17-81de-961e4e4d7977.png

Leon Parker Witness and Exhibit List - Cornelius Garrison is the only random witness

████████████
Attorney
The King Firm

*See* December 2018 Email, attached hereto as Government's Exhibit E.

In early January 2019, the associate exchanged emails with Giles and another partner about pretrial motions in the Charger lawsuit. As part of an email chain, Giles told the associate and the partner, "Let's talk tonight about [the expert]." *See* January 2019 Email Chain, attached hereto as Government's Exhibit F, p. 2. In the same email chain, the King Firm partner questioned whether they should concede in their pretrial filing that Parker was an "associate" of Garrison's. Gov. Ex. F, p. 1. The associate responded, "Not sure what else to call him. Leon knows him and buys clothes from the guy." Gov. Ex. F, p. 1. The associate later noted that the "Defendants then reference Cornelius Garrison as a man that has been in contact with a number of people on the dates of their respective accidents." Gov. Ex. F, p. 1.

The day following the email exchange, the associate deposed the expert about the Charger collision and the red flags the expert identified that suggested that there was a staged collision ring.[8] During the deposition, the expert pointed out that Parker's wife and Parker's brother had also been in a suspicious collision and had calls with Garrison before the collision

---

[8] The government has not attached the deposition because it is 152 pages long. The government will provide a copy of the deposition upon request from the Court.

occurred. *See* Gov. Ex. C, p. 10 (describing same collision and noting that the fraudulent lawsuit that resulted from it was handled by Attorney D's law firm). When asked, "The fact that people are related and in multiple different accidents, that's a red flag[,]" the expert answered that it was a "[b]ig red flag" and "extremely unusual" to have people who know each other be in collisions shortly after talking to the same person (Garrison) and with other similar characteristics. Four days later, the associate emailed a transcript of the deposition to Giles, the other King Firm partners, and Attorney D. *See* Deposition Email, attached hereto as Government's Exhibit G.

By at least January 11, 2019, Giles and The King Firm knew that Garrison was being investigated by the United States Department of Justice for staging collisions, including the Charger collision. Around that time, the insurance defense attorney opposing the Charger lawsuit spoke to a different attorney who "had prior run ins with Cornelius Garrison, got [the Charger lawsuit attorney's] number after the hearing, then a US Attorney called [the Charger lawsuit attorney] when she was back at her office about Garrison and this case." *See* January 12, 2019, Email, attached hereto as Government's Exhibit H. The defense attorney relayed this information to the King Firm associate handling the Charger lawsuit, who then forwarded it to Giles and the other King Firm partners. Gov. Ex. H.

Emails between Giles, The King Firm, Keating, Attorney C, and Attorney D about the fraud allegations continued throughout January and February 2019. For example, on February 12, 2019, Giles sent Keating a go-by motion for arguing that the expert's red flag testimony should be excluded. *See* February 12, 2019, Email, attached hereto as Government's Exhibit I. On February 19, 2019, Attorney C forwarded Giles and The King Firm a pleading in a case that began with Motta/Motta Law in which insurance defense attorneys noticed their intent to introduce evidence related to 85 staged collisions, including the Charger collision and the Hotard

bus collision. *See* February 19, 2019, Email, attached hereto as Government's Exhibit J; *see also*

*Frazier v. Runnels*, E.D. La. No. 18-cv-2340, Doc. 81 (pleading forwarded from Attorney C to

Giles and The King Firm).[9] Giles sent the pleading to Keating, who forwarded it to another

attorney with the subject "Look at this shit." Gov. Ex. J. And, on February 21, 2019, a King Firm

associate forwarded others at the firm and Attorney C an email from an insurance defense group

seeking information about staged collisions and listing various red flags. *See* February 21, 2019,

Email, attached hereto as Government's Exhibit K. The email stated that, "in the accidents we

have researched, there are very frequently the same lawyers and third-party medical funding

companies involved." Gov. Ex. K. Giles forwarded the email to Keating. Gov. Ex. K.

On February 26, 2019—after months of allegations that the Charger collision was staged

by Garrison and was part of a broad staged collision ring—Giles and The King Firm settled the

fraudulent lawsuit for over $800,000, with Parker receiving $119,000 and Giles/The King Firm

receiving $150,000. Parker was subsequently involved in other staged collisions, including a

December 2021 collision that resulted in a fraudulent lawsuit that was handled by Motta and

Motta Law. Rec. Doc. 256, p. 15. Parker is of further significance to this case because, in

September 2020, he schemed with Harris and Alfortish to murder Garrison to prevent him from

cooperating with the investigation into the staged collision scheme. Rec. Doc. 184, pp. 5-6.

### D.    April 2017 Lincoln Town Car collision.

In April 2017, Garrison staged a collision between a tractor-trailer and a Lincoln Town

Car that included Harris's aunt, the aunt's blind brother (Harris's uncle), the aunt's teenage

granddaughter (Harris's cousin), and the aunt's husband Carl Morgan (Harris's uncle and a

---

[9] The plaintiffs in the Frazier lawsuit later pleaded guilty to staging their collision with Harris as the slammer. *See United States v. Frazier*, E.D. La. No. 23-cr-176, Docs. 88, 90 & 93 (factual bases for Dimitri Frazier, Tiffany Turner, and Adonte Turner).

defendant in this case). *See* Rec. Doc. 256, p. 14.[10] Harris's family members went first to Giles and The King Firm for representation. After firing Giles and The King Firm, they went to Motta and Motta Law, who filed a fraudulent lawsuit based on the staged collision. Attorney C assisted Motta and Motta Law in handling the lawsuit.

As described above, during the time period the Lincoln Town Car lawsuit was pending, numerous allegations were made concerning Garrison's role in staging collisions, particularly those collisions involving Harris's family members. Among other things, the expert report included the Lincoln Town Car collision in its list of suspicious collisions and noted that other Harris family members directly related to plaintiffs in the Lincoln Town Car collision were involved in their own similar crashes that same month. Gov. Ex. C, pp. 10-11. In January 2019, Motta and Motta Law settled the fraudulent lawsuit for a total of $300,000, with $33,500 going to Harris's family members and $94,000 going to Motta, Motta Law, and Attorney C. An additional $51,500 went to Alfortish's medical factoring company, and Motta sent a check for $3,000 to The King Firm for "settlement fees payment."

**E.      May 2017 Toyota Corolla collision.**

In May 2017, Labeaud staged a collision between a tractor-trailer and a Toyota Corolla. The passengers in the staged collision were recruited by defendant Diaminike Stalbert, who directed them to Attorney E for representation in a fraudulent lawsuit based on the collision. Garrison and Slammer G likewise staged collisions that were handled by Attorney E. Rec. Doc. 227-11, p. 2.

---

[10] Garrison told law enforcement that "Harris had a blind brother who was in a staged accident," a reference to this collision. *See* Rec. Doc. 227-7, p. 2.

### F.    September 2017 Toyota RAV4 collision.

In September 2017, Garrison staged a collision between a tractor-trailer and a Toyota RAV4 that included Stalbert as a passenger. Similar to the May 2017 Toyota Corolla collision, Stalbert recruited the other passengers who were involved in the RAV4 collision and directed them to Attorney E for representation in a fraudulent lawsuit based on the collision. *See Garrison*, E.D. La. No. 20-cr-92, Doc. 158 (factual basis for coconspirator Aisha Thompson).[11] In the weeks leading to the RAV4 collision, Stalbert and Garrison called each other over twenty times. After the collision, Stalbert provided the name of another individual to the police officers who arrived at the scene. *Garrison*, E.D. La. No. 20-cr-92, Doc. 158, p. 3. That individual was later part of the fraudulent lawsuit and received medical treatment, despite her not being in the RAV4 at the time of the collision. *Garrison*, E.D. La. No. 20-cr-92, Doc. 158, p. 3. In May 2020, FBI agents questioned Stalbert about the RAV4 collision. During the interview, Stalbert falsely stated that she had never been in a staged collision, she did not know anyone in the RAV4, and she had never used a phone number that was in fact hers.

