UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO.: 2:24-CR-00105 |
| | CHIEF JUDGE WENDY VITTER |
| VERSUS | SECTION: D |
| | MAGISTRATE JUDGE JANIS VAN MEERVELD |
| VANESSA MOTTA, ET AL. | DIVISION: 1 |

**VANESSA MOTTA AND MOTTA LAW, LLC'S**
**REPLY IN SUPPORT OF MOTION FOR NEW TRIAL**

Because reply memoranda are limited to ten pages, *c.f.* Local Rule 7.7, Ms. Motta addresses only two of the five issues raised in her motion herein, namely, Motta Issues A and B. First, the government cannot wield the threat of introducing allegations connecting Ms. Motta to a murder for which she was never charged – and which this Court had already found too prejudicial to support the non-murder counts – to control the exercise of Ms. Motta's core constitutional rights. Second, it was error that the jury was instructed to evaluate, and Ms. Motta was assigned the burden to prove, an affirmative defense for which the evidentiary record was silent, particularly when the government's conduct impaired Ms. Motta's ability to present any evidence. Ms. Motta relies on her motion in support of the three motion-for-new-trial issues not addressed in reply. In the interests of justice, this Court should grant Ms. Motta's motion and order a new trial.

## I. The government's threat to introduce Ms. Motta's alleged involvement in a crime not charged to support its case contradicted its pretrial representations, circumvented this Court's severance order, and obstructed Ms. Motta's ability to exercise her constitutional rights. (Motta Issue A).

Contrary to the government's understanding, Ms. Motta does not seek a new trial because the jury heard evidence that Mr. Garrison had been murdered or that Mr. Harris pleaded guilty to a crime related to Mr. Garrison's murder. R. Doc. 848 at 40. Ms. Motta seeks a new trial because,

despite the government's repeated pretrial assurances that it would honor this Court's severance order,[1] R. Doc. 634 at 14-15, the government used the threat of introducing evidence concerning Ms. Motta's purported involvement in a murder for which she was not charged in order to: (1) bolster its fraud, obstruction, and witness-tampering case against her; and (2) coerce her from testifying, presenting witnesses, and otherwise exercising core constitutional rights. The result: Ms. Motta was faced with the Hobson's choice between presenting her defense and forfeiting the protections this Court had already deemed essential to a fair trial, R. Doc. 357 at 53-54. Because the government substantially interfered with Ms. Motta's constitutional rights to present a defense by leveraging the threat of uniquely prejudicial murder allegations to control whether she testified, presented witnesses, and impeached the government's key witness, a new trial is required.

**A. The government does not dispute the threats it made at trial.**

Moments after this Court ruled that Mr. Ciolino's proffered testimony, Exhibit B (Dane Ciolino Proffer), was admissible, R. Doc. 778 at 2, the government threatened undersigned counsel that if he were to call Mr. Ciolino to testify, the government would ask Mr. Ciolino on cross examination "whether his advice to Ms. Motta would have changed had Mr. Ciolino known that Ms. Motta was under investigation by the FBI for Cornelius Garrison's murder." Exhibit A at ¶ 5 (Affidavit of Sean Toomey). Despite extensive pretrial litigation concerning Mr. Ciolino's testimony, the government never argued that his testimony would permit such questioning, revealing that intention only after the Court ruled that he could testify.[2]

[1] This Court's severance order rested on a straightforward premise: allowing the government to use murder-related evidence to buttress its case on the fraud, obstruction, and witness-tampering counts against Ms. Motta would create "specific and compelling prejudice." R. Doc. 357 at 53-54. There, this Court specifically recognized the danger that would result if allegations concerning Ms. Motta's purported, and uncharged, involvement in Mr. Garrison's murder were used to support the counts against Ms. Motta (none of which concern murder). *Id.*

[2] The government's willingness to spring this on Ms. Motta during the third week of trial after months of litigating the issue is curious not only because it was never raised before, but also because the government represented to this Court that its "practice throughout this case … has been to flag potential issues for the parties and the Court to sort out *before trial*." R. Doc. 830 at 5 (emphasis added). Ms. Motta was not accorded this protection.