### G.    August 2020 Buick Envision and Ford Taurus collision.

In August 2020, Harris staged a collision between a Buick Envision and a Ford Taurus that resulted in a fraudulent insurance claim. The claim was filed under the name of an individual who lives in central Louisiana. Harris's iCloud account shows defendant Timara Lawrence, who was one of Harris's romantic partners, sending the individual's personal information to Harris the day before the collision so Harris could use the information in the fraudulent insurance claim.

---

[11] The other passengers in the RAV4 collision pleaded guilty to staging the collision with Garrison as the slammer. *See Garrison*, E.D. La. No. 20-cr-92, Docs. 124, 137, 158 & 184 (factual bases for Erica Lee Thompson, Dewayne Coleman, Aisha Thompson, and Donisesha Lee).

III.    **Other collisions and overlap between coconspirators.**

The Second Superseding Indictment lists over a dozen additional staged collisions involving the defendants, and still more will be referenced at trial. Those collisions include a March 2017 collision that was staged by Labeaud and Hickman and that resulted in a fraudulent lawsuit that was handled by Giles, The King Firm, and Keating.[12] Giles and The King Firm referred their client to Alfortish's medical factoring company to assist with financing the client's medical procedures. In an email to his coworkers, Alfortish stated, "This case is going to be surgical and its a good one." *See* Alfortish Email, attached hereto as Government's Exhibit L.

The staged collisions also include a June 2017 collision that was staged by Labeaud and Hickman and that resulted in a fraudulent lawsuit that was handled by Giles, The King Firm, Keating, and Attorney C.[13] Two years after the collision, in October 2019, Labeaud was indicted for conspiring with Keating on a different staged collision. *See United States v. Labeaud*, E.D. La. No. 19-cr-219, Doc. 1. Nine months after Labeaud was indicted, in July 2020, Giles and The King Firm settled the lawsuit Labeaud and Hickman brought to them and Keating for $50,000, with the client receiving over $20,000, The King Firm receiving $11,000, and Giles and an associate splitting over $4,800.

And the staged collisions include a December 2021 collision that was staged by Harris and Parker and that resulted in a fraudulent lawsuit that was handled by Motta and Motta Law. Motta and Motta Law took the case and filed a fraudulent lawsuit despite the fact that Parker's

---

[12] The passengers in the March 2017 collision pleaded guilty to staging the collision with Labeaud and Hickman as the slammers. *See Hickman*, E.D. La. No. 20-cr-80, Docs. 202, 204, 206 & 218 (factual bases for Lois Russell, Tanya Givens, John Diggs, and James Williams).

[13] The passengers in the June 2017 collision pleaded guilty to staging the collision with Labeaud and Hickman as the slammers. *See United States v. McGowan*, E.D. La. No. 21-cr-110, Docs. 144, 147 & 166 (factual bases for Herbert Allen, Dion Ridley, & Troylynn Brown).

vehicle had been placed in Parker's name just two weeks before the collision, the numerous allegations of fraud concerning Harris and his family members dating back to the November 2018 expert report, the phone contacts between Garrison, Parker, and Harris's mother before Parker's January 2016 staged collision, and the fact that Garrison had been indicted over a year earlier for staging the Hotard bus collision that resulted in a fraudulent lawsuit that Motta and Motta Law were paid over $106,000 for litigating. Motta was aware of the expert report and the red flags it described—seven months before Parker's December 2021 collision, Motta and a King Firm partner exchanged emails to strategize about how best to exclude the expert's testimony in their cases. *See* Motta Email, attached hereto as Government's Exhibit M, pp. 1-4.

As the federal criminal cases against the passengers and the slammers progressed, the insurance defense firms opposing the lawsuits continued to raise the defense of fraud, and the personal injury attorneys continued to commiserate about the allegations and discuss how to defend against them. For example, in March 2023, Motta and a King Firm partner emailed each other about how to respond to allegations related to Garrison's phone records. *See* Phone Records Email, attached hereto as Government's Exhibit N.[14] That same month, Motta argued two cases before the United States Court of Appeals for the Fifth Circuit. The appeals concerned one of Motta's tractor-trailer cases where the district court admitted testimony from the same

---

[14] In August 2022, Motta filed a Hurricane Ida-related insurance lawsuit in state court that was later removed to federal court. *See Motta v. QBE Specialty Ins. Co.*, E.D. La. No. 22-cv-04248, Doc. 1. In April 2023, Giles, a second King Firm partner, and a King Firm associate enrolled in the case as Motta's counsel. *Motta*, E.D. La. No. 22-cv-04248, Doc. 9. In January 2025, after Motta, Giles, and The King Firm were charged in the instant case and Motta's and Giles's law licenses were suspended, Judge Milazzo stayed Motta's insurance case to allow Giles to withdraw pursuant to Louisiana Supreme Court Rule XIX, § 19.2(c). *Motta*, E.D. La. No. 22-cv-04248, Doc. 27. Giles withdrew the following week. *Motta*, E.D. La. No. 22-cv-04248, Doc. 30. Based on a review of the docket, it appears that case remains stayed and that Motta continues to be represented by the non-suspended King Firm partner and King Firm associate.

expert who prepared the November 2018 red flag report and another where the district court admitted evidence related to Garrison's criminal case, including testimony from Garrison's attorney Claude Kelly. Motta was unsuccessful in both appeals. *See Collins v. Ingle*, Fifth Circuit No. 22-30153, 2023 WL 4046279 (5th Cir. June 16, 2023); *Robert v. Maurice*, Fifth Circuit No. 22-30221, 2023 WL 4235550 (5th Cir. June 28, 2023). After the Fifth Circuit issued its decisions, Motta emailed a King Firm partner for advice on her petition for rehearing, *see* Collins Email, attached hereto as Government's Exhibit O, and she emailed a King Firm associate with the subject line "FUCK THE 5th CIR." *See* Robert Email, attached hereto as Government's Exhibit P.

## IV.    Witness tampering and obstruction of justice.

Recognizing that the slammers posed a threat if they cooperated with the federal investigation into the staged collision scheme, the defendants engaged in several acts of witness tampering and obstruction of justice to either protect themselves or silence the slammers.

### A.    Alfortish, Motta, and Motta Law's obstructive conduct with Garrison and Harris.

*Attempted Pay-Off of Garrison*

In May 2019, an attorney retained by Motta to represent her related to staged collision allegations received a letter from an Assistant United States Attorney stating that Motta was "the subject of a federal investigation involving mail and wire fraud relating to allegedly staged motor vehicle accidents." *See* Motta Subject Letter, attached hereto as Government's Exhibit Q. The subject letter advised Motta "that any communications by Ms. Motta (or thru third parties on her behalf or for her benefit) to potential witnesses concerning their knowledge of the alleged staged motor vehicle accidents may be considered witness tampering and/or obstruction of justice." Gov. Ex. Q.

Garrison began covertly cooperating with the federal investigation in October 2019. In January 2020, Garrison reported to law enforcement that Alfortish and Motta offered to pay him $500,000 and move him to the Bahamas "because of the heat from the investigation into the staged accidents." Rec. Doc. 227-10, p. 1.