The threats continued throughout trial. The government informed undersigned counsel that if Ms. Motta testified, it would inquire on cross-examination into her purported involvement in Mr. Garrison's murder. Exhibit A at ¶ 9. When undersigned counsel attempted to use a recording to challenge Mr. Harris's credibility, R. Doc. 848-3 at 60, the government advised that it would respond on redirect by eliciting testimony concerning Ms. Motta's alleged involvement in the murder. *See* Exhibit A at ¶¶ 18-20; Exhibits C, F, J (excerpts of August 16, 2023 Recording); Exhibit K (Transcript of Excerpts of August 16, 2023 Recording (Exhibits C-J)). The government further threatened that if questioning any witness "opened the door to a broader discussion of the murder," it would seek to recall Mr. Harris, the government's star witness against Ms. Motta. *See* Exhibit A at ¶ 25; R. Doc. 848-2 at 178. Notably, the government does not dispute that this conduct occurred. The dispute, then, is whether the Constitution permits such conduct. It does not.

### B. The government unconstitutionally conditioned the protections of the severance order on Ms. Motta's surrender of her constitutional rights.

The government's threats imposed a constitutionally impermissible condition on the protections afforded by this Court's severance order: Ms. Motta could preserve the severance order's protections, or she could testify, present witnesses, and meaningfully challenge the government's evidence, but she could not do both. If she exercised those constitutional rights, the government would place before the jury allegations connecting her to a murder for which she was never charged and which this Court had already found too prejudicial to support the counts for which she was on trial. In practice, then, the government's position that "if left to its own devices, it would not discuss Garrison's murder in front of the jury during the March 2026 fraud trial," R. Doc. 634 at 14-15, meant that if Ms. Motta put on a meaningful defense, the government would place before the jury uniquely prejudicial and inflammatory evidence. The result was that the government conditioned the benefits of severance on Ms. Motta's surrender of core constitutional

rights, and the severance order had effect only if Ms. Motta remained silent and abandoned advocacy. Having found that the threatened evidence created "specific and compelling prejudice," this Court should not permit the government to accomplish through threats what it could not accomplish under the severance order.

The government's threats worked. As set forth in undersigned counsel's affidavit, because of the government's threats, Mr. Ciolino did not testify, Ms. Motta did not testify, and the jury never heard evidence bearing on Ms. Motta's intent – the central issue in this case – including evidence crucial to Ms. Motta's good-faith and advice-of-counsel defenses. Exhibit A at ¶¶ 8, 10. Undersigned counsel advised Ms. Motta that allegations connecting her to Mr. Garrison's murder presented an extraordinary risk that the jury would decide the case based on emotion, fear, or moral outrage rather than the evidence related to the charged offenses. Exhibit A at ¶ 7. That concern was not hypothetical, it was the basis for severance. R. Doc. 357 at 51-54. Ms. Motta's "decision" not to present evidence was not an ordinary, voluntary, strategic decision – it was the result of a Hobson's choice induced by the threat that the jury would hear allegations that Ms. Motta was involved in a highly-inflammatory crime.

That the jury ultimately was not exposed to the threatened questions and evidence does not mean that no prejudice resulted. The reason the jury never heard evidence tying Ms. Motta to Mr. Garrison's murder is that the government's threats caused Ms. Motta not to present evidence or testimony that would have triggered the government's threatened response. The constitutional injury, therefore, results from the effect of the government's threatened use of uniquely prejudicial evidence on Ms. Motta's free and unhampered exercise of her trial rights. In other words, the absence of the threatened evidence from the trial transcript does not demonstrate the absence of prejudice; it reflects the success of the government's threats in controlling the defense.