*Attempted Coercion of Individual 1*

In September 2018, Individual 1 posted on the Facebook page of Tiffany Turner, a Harris family associate. Turner was a passenger in a November 2017 collision that was staged by Harris and that originally went to Motta and Motta Law before going to a different attorney. Individual 1's September 2018 post stated:



Insurance defense companies opposing Motta and Motta Law's fraudulent lawsuits began attaching Individual 1's Facebook post to pleadings to support their allegations that Motta and Motta Law's clients staged collisions. Motta was aware of the defense attorneys' allegations—indeed, in January 2019, Motta referenced Individual 1's post in a pleading. *See Thomas v.*

*Chambers*, E.D. La. No. 18-cv-4373, Doc. 46-1, p. 4.[15] One month after Motta's filing referenced the post, Motta visited Individual 1 at the St. Tammany Parish Prison, where Individual 1 was housed following an arrest for shoplifting. Individual 1 was scheduled for a deposition related to Turner's collision later that month. Motta did not come alone—she brought a former official from the New Orleans Police Department, who, at that time, was the chief security officer for a New Orleans college.

Motta and the former NOPD official met Individual 1 at the jail two times. The former NOPD official wore his security officer uniform to the first meeting, and Individual 1 believed he was a police officer. At the first meeting, Motta accused Individual 1 of taking money from insurance defense firms and their investigators. Motta attempted to coerce Individual 1 into signing an affidavit that said Individual 1 was a drug addict and that she had taken money from the insurance companies to say things that were not true. Motta threatened that Individual 1 would be hurt if she did not sign the affidavit because her statements were impacting multiple personal injury cases. Individual 1 refused to sign the affidavit.

Between the first and second meetings at the jail, Individual 1 spoke to FBI agents and agreed to record the second jailhouse meeting, which the FBI arranged to be recorded.[16] At the second meeting, Motta again accused Individual 1 of taking payments from insurance defense firms and asked her to sign the affidavit recanting her previous statements. Individual 1 questioned the affidavit and reiterated that she had not taken money from defense attorneys, but

---

[15] The plaintiffs in the *Thomas* case later pleaded guilty to staging the collision with Garrison as the slammer. *See United States v. Clark*, E.D. La. No. 23-cr-176, Docs. 110 & 208 (factual bases for Shirley Harris and Antoine Clark).

[16] This filing references multiple recordings that have been produced to the defendants, including the above-referenced FBI recording of Individual 1, a secret recording of Labeaud, a secret recording of Hickman, and FBI recordings of Garrison talking to Alfortish and Motta. The government will provide copies of these recordings upon request from the Court.

she signed the affidavit anyway. Despite Individual 1's statement that the affidavit contained the false information that she had accepted money from defense attorneys, Motta had the affidavit notarized.

On a phone call later that month, Motta advised Individual 1 that she did not represent her for the upcoming deposition in Turner's case, but that she would nevertheless "assist" her. Motta instructed Individual 1 that she could answer "I don't know" to every question. At the deposition, Individual 1 was questioned aggressively by the plaintiff's attorney representing Turner. The day after the deposition, Individual 1 called Turner's attorney and told him the truth about Turner's accident being staged. The attorney dismissed the lawsuit. During another FBI-recorded jailhouse meeting, Individual 1 told Motta that she had called the attorney and told him "everything about his clients." Motta replied, "You called [the attorney] and told him everything over the phone?" Individual 1 replied, "Yes. Should I not have done that?" Motta replied, "No, not really," and admitted, "Now I can understand why he doesn't want to represent them."

*Garrison's Deposition in Robert v. Maurice*

In January 2020, Garrison was served with a subpoena by attorneys from Perrier Lacoste who were representing a trucking company in a lawsuit brought by Motta Law client Reginald Robert. *See Robert*, 2023 WL 4235550, at *1 (describing Robert's case). The Perrier Lacoste attorneys had discovered that, about one week before Robert's collision, Robert had two phone calls with Garrison. The fact that these were the only two communications between Robert and Garrison and that they otherwise did not appear to know each other, along with other suspicious facts, led the Perrier Lacoste attorneys to suspect that Robert's collision had been staged, so they subpoenaed Garrison with plans to depose him.

Garrison reported to the FBI that he had been served with a subpoena. The FBI arranged for Garrison to record several of his subsequent interactions with Alfortish and Motta. During one of the recorded interactions, Garrison met Alfortish in a gas station parking lot and showed him the subpoena. Upon seeing the case caption on the subpoena, Alfortish told Garrison, "You don't know anything about that case." Alfortish stated that Garrison should have lied to the person serving him the subpoena and said he was someone else. Alfortish also coached Garrison on what he should say during the deposition, *i.e.*, that he should tell "the truth," which was that he "did not know anyone." Alfortish told Garrison that he would speak to Motta and that they would take care of it. Shortly after their in-person meeting, Alfortish called Garrison, said that he had just spoken to Motta, and repeated that they would take care of it.

Later that month, Motta took Garrison to meet with a New Orleans personal injury attorney. Garrison recorded the meeting and his interactions with Motta before and after the meeting. While on the elevator to the attorney's office, Motta told Garrison not to worry because the attorney "knows about Sean and knows about the construction"—a reference to the cover story Alfortish told Garrison to use if anyone asked why he received so much money from entities controlled by Alfortish. *See* Rec. Doc. 227-11, p. 2. Once in the attorney's office, Motta and Garrison spoke to the attorney and his partner. During the meeting, Motta—who did not represent Garrison—stated that the deposition was problematic because its setting at the federal courthouse meant that other defense attorneys who wanted to depose Garrison could find and serve him. Similar to Alfortish, Motta coached Garrison by repeating that he "did not know anyone" and that he had been unfairly targeted by the defense attorneys who simply did not understand that he knew many people because he was a "businessman of [New Orleans] East." Motta recommended that the attorney email the Perrier Lacoste defense attorneys, inform them

that he now represented Garrison, and state that he needed to reschedule the deposition. The attorney followed Motta's instructions, and Motta and Garrison left the office. On the elevator back down to the lobby, Motta stated that she would "play dumb" about the attorney's representation of Garison the next time she spoke to the Perrier Lacoste attorneys.

Shortly after the meeting in the personal injury attorney's office, Garrison's attorney, Federal Public Defender Kelly, sent a letter to the personal injury attorney stating that he represented Garrison. Despite their learning that Garrison had counsel, Alfortish and Motta continued calling Garrison to speak about the upcoming deposition in the *Robert* case, which had not been postponed. For example, Motta told Garrison to think about what he said before he said it and that, after the deposition, insurance defense attorneys would stop harassing him. Rec. Doc. 227-17, p. 1. At the deposition, Garrison invoked his Fifth Amendment rights in response to every question. According to Garrison, Motta, who was present because she represented Robert, did not look at him during the deposition. Rec. Doc. 227-18, p. 2. After the deposition, Alfortish called Garrison and told him that things had not gone well. Rec. Doc. 227-18, p. 2. Garrison expressed his concern to FBI agents that he did not feel safe and that he did not know who to trust. Rec. Doc. 227-13, p. 1. Garrison's interactions with Alfortish and Motta appear to have ended after the *Robert* deposition, and he was murdered seven months later.