The Constitution does not permit the government to force a defendant to choose between preserving Court-ordered protections necessary to ensure a fair trial and presenting a meaningful defense. The Fifth Amendment "protects the defendant from improper governmental interference with his defense." *United States v. Bieganowski*, 313 F.3d 264, 291 (5th Cir. 2002). And "[s]ubstantial government interference with a defense witness' free and unhampered choice to testify violates [the] due process rights of the defendant." *United States v. Anderson*, 755 F.3d 782, 792 (5th Cir. 2014) (internal quotation marks omitted). Here, however, the government did exactly what the Fifth Circuit forbids: substantially interfere with Ms. Motta's exercise of her constitutional rights by forcing her to "choose" between exercising her rights and preserving the protections of the severance order. The government reneged on its pretrial agreement,[3] nullified the practical benefit of this Court's severance order, and transformed the specific prejudicial evidence that warranted severance into a strategic advantage. Its threats materially altered the structure of the defense itself and successfully barred the jury from hearing critical exculpatory evidence in violation of Ms. Motta's due process rights. *See Anderson*, 755 F.3d at 793 (holding a causal nexus between the alleged governmental action and the defendant's decision not to present witnesses or establish a defense is required to show substantial government interference). While the government characterizes its conduct as a courtesy and twists undersigned counsel's professionalism into a blessing of its conduct, R. Doc. 848 at 41, constitutional violations do not become benign because they are announced in advance. A warning that exercising constitutional

[3] *See United States v. Millet*, 559 F.2d 253, 256–57 (5th Cir. 1977) ("Unequivocably, the Government has the obligation to fully comply with any and all agreements and promises it makes with and to defendants and we would interpret any non-compliance as a serious breach of the Government's duty, as well as a possible violation of a defendant's constitutional due process rights."); *see also United States v. Jarman*, 2015 WL 4644307, at *2 (M.D. La. Aug. 4, 2015) (observing that dismissal of an indictment may be appropriate "when the government breaches an agreement with the defendant").

rights will trigger uniquely prejudicial consequences remains coercive regardless of how politely it is delivered. Against this backdrop, a new trial must be granted.

**C. The government's "rationale" cited in its opposition provides no legitimate basis for threatening to introduce allegations connecting Ms. Motta to a murder for which she was never charged.**

The government does not engage with any of Ms. Motta's cited caselaw. Instead, it attempts to justify its threats through the "opening the door" doctrine, arguing that it would have been entitled to proceed in that manner because the defense would have "opened the door." R. Doc. 848 at 40. That explanation fails. The "opening the door" doctrine exists to correct a misleading impression created by the opposing party. *See United States v. Age*, 136 F.4th 193, 222–23 (5th Cir. 2025) (explaining that "[s]tatements elicited by defense counsel 'open the door' if they convey an erroneous impression on the jury") (alteration in original omitted). It does not provide an unrestricted license to inject allegations of an uncharged murder in a fraud trial as substantive support of the government's case whenever a defendant signals that she can present favorable evidence regarding intent, good faith, or credibility. *See United States v. Warnock*, 2025 WL 1756855, at *4 n.2 (S.D. Miss. June 25, 2025) ("An 'open door' does not give an opponent unbridled license to introduce otherwise inadmissible evidence into the trial, nor does it justify receipt of rebuttal evidence merely because it is in the same category of excludable evidence as the evidence previously offered.") (quotation and alteration omitted).

Consider, for example, that the government never explains what misleading impression Mr. Ciolino's direct testimony would have created that could justify the government's proposed questioning (in other words, how Mr. Ciolino's testimony would "open the door" to questioning about whether his advice would change if he knew, hypothetically, that Ms. Motta was investigated for murder). Mr. Ciolino was expected to testify regarding legal advice he provided to Ms. Motta in response to defense attorneys' allegations that certain claims were fraudulent. Exhibit B at 1-2.

The government's proposed questioning, however, was not to correct a misleading impression or to challenge the facts upon which Mr. Ciolino relied, the scope of his advice, or whether Ms. Motta followed that advice. Instead, it was to place before the jury the very allegation the government wanted the jury to infer and that this Court found uniquely prejudicial: that Ms. Motta was involved in Mr. Garrison's murder. The evidentiary value of the question derived not from "correcting" Mr. Ciolino's testimony, but from the effect of the murder allegation embedded within it.