*Harris's Deposition*

In November 2020, defense attorneys with Perrier Lacoste who represented a defendant in a lawsuit with Motta Law attempted to serve Harris with a subpoena. In March 2021, the state court in the civil lawsuit signed an order compelling Harris's deposition. In July 2021, Motta— who also represented the plaintiff in the lawsuit against Perrier Lacoste's client—filed a motion to quash Harris's subpoena. The state court denied the motion to quash, and Motta appealed.

After the state appellate court affirmed the denial of the motion to quash, the defense attorneys again attempted to depose Harris. Motta informed the defense attorneys that she no longer represented Harris and was unable to secure his cooperation. Eventually, Harris was arrested in this case, and his deposition never took place.

### B.    Giles and The King Firm's obstructive conduct with Labeaud and Hickman.

*Secret Recording of Labeaud*

Before 2017, Labeaud and Hickman frequently visited The King Firm to pick up payments or assist with intake of passengers from their staged collisions. As Labeaud and Hickman began staging more collisions for Keating and fewer collisions for Giles and The King Firm throughout 2017, they visited The King Firm less often. In November 2017, Giles contacted Labeaud and instructed him to come to the firm for reasons related to the $258,000 settlement Giles and The King Firm had negotiated in one of Labeaud's outstanding cases.

When Labeaud arrived, Giles contrived for Labeaud to meet with The King Firm's partners to discuss the fraud allegations and the possibility that the partners would need to explain the allegations to the passengers Labeaud and Hickman had brought to the firm. Giles told Labeaud that they needed to pretend that his collisions were legitimate to make one of The King Firm partners feel better about the fraud allegations. Once the other partners were in the room, Giles surreptitiously turned on a recording device and recorded the final eight minutes of the conversation. Giles—an experienced trial lawyer—steered the discussion and manipulated Labeaud into stating that the collisions were legitimate. Giles also lied about never having paid Labeaud for bringing him cases.

*Secret Recording of Hickman*

In October 2019, Labeaud was indicted for staging collisions. *Labeaud*, E.D. La. No. 19-cr-219, Doc. 1. In August 2020, Labeaud pleaded guilty. *Labeaud*, E.D. La. No. 19-cr-219, Doc. 167. The only attorney implicated in Labeaud's indictment and factual basis was Keating. *See Labeaud*, E.D. La. No. 19-cr-219, Docs. 1 & 168. However, two weeks after Labeaud pleaded guilty, Hickman was indicted, and Hickman's indictment made clear that Labeaud was cooperating against Giles and The King Firm. *See Hickman*, E.D. La. No. 20-cr-80, Doc. 1. For example, Hickman's indictment stated that Labeaud and Giles (referenced in Hickman's indictment as "Attorney C") spoke in code about staged collisions, including through fishing terms, and that Giles knowingly paid for staged collisions. *See Hickman*, E.D. La. No. 20-cr-80, Doc. 1, pp. 6-8. After he was indicted, Hickman was appointed Clarence Roby as his criminal defense attorney.

Shortly after Hickman's indictment and appointment of counsel, Giles summoned Hickman to The King Firm for reasons related to one of Hickman's outstanding cases. Once Hickman was in the office, Giles proceeded to have an approximately 40-minute-long conversation with Hickman that he secretly recorded. As he did in November 2017 with Labeaud, Giles baited and coached Hickman into saying that Labeaud was lying to the federal government about them and that Labeaud and Hickman's collisions were legitimate. On the recording, Giles mentioned that Hickman was represented in his recently indicted criminal case by Roby, who was not present.

V.    **Garrison's murder.**

In September 2020, Motta was served a grand jury subpoena demanding documents in her possession related to the lawsuit that resulted from Garrison's collision with the Hotard bus. *See* Motta Grand Jury Subpoena, attached hereto as Government's Exhibit R, p. 4. Included as an attachment to the subpoena was a "Limited Waiver of Attorney-Client Privilege" signed by Garrison and Federal Public Defender Kelly. Gov. Ex. R, pp. 5-6. Notably, Garrison's waiver of his attorney-client privilege with Motta was signed the same date the subpoena was issued, strongly suggesting that Garrison was cooperating with the federal criminal investigation. *See* Gov. Ex. R, p. 6. Motta sent responsive documents to the United States Attorney's Office eight days after she received the grand jury subpoena.

The same day Motta produced documents, a federal grand jury in the Eastern District of Louisiana charged Garrison and eight codefendants in a seven-count indictment related to staged collisions. *See Garrison*, E.D. La. No. 20-cr-92, Doc. 1. The indictment made references to "Co-Conspirator A" (Alfortish) and "Attorney B" (Motta), stating that "Co-Conspirator A solicited and/or referred personal injury clients to Attorney B." *Id.* at p. 2. Certain information in the indictment clearly came from Garrison, including that "Co-Conspirator A instructed Garrison on the number of passengers to include in staged collisions" and "Co-Conspirator A instructed Garrison to lie about payments he received from Co-Conspirator A if ever asked." *See Garrison*, E.D. La. No. 20-cr-92, Doc. 1, p. 7.

Four days after the indictment, on September 22, 2025, Garrison was murdered at his mother's New Orleans home. Harris has pleaded guilty to his conduct the night Garrison was murdered, as has Harris's romantic partner Jovanna Gardner. In the factual basis supporting his guilty plea, Harris admitted that, in 2020, he learned that Garrison was cooperating, as did

Alfortish, Motta, and Parker. Rec. Doc. 184, p. 4. Further, Harris admitted that he facilitated a

meeting between Alfortish and Parker so Alfortish could pay Parker to murder Garrison. Rec.

Doc. 184, pp. 4-5. According to Harris:

> Garrison's cooperation was problematic for Alfortish and Motta
> because they had paid Garrison for staged collisions. Similarly,
> Garrison's cooperation was problematic for Harris and Parker
> because Garrison had assisted them with staging collisions,
> including Parker's staged collision in January 2016. Alfortish told
> Harris that he and Motta had offered to pay Garrison to convince
> Garrison not to cooperate with the investigation. Additionally,
> Alfortish, Motta, and Parker commented to Harris that Garrison
> was a "rat" and a "snitch" and that it would be better if Garrison
> were dead. Alfortish asked Harris if he knew anyone who could
> assist Alfortish in killing Garrison. Harris arranged for Alfortish to
> meet Parker. Harris knew that, by arranging the meeting between
> Alfortish and Parker, he was assisting Alfortish and Parker's
> scheme to murder Garrison.

> The meeting between Alfortish and Parker took place at Harris's
> automotive repair shop. During the meeting, Alfortish offered to
> pay Parker to murder Garrison. Following the meeting, Harris met
> with Parker multiple times and provided Parker with a "burner"
> phone for Parker to use to commit the murder. Harris also recruited
> his romantic partner Jovanna Gardner to assist Harris and Parker
> with tricking Garrison into being at his home at a particular time.
> However, Harris did not tell Gardner that she would be assisting
> with a murder. Rather, Gardner believed she was assisting Harris
> and Parker in a scheme to pay Garrison to convince Garrison not to
> cooperate with the investigation. Harris knew that, by providing
> Parker with the "burner" phone and recruiting Gardner to lie to
> Garrison, he was assisting Alfortish and Parker's scheme to murder
> Garrison.

> On September 22, 2020, Parker murdered Garrison as part of a
> scheme with Harris and Alfortish to prevent Garrison from further
> cooperating with the federal government and exposing the scheme
> to stage collisions. Shortly before the murder, Harris saw Parker in
> possession of a firearm, mask, and gloves that Harris believed
> Parker would use to murder Garrison. Thus, it was reasonably

foreseeable to Harris that a firearm would be used to murder Garrison. After the murder, Parker told Harris that he murdered Garrison and that Alfortish paid him for the murder.