The government's post-trial conduct confirms that the extraordinary prejudicial force of Ms. Motta's alleged connection to Mr. Garrison's murder bore little, if any, relevance and relationship to the fraud charges actually before the jury. After securing its convictions, the government advised the Probation Office that "[t]he fraud counts for which Motta was convicted do not involve Garrison's murder" and expressly declined "to apply any murder-related cross-references." Exhibit A at ¶ 26. Having obtained the tactical benefit of the threat during trial, the government later disclaimed any substantive connection between the murder and the offenses of conviction. The government's subsequent post-trial productions regarding the circumstances of Mr. Garrison's murder – far more extensive that the limited pretrial disclosures consisting primarily of Mr. Harris's 302 statements – further underscore the extent to which the specter of this inflammatory evidence was deployed as tactical leverage. The government, then, sought to use the "opening the door" doctrine not as a corrective evidentiary principle, but as a weapon to accomplish indirectly what the severance order prohibited directly. It cites no authority (and Ms. Motta is aware of none) approving the use of "opening the door" doctrine in this manner. In sum, despite effectively admitting post-trial that the murder was not probative to the crimes of conviction, the government exploited the fear of uniquely prejudicial evidence at trial to dictate Ms. Motta's exercise of constitutional rights; therefore, a new trial must be granted.

## II. The jury was instructed to impose a burden on Ms. Motta unsupported by any evidence. (Motta Issue B).

All parties agree that an affirmative-defense instruction is proper only if sufficient evidence would permit a reasonable jury to find in the defendant's favor. R. Doc. 848 at 48 (citation omitted). Because of the government's threats, Ms. Motta was unable to put on a defense, the § 1512(e) instruction should not have been given, and the jury should never have been told that she bore any burden of proof on Count 7. The resulting instructional error warrants a new trial.

First, Ms. Motta's position, shown through undersigned counsel's cross-examination of Special Agent Smith, was that she never offered to move Mr. Garrison to the Bahamas as Count 7 alleges; rather, Sean Alfortish did the charged conduct without Ms. Motta's knowledge and on his own accord. R. Doc. 848-2 at 247-253.[4] The § 1512(e) defense, however, requires that the defendant show that she did, in fact, engage in the charged conduct. R. Doc. 725 at 21; *United States v. Penn*, 969 F.3d 450, 455 (5th Cir. 2020) ("The defendant must produce evidence to sustain a finding on *each* element of the defense before it may be presented to the jury.") (emphasis added) (internal quotation marks omitted). Assuming § 1512(e) can theoretically coexist with a denial of the charged conduct, § 1512(e) does not ask whether there was some generalized evidence that a defendant valued truthfulness, like the "evidence" the government cites in opposition (none of which concern the subject of Count 7). *See* R. Doc. 848 at 48-41. Further, the evidence upon which the government relies, cross examination, is insufficient to supply an evidentiary foundation for the defense. *See, e.g., United States v. Stone*, 960 F.2d 426, 433 n.2 (5th Cir. 1992) (holding that a defensive theory not affirmatively raised by the evidence could not be placed before the jury

[4] The government's closing argument that it was Mr. Alfortish – not Mr. Alfortish *and* Ms. Motta – who made the offer to move Mr. Garrison to the Bahamas underscores Ms. Motta's position that she had no part in the charged conduct. *See, e.g.*, Exhibit O at 6 ("You heard testimony that Mr. Garrison reported to the FBI that he spoke with Mr. Alfortish and Mr. Alfortish offered to pay him and fly him to the Bahamas."), 10 ("Then you heard about how Sean Alfortish told Mr. Garrison, "Go to the Bahamas. We just got back from the Bahamas.").

when "defense counsel's suggestions during opening statements and argument and in his questions of Rogers on cross-examination are the only sources of that theory").