Rec. Doc. 184, pp. 4-5.[17]

## VI.    Indictment and motions for severance.

In May 2024, a federal grand jury in the Eastern District of Louisiana charged Harris and Gardner with conspiracy to commit mail and wire fraud and various offenses related to Garrison's murder. Rec. Doc. 1. Gardner pleaded guilty in June 2024. Rec. Doc. 48.

In December 2024, the grand jury charged Harris, Alfortish, Motta, Motta Law, Giles, The King Firm, Morgan, Stalbert, and Lawrence in a Superseding Indictment, with Harris the only defendant charged with Garrison's murder. Rec. Doc. 78. Harris pleaded guilty the following month. Rec. Doc. 184. In April 2025, the grand jury issued a Second Superseding Indictment adding Alfortish and Parker to the murder counts. Rec. Doc. 256. Trial is currently scheduled to begin on September 8, 2025. Rec. Doc. 208.

In March 2025, Giles and The King Firm filed motions to sever their cases from those of the other defendants. Rec. Doc. 216. In May 2025, Motta and Motta Law filed motions to sever their cases from those of Giles and The King Firm and also to sever the murder counts from the fraud counts. Rec. Doc. 271. Stalbert, Morgan, and Lawrence have joined Motta's and Motta Law's motions. Rec. Docs. 287, 288 & 291. Alfortish and Parker have not filed motions to sever.

---

[17] In another filing, Motta has claimed that the government "expressly acknowledge[d]" that Alfortish, Parker, Harris, and Gardner were the only ones who "had any knowledge of or involvement in Mr. Garrison's murder." Rec. Doc. 262, p. 8 n.9. Motta further states that, "as the superseding indictment makes clear, only two individuals are charged with any involvement with Mr. Garrison's murder whatsoever: Mr. Alfortish and Mr. Parker." Rec. Doc. 262, p. 8 n.9. Motta's assertions are not accurate. Substantial evidence, including Motta's close personal and professional relationship with Alfortish, her persistent efforts to meddle with Garrison throughout 2020, and admissions about Motta in Harris's factual basis, suggest that Motta was at least aware that Garrison would be killed. Her exclusion from the murder counts in the Second Superseding Indictment should not be misinterpreted as an admission that she was unaware of or uninvolved with Garrison's murder.

## LAW AND ARGUMENT

**I.     The defendants were properly charged in a single conspiracy.**

The defendants claim that the Second Superseding Indictment improperly charges them together in a single conspiracy. *See* Rec. Doc. 216-1, pp. 2-6; Rec. Doc. 271-1, p. 1. This claim is relevant to severance because "[a] charge of conspiracy initially legitimizes joinder of all defendants." *See United States v. Lindell*, 881 F.2d 1313, 1318 (5th Cir. 1989). Further, "[i]t is the rule, [] not the exception, that persons indicted together should be tried together, especially in conspiracy cases." *United States v. McRae*, 702 F.3d 806, 821 (5th Cir. 2012).

The Fifth Circuit has "firmly rejected" the wheel and chain models of conspiracies in favor of a more flexible test. *See United States v. Shah*, 95 F.4th 328, 361 (5th Cir. 2024). Instead, the Fifth Circuit looks to "(1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings." *Id.* The first prong—the existence of a common goal—is interpreted broadly. *Id.* "A common pursuit of personal gain is sufficient[.]" *Id.* "[A]s to the nature of the scheme, if the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect then that supports a finding of a single conspiracy." *Id.* "Finally, regarding the overlapping of participants, [the Fifth Circuit] finds that a single conspiracy exists where a 'key man' is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal." *Id.* (quotation marks and brackets omitted).

"Because one conspiracy may have many illegal objectives, it will necessarily involve a number of sub-agreements to commit each of these specified objectives." *United States v. Faulkner*, 17 F.3d 745, 760 (5th Cir. 1994). "Some members may concur in only some of the many objectives, yet they are liable for all because there is but one scheme, one enterprise, one

conspiratorial web." *Id.*; *see also United States v. Calderon*, 127 F.3d 1314, 1329 (11th Cir. 1997) ("It is often possible . . . to divide a single conspiracy into sub-agreements. This does not, however, mean that more than one conspiracy exists.") (ellipsis omitted). "Where the memberships of two criminal endeavors overlap, a single conspiracy may be found." *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987). "The members of a conspiracy which functions through a division of labor need not have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy." *Id.*

This issue often arises in large conspiracies where, although certain conspirators had little or no interactions with each other, they were nevertheless part of the same conspiracy because they worked with a central coconspirator. For example, in *United States v. Thomas*, 12 F.3d 1350 (5th Cir. 1994), the defendants were charged for their roles in "an extensive conspiracy to distribute cocaine, amphetamine, methamphetamine, and marijuana in central Texas." *Thomas*, 12 F.3d at 1355-56. The central figure in the conspiracy, Hodgkiss, "employed many people . . . to store, transport, and distribute controlled substances," and he "obtained the drugs distributed by his retailers from various sources." *Id.* at 1356. Among the defendants convicted were one of Hodgkiss's suppliers (Gregg) and three of the downstream sellers who purchased narcotics from Hodgkiss (Thomas, Maxwell, and Sanchez). *Id.* at 1357-58. On appeal, the defendants argued that, "because they did not know the identity of other members of the Hodgkiss conspiracy, they could not be guilty of conspiring with them." *Id.* at 1357. The Fifth Circuit disagreed, holding that the defendants "were part of a single conspiracy: Gregg as a supplier, Hodgkiss as a wholesaler, and Thomas, Maxwell, and Sanchez as retailers." *Id.* at 1358. As the Fifth Circuit held, "a jury may find a defendant guilty of conspiring with unknown persons where a sufficient overlap of personnel occurs—*i.e.*, if a pivotal figure, such as Hodgkiss, directs and organizes the

illegal activity, and has extensive dealings with each of the parties." *Id.* at 1357 (quotation marks and brackets omitted). Put differently, "parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy, even in the absence of contact with other conspirators." *Id.* (brackets and quotation marks omitted).

The Second Circuit came to a similar conclusion in *United States v. Khalupsky*, 5 F.4th 279 (2d Cir. 2021). In that case, two brothers obtained non-public information from Ukrainian hackers who hacked into newswires. *Khalupsky*, 5 F.4th at 286. The brothers then sold the information to two different traders who were unaware of each other—indeed, one of the brothers later testified that he purposely kept the traders apart because he "wanted to see who was better at trading." *Id.* at 286-88. The traders were convicted, and, on appeal, one trader argued that the government failed to prove the existence of a single conspiracy. *Id.* at 288. Among other things, the trader argued that, at most, the government proved that he was aware of "upstream" coconspirators, such as the Ukrainian hackers, but not that he was aware of any similarly situated conspirators trading on the hacked information. *Id.* at 288-89. The Second Circuit rejected the trader's claims, holding that the law concerning single or multiple conspiracies "does not require that level of specific awareness." *Id.* at 289. Rather, the trader's awareness that he was agreeing to be part of a collective venture with a large organization supported his membership in the same conspiracy as the brothers and the other trader. *Id.*

Courts have focused on these same facts—the presence of central figures within conspiracies and interdependence among conspirators—in numerous other cases, including cases involving staged collisions. *See Perez*, 489 F.2d at 57-64 & n.19 (in similar staged collision case involving "hitters," single conspiracy existed even when brothers who originally devised scheme split up and mostly staged their own collisions in different parts of Louisiana); *United States v.*