Second, it was fundamentally unfair to instruct the jury that Ms. Motta had to establish an affirmative defense when the government prevented her from presenting the evidence necessary to do so. *See* Motta Issue A. Ms. Motta did not present any defense or evidence. Therefore, there was evidentiary foundation for the § 1512(e) defense theory. This Court correctly did not include an advice-of-counsel instruction despite the suggestion that Mr. Ciolino had assisted Ms. Motta in connection with briefing in response to allegations of fraud, R. Doc. 848-7 at 127-130 (Misha Logan-Johnson Testimony). *C.f. United States v. Branch*, 91 F.3d 699, 712 (5th Cir. 1996) (holding that "the 'merest scintilla of evidence' in the defendant's favor does not warrant a jury instruction regarding an affirmative defense for which the defendant bears the initial burden of production"). The same reasoning should have applied in greater force to § 1512(e), where there was no evidence whatsoever in support of the elements of the defense.

Third, the government attacks a burden-shifting argument Ms. Motta does not make. Ms. Motta does not contend that the wording of § 1512(e) improperly allocates a burden of proof on a defendant when the defense is raised and there exists an evidentiary foundation for the defense. Rather, Ms. Motta contends that the jury should never have been instructed on § 1512(e) in the first place because the evidentiary predicate for that instruction was absent due to the government's threats. Once the unsupported instruction was given, the jury was expressly told that Ms. Motta bore the burden of proving a defense for which no supporting evidence was in the record. The government's argument that the jury understood that only the government bore the burden of proof (re: Motta's guilt beyond a reasonable doubt) contradicts the fact that the specific instruction

dictates that Motta had a burden (which was not supposed to be charged). For that reason, *United States v. Wolffs*, 594 F.2d 77 (5th Cir. 1979), controls.

Finally, the affirmative-defense instruction was not "invited error." R. Doc. 848 at 50. While Ms. Motta proposed the jury instruction, error is not "invited" when the defendant "inform[s] the court that he no longer seeks the challenged instruction." *United States v. James*, 2026 WL 1552729, at *8 (5th Cir. June 2, 2026) (quotation omitted). Ms. Motta timely objected during the jury charge, once at an unrecorded sidebar between Ms. Motta's counsel and the Court, Exhibit A at ¶¶ 28, 31, and once again at a partially-recorded sidebar in front of all counsel. *See* Exhibit O at 17 (partially-recorded sidebar); *see also* Fed. R. Crim. Proc. 30 ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection *before the jury retires to deliberate*.") (emphasis added). Therefore, the government's invited-error theory fails. Because the instruction imposed a burden on Ms. Motta to prove something for which there was no evidence, a new trial must be granted.

**III. Conclusion:**

For these reasons, and for the reasons set forth in Ms. Motta's motion for new trial, errors infected the trial and substantially affected Ms. Motta's rights. For Ms. Motta to be adjudged consistent with the Constitution, a new trial is proper.[5]

Respectfully submitted,

[5] Although the government has not raised any such concerns, Ms. Motta and her counsel (who have proceeded without pay since the start of trial) are acutely aware of the financial concerns that arise in connection with the Court presiding over a new trial. Financial inconvenience, however, cannot outweigh the constitutional rights of an accused. *See, e.g.*, *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963) ("More significantly, however, it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them."); *Morris v. Slappy*, 461 U.S. 1, 14 (1983) ("Of course, inconvenience and embarrassment to witnesses cannot justify failing to enforce constitutional rights of an accused: when prejudicial error is made that clearly impairs a defendant's constitutional rights, the burden of a new trial must be borne by the prosecution, the courts, and the witnesses; the Constitution permits nothing less."). What's more, a new trial limited to Ms. Motta should not exceed a week and a half or two weeks.

*/s/ Sean M. Toomey*
Sean M. Toomey (La. Bar #36055)
Ellen D. George (La. Bar #39891)
Zachary D. Berryman (La. Bar # 40278)
Dominic M. Berthelot (La. Bar No. 41159)
Hancock Whitney Center
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
Email: stoomey@liskow.com
egeorge@liskow.com
zberryman@liskow.com
dberthelot@liskow.com

***Attorneys for Defendants Vanessa Motta and Motta Law, LLC***

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 19th day of June, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system.

*/s/ Sean M. Toomey*