34

*Sosa-Baladron*, 800 F. App'x 313, 319-21 (6th Cir. 2020) (in similar staged collision scheme, single conspiracy existed despite participation by three different massage therapy clinics); *id.* at 321 ("All three clinics used the same scheme of recruiting 'patients,' staging car accidents, and submitting false claims for physical therapy services they never rendered. . . . Even if [the defendants] did not directly conduct the operation at [one of the clinics], the evidence overwhelmingly demonstrated a single conspiracy involving [all three clinics] and that the defendants participated in that conspiracy.").[18]

Application of this authority here is straightforward. The defendants pursued the common goal of personal gain through fraudulent lawsuits and insurance claims. *See Shah*, 95 F.4th at 361. Further, using the Fifth Circuit's terminology, the slammers (particularly Garrison, who brought staged collisions to The King Firm, Motta Law, and multiple unindicted coconspirators) were the "key men" who were involved in and directed illegal activities. "[V]arious combinations of other participants," *i.e.*, the passengers and attorneys, "exerted individual efforts toward [the] common goal." *See id.* The slammers' activities in one aspect of the scheme were necessary and advantageous to the scheme's other aspects. If the slammers were sloppy during

---

[18] *See also, e.g.*, *United States v. Gallardo-Trapero*, 185 F.3d 307, 314-15 (5th Cir. 1999) (single conspiracy existed where different marijuana suppliers used the same couriers to transport marijuana to different locations in the Midwest); *id.* at 315 ("There was a common goal of transporting marijuana to certain Midwestern cities and the scheme hinged upon the participants' supplying the couriers with the drugs and then contacting the couriers along their route to direct them to drop off their cargo in Detroit, Chicago, Indianapolis, or Michigan City."); *United States v. Morris*, 46 F.3d 410, 415-16 (5th Cir. 1995) (rejecting "horizontal" analysis that focused only on one layer of conspiracy and stating that, "although the sellers and the purchasers [of cocaine] may not have had a direct relationship with each other, each was necessary for the continued success of the venture"); *id.* at 416 ("[W]e believe that a separate conspiracy was not created because from time to time Costa used other sellers or purchasers to keep the scheme alive."); *United States v. Leach*, 613 F.2d 1295, 1298-1303 (5th Cir. 1980) (in case involving insurance fraud scheme, fact that intentional burning of houses involved "differences in time, place, participants, and victims" did not establish multiple conspiracies because each arson involved similar scheme and two of the same conspirators); *cf. United States v. Abdelaziz*, 68 F.4th 1, 42-54 (1st Cir. 2023) (in "Varsity Blues" case, multiple conspiracies existed where college admissions counselor brokered deals for parents "on an individual basis" and "the competitive nature of college admissions would, if anything, cut against a finding of interdependence [among coconspirators]").

their staged collisions, it could have potentially disastrous consequences for others involved in the scheme. This exact scenario played out with the November 2018 expert report that described red flags with certain of Garrison's and Harris's staged collisions. As described above, every attorney in the Second Superseding Indictment was forced to deal with the red flag report, sometimes in multiple cases, and the attorneys, including Motta and attorneys at The King Firm, strategized with each other about how to exclude the expert's testimony. At the time, the attorneys clearly saw themselves as participating in a team effort against the insurance defense firms, judges, and anyone else who justifiably raised concerns about their cases. Their attempts now to rewrite their shared history should be rejected.

If Garrison had been a wholesale supplier of cocaine, and Giles and Motta had been dealers who purchased their supplies from him, there would be no question that they were part of a single conspiracy. *See Thomas*, 12 F.3d 1357; *Morris*, 46 F.3d at 415-16. Swap out "cocaine" for "passengers in staged collisions" and the result is the same. *See Perez*, 489 F.2d at 57-64 & n.19; *Khalupsky*, 5 F.4th at 288-89; *Sosa-Baladron*, 800 F. App'x at 319-21. The defendants conspired with the same key-men, and their actions were interdependent of each other. Accordingly, the Second Superseding Indictment properly charges them as coconspirators in a single conspiracy.

## II.  The charges against the defendants were properly joined under Federal Rule of Criminal Procedure 8.

Related to their claims of multiple conspiracies, the defendants claim that their cases were improperly joined under Federal Rule of Criminal Procedure 8. *See* Rec. Doc. 216-1, pp. 2-6; Rec. Doc. 271-1, pp. 2-3. The defendants' misjoinder arguments fail for similar reasons.

Rule 8(a) permits joinder of offenses when the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of

a common scheme or plan." Fed. R. Crim. P. 8(a). Rule 8(b) permits joinder of defendants when "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "Joinder of charges is the rule rather than the exception and Rule 8 is construed liberally in favor of initial joinder." *United States v. Bullock*, 71 F.3d 171, 174 (5th Cir. 1995). "[T]he transaction requirement in Rule 8 is flexible," and "such a transaction may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *United States v. Butler*, 429 F.3d 140, 146-47 (5th Cir. 2005). "In determining whether joinder is proper, the court looks only to the allegations in the indictment." *United States v. Osuagwu*, No. 3:16-CR-343-K (01), 2018 WL 1014176, at *2 (N.D. Tex. Feb. 22, 2018). "When the facts underlying each offense are closely connected so that evidence of the same facts is necessary to establish each offense, joinder is most likely proper." *Id.* "When there is no substantial identity of facts between the two offenses, then joinder is improper." *Id.* "A charge of conspiracy initially legitimizes joinder of all defendants." *Lindell*, 881 F.2d at 1318.

Here, the Second Superseding Indictment charges the defendants with committing the same series of acts or transactions constituting offenses that are of similar character and part of a common scheme or plan. Specifically, the Second Superseding Indictment charges the defendants with conspiring with many of the same individuals—including Garrison, who brought staged collisions to both Motta Law and The King Firm—as part of a scheme to defraud insurance and trucking companies through fraudulent lawsuits and insurance claims. *See* Rec. Doc. 256. The non-attorney defendants were likewise members of the conspiracy: Stalbert staged collisions with Labeaud and Garrison and made false statements to the FBI related to her participation in those collisions, Morgan staged a collision with Garrison, and Lawrence

provided stolen personal information to Harris for the purpose of staging a collision and filing a false insurance claim. The charged offenses were thus either committed by the same conspirators, occurred close in time to each other, or were otherwise logically related such that joinder of both offenses and defendants was proper. *See Butler*, 429 F.3d at 146-47; *cf. United States v. Huffine*, No. Crim. A 02-93, 2002 WL 1423291, at *2 (E.D. La. June 26, 2002) (Barbier, J.) (finding fraud and tax counts improperly joined where indictment failed to allege that income derived from fraud was the basis of the tax charges). The defendants have not demonstrated misjoinder, and their claims under Rule 8 should be denied.

### III.    The defendants have not demonstrated that theirs are the rare cases that should be severed under Federal Rule of Criminal Procedure 14.

The defendants alternatively argue that, assuming their cases were properly joined, they are entitled to severance under Federal Rule of Criminal Procedure 14 because continued joinder will lead to prejudicial spillover and jury confusion. *See* Rec. Doc. 216-1, pp. 7-13; Rec. Doc. 271-1, pp. 3-5. The defendants rely primarily on the Fifth Circuit's decision in *McRae*. As explained below, *McRae* is distinguishable because, for among other reasons, the defendants in that case were not charged with a conspiracy. Because the defendants cannot satisfy the heavy burden under Rule 14, their severance claims should be denied.

#### A.    Law concerning severance.

Even if initial joinder is proper, "Federal Rule of Criminal Procedure 14(a) provides that a court 'may . . . sever the defendants' trials' if the joinder 'appears to prejudice a defendant or the government.'" *United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017) (quoting Fed. R. Crim. P. 14(a)). The Fifth Circuit's case law "does not reflect a liberal attitude toward severance[.]" *McRae*, 702 F.3d at 822. "It is the rule, [] not the exception, that persons indicted together should be tried together, especially in conspiracy cases." *Id.* at 821. "Severance is

proper only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 822 (quotation marks omitted).

"When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* at 823. "Merely alleging a 'spillover effect'— whereby the jury imputes the defendant's guilt based on evidence presented against his co-defendants—is an insufficient predicate for a motion to sever." *Chapman*, 851 F.3d at 379 (quotation marks omitted); *see also McRae*, 702 F.3d at 827 ("[T]he mere presence of a spillover effect does not ordinarily warrant severance."). "'[A] defendant is not entitled to severance just because it would increase his chance of acquittal or because evidence is introduced that is admissible against certain defendants.'" *United States v. Flowers*, 304 F.R.D. 501, 505 (E.D. La. 2015) (Fallon, J.) (quoting *Burton v. United States*, 237 F.3d 490, 495 (5th Cir. 2000)).

Further, judicial economy often disfavors claims of severance because separate trials are often duplicative and unnecessarily wasteful. "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). "Joint trials play a vital role in the criminal justice system." *Id.* (quotation marks omitted). "They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* (quotation marks omitted). Joint trials also "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *United States v. Lane*, 474 U.S. 438, 449 (1986). The interest in judicial economy favors joint trials where the same evidence would be presented at separate trials. *See United States v. Daniels*, 281 F.3d 168, 178 (5th Cir. 2002); *United States v. Reed*, No.

15-100, 2016 WL 54903, at *8 (E.D. La. Jan. 5, 2016) (Fallon, J.) (recognizing "the public interest in joint trials" and finding severance inappropriate where it would "require the government to introduce the same evidence in two trials, resulting in inefficiency and unnecessary expenditure of judicial resources"), *aff'd*, 908 F.3d 102 (5th Cir. 2018).

Reflecting the preference for joint trials, the Fifth Circuit has affirmed the denial of severance in cases involving long trials and numerous defendants, counts, and witnesses. *See United States v. Posada-Rios*, 158 F.3d 832, 863-65 (5th Cir. 1998) (6-month trial and 12 defendants); *United States v. Ellender*, 947 F.2d 748, 753-55 (5th Cir. 1991) (3-month trial, 23 defendants, and 73 witnesses); *United States v. Phillips*, 664 F.2d 971, 1016-17 (5th Cir. 1981) (6-month trial; 100-page indictment; and 12 defendants), *superseded by rule on other grounds as recognized in United States v. Huntress*, 956 F.2d 1309, 1314-17 (5th Cir. 1992); *United States v. Martino*, 648 F.2d 367, 385-86 (5th Cir. 1981) (3-month trial, 35-count indictment, 20 defendants, and more than 200 witnesses); *United States v. Zicree*, 605 F.2d 1381, 1389 (5th Cir. 1979) (11 defendants and 189 counts).

When the Fifth Circuit has vacated convictions because of spillover prejudice and jury confusion, it has been in cases with unique and stark facts absent in most multidefendant trials. *See McRae*, 702 F.3d at 826-28 ("severely emotional nature" of evidence regarding burning of victim's body, coupled with government's suggestion that defendant was part of a "grand scheme" in NOPD's "Fourth District Fraternity," caused potential confusion for the jury and prejudice against the defendant that limiting instructions could not mitigate); *United States v. Tarango*, 396 F.3d 666, 674-75 (5th Cir. 2005) (codefendant absconded after jury selection, defendant was tried next to "empty chair," and "great deal of evidence" would have been inadmissible against defendant in separate trial); *United States v. Cortinas*, 142 F.3d 242, 248-49

(5th Cir. 1998) (defendants' involvement in conspiracy ended before codefendants' "violent, criminal activities" with Bandidos motorcycle gang began); *United States v. Fisher*, 106 F.3d 622, 631-32 (5th Cir. 1997) (defendant's and codefendant's defenses were "intertwined," admission of codefendant's contempt conviction was "egregiously wrong," and admission of conviction resulted in "destruction of [codefendant's] credibility"), *abrogated in part on other grounds by Ohler v. United States*, 529 U.S. 753 (2000); *United States v. Erwin*, 793 F.2d 656, 665-66 (5th Cir. 1986) (defendant was charged with substantive count of perjury that was "only peripherally related" to codefendants' conspiracy involving drug dealing, counterfeiting, kidnappings, beatings, and killing); *United States v. Salomon*, 609 F.2d 1172, 1175-76 (5th Cir. 1980) (codefendant's testimony implicated defendant in prior criminal offenses that were neither intrinsic to a charged conspiracy nor admitted pursuant to Federal Rule of Evidence 404(b)).

> ### B.     The defendants have not demonstrated that they are entitled to severance of the fraud counts.

As set forth above, there is substantial overlap between the cases against Alfortish, Motta, and Motta Law and the cases against Giles and The King Firm. Alfortish, Motta, and Motta Law paid Garrison to bring them staged collisions. So did Giles, The King Firm, Attorney D, Attorney E, and Attorney F. Alfortish also paid thousands of dollars through his entities to Slammer G at the same time Slammer G was receiving similar payments from Giles and The King Firm. Giles and The King Firm litigated Parker's case all the way to settlement, despite numerous red flags, including Parker's ties to Garrison and Harris. While they were litigating Parker's and other cases, Giles and The King Firm talked among themselves and with other attorneys about how to address allegations from the insurance defense firms. The King Firm's communications with Motta became more regular as the allegations of fraud gained more traction in their clients' cases. The King Firm and Motta also shared a common link to Attorney

C, who was Giles's close friend and both The King Firm's and Motta's co-counsel on multiple staged collision cases.

Disentangling the cases against Giles and The King Firm from the cases against Alfortish, Motta, and Motta Law would be a difficult and inefficient task that would be at odds with the evidence establishing the defendants' guilt. One of the largest settlements in this case, Parker's in the January 2016 Dodge Charger collision, resulted from a collision that was staged by Garrison and a fraudulent lawsuit that was litigated by Giles and The King Firm. Another lawsuit based on Morgan's April 2017 Lincoln Town Car collision was also staged by Garrison and went first to Giles and The King Firm before going to Motta and Motta Law. As a result of this overlap, at a separate trial for Giles and The King Firm, the government would spend substantial time establishing that Garrison was a prolific slammer. Further, because Parker was essentially a member of Harris's family, Harris's mother and brother were in Parker's collision, and all the passengers in Morgan's collision were related to Harris, the government would spend substantial time establishing that Harris was a prolific slammer who worked with Garrison.

The defendants do not engage with any of the evidence showing they collaborated, and they do not point to any specific prejudice they will suffer from continued joinder of the fraud counts aside from general claims of spillover prejudice and jury confusion. *See* Rec. Doc. 216-1, p. 10. For these reasons, granting severance would be inappropriate, both because it would be contrary to the public's interest in joint trials, and because it would not make anything any easier or more efficient. *See Reed*, 2016 WL 54903, at *8 (finding severance inappropriate where it would "require the government to introduce the same evidence in two trials, resulting in

inefficiency and unnecessary expenditure of judicial resources").[19] The defendants' motions for severance should be denied.

### C. The defendants have not demonstrated that they are entitled to severance of the murder counts.

Much of the same is true for the defendants' motions to sever the murder counts. Garrison's murder was part of the conspiracy charged in Count 1, even if it was not committed by or foreseeable to every member of the conspiracy. The murder followed months of misconduct by Alfortish, Motta, and Motta Law to prevent Garrison from cooperating with the federal investigation into the staged collision scheme. One of the participants in the murder, Parker, was a client of both The King Firm's and Motta Law's, and the victim, Garrison, was paid by both The King Firm and Motta Law to bring them staged collisions. Because Giles and The King Firm secured an $800,000 settlement for Parker, it will be necessary in any trial against Giles and The King Firm to establish Parker's relationship with Garrison, including that Parker murdered Garrison to prevent him from cooperating, as well as the fact that Parker staged other collisions that resulted in at least one lawsuit that was litigated by Motta. Unless Giles and The King Firm stipulate that the January 2016 Charger collision was staged by Garrison and that Garrison directed passengers in the collision to The King Firm, the fact that Parker murdered Garrison to obstruct investigation into the January 2016 collision is important probative evidence that a jury determining Giles's and The King Firm's guilt should hear.

---

[19] Even assuming the defendants' articulated claims of prejudice had merit, the Court can mitigate any prejudice with instructions to the jury. For example, the Court can instruct the jury about its obligation to consider the evidence against each defendant separately and individually. *See* Fifth Circuit Pattern Jury Instructions (Criminal) § 1.25 (2024). The jury will presumably follow these instructions. *See United States v. Reed*, 908 F.3d 102, 115 n.42 (5th Cir. 2018) ("We generally presume that juries follow trial court instructions."); *see also Zafiro*, 506 U.S. at 540-41 (approving district court's instructions to jury "that it must give separate consideration to each individual defendant and to each separate charge against him" and "that opening and closing arguments are not evidence") (quotation marks omitted).

Similarly, because Garrison, Alfortish, Parker, and Harris all participated in the staged collision scheme and all had significant ties to Motta, it will be necessary in any trial against Motta and Motta Law to establish that Motta's fiancée (Alfortish) schemed with one of her clients (Harris) to pay another one of her clients (Parker) to murder a third client (Garrison) whom they all knew was cooperating against them. Evidence that Alfortish, Parker, and Harris obstructed justice by murdering Garrison is proof that they were part of the staged collision scheme and, by extension, that Motta was as well. Again, severance would be inappropriate because it would be counter to the public's interest in joint trials, and because it would create duplicative trials with redundant evidence and testimony. *See Reed*, 2016 WL 54903, at *8.

Moreover, the government intends to structure its case in such a way that it will be clear to the jury who did what with respect to the murder and in such a way that any necessary limiting instructions will be more impactful. This includes restricting evidence related to the murder to certain days of the trial. *See United States v. Juarez*, 866 F.3d 622, 629-30 (5th Cir. 2017) (in context of admission of evidence under Federal Rule of Evidence 404(b), approving district court's "preventative measure" of allowing government only one day to present potentially prejudicial evidence). Further, as to Giles and The King Firm, no evidence suggests they were part of the scheme to murder Garrison, and the government does not intend to argue that they were. Indeed, the government would stipulate that Giles and The King Firm were not involved with the murder and would assist in crafting a jury instruction to that effect.

To support their severance claims, the defendants rely primarily on the Fifth Circuit's decision in *McRae*. *See* Rec. Doc. 216-1, pp. 9-12; Rec. Doc. 271-1, pp. 4-5.[20] However, *McRae*

---

[20] Giles and The King Firm also cite *Erwin*, 793 F.2d at 666. The defendant in that case was charged with substantive count of perjury that was "only peripherally related" to codefendants' conspiracy involving drug dealing, counterfeiting, kidnappings, beatings, and killing. *Id.* at 665-66.

is distinguishable, and it does not support the defendants' motions. *McRae* dealt with the joint trial of former New Orleans police officers who, in the aftermath of Hurricane Katrina, shot and fatally wounded Henry Glover, burned Glover's body, and then attempted to cover up their actions. *See McRae*, 702 F.3d at 811-19. Warren, the officer who shot Glover, was not charged with the burning or the cover-up. *Id.* at 824. Trying Warren for the conduct with which he was charged—the shooting of Glover—would likely have taken three days. *Id.* at 825. Instead, the joint trial lasted one month and included "evidence, testimony, and photographs presented in connection with the government's case against [another defendant] for the burning of Glover's body, all of which had an effect of associating Warren with the burning of Glover's body and subsequent cover-up." *Id.* at 826-27. That evidence suggested that Warren was part of a "grand scheme" with his fellow officers, whom the government alleged were part of a "Fourth District Fraternity" within the New Orleans Police Department. *Id.* at 826. The trial also featured "photographs of Glover's remains after they had been burned and the emotional testimony of Glover's family," which the Fifth Circuit described as "[e]specially troubling." *Id.* at 827.

A significant factor in the *McRae* holding was that Warren was not charged in a conspiracy with the other officers. *See id.* at 824 ("Of significance to our consideration of Warren's argument is that the grand jury charged no conspiracy among the defendants to cover up Warren's role in Glover's shooting."); *id.* at 826 ("[N]otwithstanding that no conspiracy was charged among the defendants, our review of the record strongly suggests that the government was attempting to try the cases against each defendant as a whole piece, in effect a conspiracy, involving each of the defendants in a grand scheme in the Fourth District to engage in criminal conduct to protect Warren for his role in Glover's shooting.") (emphasis in original). Courts have

---

Unlike the defendant in *Erwin*, Giles and The King Firm are at the center of this case, and their conduct was more than "peripherally related" to the crimes alleged in the Second Superseding Indictment.

distinguished *McRae* in cases where defendants were charged with conspiracies. *See United States v. Ledezma-Cepeda*, 894 F.3d 686, 691 & n.9 (5th Cir. 2018) (stating that *McRae* and other cases were "easily distinguishable" because "the prevailing party was not a member of the conspiracy or had committed crimes qualitatively less severe than those of his co-defendants"); *United States v. Haynes*, No. 4:15-CR-73-7, 2016 WL 7217236, at *5 (N.D. Miss. Nov. 29, 2016) ("[T]his case, unlike *McRae*, is a conspiracy prosecution and thus more strongly implicates the rule that those defendants indicted together should be tried together."); *United States v. Hankton*, Crim. A. No. 12-01, 2016 WL 4487744, at *15 (E.D. La. Aug. 25, 2016) (Feldman, J.) ("Unlike *McRae*, this was a conspiracy case."), *aff'd*, 51 F.4th 578, 607-10.

The problem in *McRae* was not merely the admission of inflammatory and prejudicial evidence, and it was not merely because some defendants were charged with murder while others were not. Instead, it was a combination of the admission of the evidence and the government's confusing presentation, which may have resulted in the jury's convicting the defendants for a conspiracy they were not charged with committing. *See McRae*, 702 F.3d at 826. That problem is not present here, because the defendants are charged with conspiracy, because the evidence clearly implicates certain defendants and not others, and because the government plans to be more conscientious with its presentation of this case. The defendants have not carried their burden under Rule 14, and their severance claims should be denied.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny the defendants' motions for severance.

Respectfully submitted,

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY


/s/ *Matthew R. Payne*
MATTHEW R. PAYNE
BRIAN M. KLEBBA
MARY KATHERINE KAUFMAN
Assistant United States Attorneys
J. RYAN McLAREN
Trial Attorney


## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Matthew R. Payne*
MATTHEW R. PAYNE
Assistant United States Attorney